# EXHIBIT 3

**First Witness Statement of David J. Standish**

**On behalf of Applicants**
**David John Standish**
**First**
**Exhibit: DJS-1**
**25 June 2026**

**Case Number: TBC**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF**

**ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF NOBLE TITLE LIMITED (IN PROVISIONAL LIQUIDATION)**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

**AND IN THE MATTER OF A REQUEST FROM THE EASTERN CARIBBEAN SUPREME COURT IN THE BRITISH VIRGIN ISLANDS DATED 17 JUNE 2026**

**BETWEEN:**

**(1) JAMES DRURY**
**(2) PAUL PRETLOVE**
**(3) DAVID JOHN STANDISH**
**(in their capacities as Joint Provisional Liquidators of Noble Title Limited (in BVI provisional liquidation))**

**Applicants**

**-and-**

**NOBLE TITLE LIMITED**
**(in BVI provisional liquidation)**

**Respondent**

---

**FIRST WITNESS STATEMENT OF DAVID JOHN STANDISH**

---

I, **David John Standish**, Managing Director of Interpath Ltd of 10 Fleet Place, London EC4M 7RB, United Kingdom ("**Interpath**"), as a joint provisional liquidator of Noble Title Limited (in provisional liquidation) (the "**Company**"), **WILL SAY AS FOLLOWS**:

## I. INTRODUCTION

1. I am a Managing Director and a licensed insolvency practitioner of Interpath, licensed to act as an insolvency practitioner in both the United Kingdom ("**UK**") and the British Virgin Islands ("**BVI**").

2. I, David John Standish, together with Paul Pretlove and James Drury, also of Interpath, am a joint provisional liquidator of the Company.

3. I am duly authorised to make this witness statement on behalf of myself, Mr Pretlove and Mr Drury (together, the "**Joint Provisional Liquidators**", "**JPLs**" or "**Applicants**").

4. This witness statement is made in support of the JPLs' application under section 426 of the Insolvency Act 1986 (the "**Application**"), pursuant to which this Court may act in aid of and be auxiliary to the courts of the British Virgin Islands in connection with the provisional liquidation of the Company (the "**BVI Proceedings**"), seeking recognition in England and Wales of the BVI Proceedings and for consequential relief.

5. By this Application, assistance is sought from this Court pursuant to section 426 of the Insolvency Act 1986, on the basis of a letter of request issued by the BVI Court to the English High Court dated 17 June 2026, a copy of which is exhibited at ***[DJS-[7-10]]*** (the "**Letter of Request**"). The Letter of Request was issued following an application by the JPLs to the BVI Court for such a request, the BVI being a "relevant country or territory" for the purposes of section 426 of the Insolvency Act 1986.

6. This witness statement has been prepared following video calls and through the exchange of emails with the JPLs' legal representatives, Sullivan & Cromwell LLP ("**S&C**") and Walkers ("**Walkers**"). The facts and matters set out in this witness statement are within my own knowledge, save where I indicate otherwise, and I believe them to be true. Where facts and matters are based on information supplied to me by others, I identify the source of the information, and those facts and matters are true to the best of my information and belief.

7. There is now produced and shown to me a paginated exhibit of true copy documents marked "**Exhibit DJS-1**" to which I refer in this witness statement. Unless otherwise stated, all references to documents in this statement – in the form "***[DJS-1[x]]***" – are references to Exhibit DJS-1 where [x] represents the page number.

8. Nothing in this witness statement is intended to waive privilege and privilege is not waived.

## II. BACKGROUND

9. The JPLs have been appointed by orders of the High Court of the British Virgin Islands (the "**BVI Court**") as joint provisional liquidators of 30 BVI incorporated entities (including the Company) associated with the group referred to as the "Prince Group" (collectively, the "**JPL Entities**"). Our appointment was made upon the application of the Attorney General of the BVI, Dawn J. Smith (the "**BVI Attorney General**"), who presented petitions to the BVI Court seeking to wind up each of the JPL Entities on the grounds that a winding up is in the public interest and/or that it is just and equitable that winding up orders are made.

10. In broad terms, the ultimate controller of the Prince Group, Mr Chen Zhi, is alleged to have been engaged in, and to have utilised various companies in connection with fraudulent and criminal schemes, including cryptocurrency investment fraud, human trafficking, money laundering, wire fraud, bank fraud, and forced labour, in numerous jurisdictions. The BVI Attorney General's stated position is, amongst other things, that there is reason to be concerned that the JPL Entities were involved in or themselves perpetrated criminal conduct, such as money laundering the proceeds of criminal activities, and the purpose of the intended liquidations is to ensure an orderly process of dealing with the interests of stakeholders in the JPL Entities under the supervision of the BVI Court, which may include victims of the criminal activities allegedly perpetrated by Mr Chen Zhi.

11. As currently appointed, the JPLs' principal function is to investigate the affairs of the JPL Entities and maintain the value of the assets of the companies. Our specific powers include the power to identify any assets in the possession or control of the JPL Entities and to take such steps as may be necessary to protect any such assets from removal or dissipation, and to seek the recognition (or its equivalent) of our appointment in various jurisdictions, including the United Kingdom, for the purposes of (i) securing, realising

and remitting assets to our control, and (ii) obtaining access to and control of the records of the JPL Entities. The JPLs have identified that the Company is the registered proprietor of the freehold of a substantial commercial property in the City of London at 6-12 Fenchurch Street and 1 Philpot Lane, London, EC3 (the "**Property**").

12. The Company was incorporated on 12 October 2016 in the British Virgin Islands with registration number 1925678. The Company's registered office is at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands. Copies of the Company's Memorandum of Articles and Association (at ***[DJS-1[11]]***) and a company search extract obtained from the online portal to the BVI Registrar of Corporate Affairs (at ***[DJS-1[34]]***) show the Company's registered office address (at ***[DJS-1[144]]*** and ***[DJS-1[38]]***, respectively).

13. The Company was registered as an overseas entity in the UK Register of Overseas Entities on 23 December 2022 with registration number OE009890. A copy of the relevant entry in the UK Register of Overseas Entities is exhibited at ***[DJS-1[41]]***.

14. Further, the sole member of the Company is Retain Prosper Limited ("**Retain Prosper**"), which is itself a company incorporated in the BVI (with registration number 2022874). Retain Prosper is another of the JPL Entities. The sole shareholder of Retain Prosper is Mr Chen Zhi. Copies of the register of members for each of the Company and Retain Prosper are exhibited at ***[DJS-1[45-46]]*** and ***[DJS-1[47]]***, respectively.

15. As I have set out above, the Company forms part of the group of entities (including Retain Prosper) referred to collectively as the "Prince Group".

16. On 14 October 2025, the U.S. Department of Justice ("**DOJ**") unsealed an indictment (at ***[DJS-1[48-73]]***) against Mr Chen Zhi (the "**DOJ Indictment**"), charging him with conspiracy to commit wire fraud and money laundering. The DOJ Indictment alleges that Mr Chen Zhi, as chairman of the Prince Group, orchestrated and profited from a large-scale transnational fraud and money-laundering enterprise centred on so-called "scam compounds" in Cambodia, where victims were trafficked or coerced into conducting online investment and romance scams from these compounds, which targeted individuals worldwide. According to the DOJ Indictment, Mr Chen Zhi and his co-conspirators generated billions of dollars in illicit proceeds through these schemes and then laundered those funds through a network of shell companies, financial accounts, and cryptocurrency transactions designed to conceal the source and

ownership of the proceeds. The DOJ Indictment further alleges that Mr Chen Zhi exercised control over key entities and infrastructure used in the scheme, knowingly facilitated the movement of funds – including via Bitcoin – and participated in a coordinated effort to evade law enforcement detection while continuing to expand the enterprise.

17. In parallel, the DOJ filed a civil forfeiture complaint in the U.S. District Court for the Eastern District of New York (the "**Civil Forfeiture Complaint**") seeking forfeiture of approximately 127,271 Bitcoin alleged to constitute proceeds of the same fraud and money-laundering schemes, tracing the assets through the blockchain analysis to wallets and intermediary entities associated with the enterprise.

18. Also on 14 October 2025, the DOJ and the United States Department of the Treasury Office of Foreign Assets Control ("**OFAC**") designated the Prince Group as a transnational criminal organisation and imposed sanctions on 146 individuals and entities connected to the Prince Group. On the same date, the United Kingdom also announced sanctions targeting Mr Chen Zhi and the Prince Group, imposed by HM Treasury's Office of Financial Sanctions Implementation ("**OFSI**"). I refer to the sanctions imposed by OFAC and by OFSI collectively as the "**Sanctions**".

19. Each of the Company, Mr Chen Zhi and Retain Prosper are the subject of the Sanctions. Materials evidencing the relevant Sanctions listings and related press releases are exhibited at ***[DJS-1[74-104]].*** . Efforts by the JPLs to seek licences in relation to the Sanctions, and licences obtained, are described below at paragraphs 32-36.

20. The information currently available to the JPLs from U.S. authorities and other sources, including the DOJ Indictment and Civil Forfeiture Complaint, reflects the potential scale and seriousness of the harm attributed to the Prince Group's operations. The forfeiture complaint issued by the DOJ – which seeks the forfeiture of approximately 127,271 Bitcoin, valued at approximately $15 billion at the time of seizure (which I understand from a press release issued by the DOJ represents the largest forfeiture action in DOJ history) – gives some context to the alleged scope of the Prince Group criminal enterprise. According to the DOJ Indictment, by 2018, the Prince Group was earning more than $30 million per day (translating to approximately $11 billion annually) from its fraudulent schemes and related illicit activities.

## III. THE BVI PROCEEDINGS

21. On 5 January 2026, in response to actions taken against the Prince Group by authorities in other jurisdictions, the BVI Attorney General applied to the BVI Court for the appointment of me, Mr Pretlove, and Mr Drury as liquidators over the JPL Entities (including the Company) (the "**Originating BVI Applications**") on public interest and just and equitable grounds. Copies of the Originating BVI Application in relation to the Company, and the affidavit of the BVI Attorney General filed in support (but not its exhibit) are exhibited at ***[DJS-1[105-118]]***, and ***[DJS-1[119-138]]*** respectively.

22. In parallel, the BVI Attorney General issued urgent *ex parte* applications under section 170 of the BVI Insolvency Act 2003 seeking our appointment as provisional liquidators over each of the JPL Entities pending the determination of the Originating BVI Applications. A copy of the application for the appointment of provisional liquidators over the Company is exhibited at ***[DJS-1[139-149]]***. Following a hearing before the BVI Court on 9 January 2026, the Honourable Justice Abbas Mithani of the Eastern Caribbean Supreme Court granted, on an *ex parte* basis, orders appointing the JPLs over the JPL Entities (the "**Appointment Orders**"). The Appointment Order in respect of the Company (the "**Company Appointment Order**") is exhibited at ***[DJS-1[151-164]]***. In the application for the appointment of the JPLs, the BVI Attorney General submitted that the proposed appointment was necessary, amongst other things, to (i) remove Mr Chen Zhi and his associates of control of the JPL Entities and prevent their further use as vehicles for criminal activity, (ii) identify and preserve the JPL Entities' assets, and (iii) cooperate with law enforcement agencies in their investigative and enforcement efforts. The Appointment Orders made in respect of each of the JPL Entities were in materially similar terms.

23. On 29 January 2026, at an *inter partes* hearing, the BVI Court granted orders continuing the appointment of the JPLs without modification to our powers, pending the final determination of the Originating BVI Applications (the "**Continuation Orders**" – at ***[DJS-1[166-169]]***). At that hearing, Campbells LLP ("**Campbells**") appeared and stated that the firm represented the Company (and other JPL Entities). It was said that the firm had been instructed as BVI legal representatives to the Company by the current director of the Company utilising residual powers (which are retained during the JPLs' appointment until such time as the Originating BVI Applications are determined).

24. On 1 March 2026, Campbells filed Notices of Opposition in the BVI Court, purportedly on behalf of 25 of the JPL Entities (including the Company), opposing the Originating BVI Applications and seeking the discharge of the Appointment Orders (the "**Opposition**"). Each of the Notices of Opposition were in substance the same and, by way of example, the Notice of Opposition in respect of Noble Title Limited is exhibited at ***[DJS-1[170-172]]***. Each of the Notices of Opposition were supported by an affidavit of Mr Cosimo Borrelli (at ***[DJS-1[173-187]]***).

25. The Originating BVI Applications were heard by the Honourable Mr Justice Wallbank KC on 16 and 17 April 2026. At the close of the hearing, the Honourable Mr Justice Wallbank KC reserved judgment and invited the BVI Attorney General and the JPL Entities to file further written submissions by 15 May 2026. So far as I am aware, as at the date of this witness statement, the Originating BVI Applications are yet to be determined.

26. On 4 May 2026, the JPLs applied to the BVI Court for directions concerning, amongst other matters, whether the directors of the JPL Entities retained authority to cause those entities to oppose or otherwise interfere with the exercise by the JPLs of the powers granted under the Appointment Orders, including the power to seek recognition of the JPLs' appointment in foreign jurisdictions (the "**May Directions Application**"). The May Directions Application was heard by the BVI Court before the Honourable Mr Justice Wallbank KC on 14 May 2026, together with two further applications: (i) an application dated 1 May 2026 (as amended on 7 May 2026) submitted by Campbells purportedly on behalf of 25 of the JPL Entities (including the Company), seeking declarations to the effect that the directors of those entities retained residuary powers extending to causing the entities to appear in foreign recognition proceedings to challenge any application by the JPLs for recognition (and, in the alternative, the variation of the Appointment Orders); and (ii) an application dated 1 May 2026 submitted by Kobre & Kim on behalf of Amber Hill Ventures Limited and Lateral Bridge Global Limited (two further JPL Entities) seeking declarations in materially similar terms (together, the "**Opposing Applications**").

27. Following the hearing, the Honourable Mr Justice Wallbank KC delivered an ex-tempore judgment. The BVI Court granted the relief sought by the JPLs and dismissed the Opposing Applications (the "**14 May Ruling**"). The BVI Court made an order in the terms sought by the JPLs which in effect means that the directors of the JPL Entities

have no standing to cause the JPL Entities to appear in foreign recognition proceedings to challenge any foreign recognition proceedings commenced by the JPLs (at ***[DJS-1[188-195]]***). I understand that the directors retain a power to apply to the BVI Court to vary or discharge the Appointment Orders, but that is to be done in the BVI Court rather than by intervening in foreign recognition proceedings.

28. Following the ruling, Kobre & Kim confirmed on behalf of Amber Hill Ventures Limited and Lateral Bridge Global Limited that those entities would take no further steps in the U.S. recognition proceedings described therein, reserving their right to revisit that position in the event of a successful appeal. Campbells has not given a corresponding confirmation in respect of the 25 JPL Entities (including the Company) which they purportedly represent, and has subsequently filed a fresh application to vary the Appointment Orders (including in relation to the Hong Kong Application (as defined in paragraph 118 below)) dated 29 May 2026 (at ***[DJS-1[196-204]]***).

29. The 25 JPL Entities (including the Company) purportedly represented by Campbells have sought and obtained leave to appeal the decision of the BVI High Court dated 14 May 2026 (at ***[DJS-1[205-213]]***), and I understand that that appeal will be dealt with in the ordinary course. In addition, the 25 JPL Entities (including the Company) purportedly represented by Campbells have applied for a stay of the order of 14 May 2026 (at ***[DJS-1[214-220]]***). That application has not as of yet come on for hearing. As at the date of this witness statement, the order of 14 May 2026 is currently in effect.

30. Unless and until the BVI Court orders otherwise, the JPLs remain in office and continue to hold and exercise the powers conferred by the Appointment Orders and applicable BVI law.

31. The Application is made pursuant to and in furtherance of the JPLs' powers under the Company Appointment Order. The basis upon which the JPLs contend that recognition and assistance may be granted under section 426 of the Insolvency Act 1986 will be addressed on our behalf in legal submissions.

## IV. STEPS TAKEN TO SECURE SANCTIONS LICENCES

32. The JPLs, working together with our legal advisers, have sought licences from relevant sanctions regulators in relevant jurisdictions, including the U.S., the UK, the BVI and the Cayman Islands.

33. As regards the U.S., on 20 February 2026, the JPLs applied to OFAC for the issuance of a licence covering all Prince Group entities under the control of the JPLs and their subsidiaries. A licence was granted by OFAC to Interpath on 13 March 2026 for a 30-day period (expiring on 15 April 2026) pending OFAC's decision on the broader licence, to allow for activity of one of the JPL Entities, Simply Advanced Limited, and its operating subsidiaries in jurisdictions that are not otherwise sanctioned by the U.S. to resume. This licence was reissued in amended form on 18 March 2026 and extended on 14 April 2026 until 15 May 2026. On 21 April 2026, OFAC issued a broad license authorising the full range of the JPLs' court-authorised liquidation activities – including administering the U.S. Chapter 15 Proceeding – until 30 April 2028. Under the licence, transactions are authorised only to the extent they occur at the direction of, or with the consent or authorisation of, the JPLs.

34. A substantial part of the Prince Group's corporate structure and asset base is subject to UK Sanctions. Furthermore, each of the JPLs is a UK citizen. Accordingly, the JPLs require an OFSI licensing framework that permits them to carry out core insolvency functions in accordance with the UK sanctions regime. Since January 2026, the JPLs have been engaging via our solicitors with the UK's Foreign, Commonwealth and Development Office ("**FCDO**") and OFSI in relation to the JPLs' request for a general licence under the Global Human Rights Sanctions Regulations 2020 that would permit the JPLs and parties acting on our behalf or at our direction to take all actions that are ordinarily incident and necessary to the exercise of the JPLs' court-appointed powers and duties in compliance with UK sanctions laws, on terms intended to be consistent with the licensing approach requested in the OFAC Licence Application.

35. On 14 April 2026, OFSI issued a general licence (reference INT/2026/9491628) under regulation 20 of the Global Human Rights Sanctions Regulations 2020 in respect of the Prince Group and group subsidiaries, including the Company (the "**OFSI General Licence**") (at ***[DJS-1[221]]***). In summary, the OFSI General Licence permits the JPLs to carry out insolvency-related activities in the United Kingdom without breaching the relevant sanctions prohibitions. The OFSI General Licence took effect on 14 April 2026 and expires at 23:59 on 13 April 2031. The entities covered by the OFSI General Licence include the Company and the other JPL Entities, as set out in Annex 1 to the licence (at ***[DJS-1[225]***).

36. Key entities and assets are located in, or administered through, British Overseas Territories that implement UK sanctions (including the BVI and Cayman Islands). Accordingly, the JPLs, are also engaging via our legal representatives with relevant authorities in the BVI and the Cayman Islands in relation to requests from those authorities for comparable licences to those requested from OFAC and OFSI.

## V. THE PROPERTY

37. As mentioned above, the JPLs have identified that the (likely, principal) asset of the Company is the Property. It is an 11-storey, freehold commercial property located at 6–12 Fenchurch Street and 1 Philpot Lane, London, with title number NGL349173.

38. The official copy of the register of title relating to the Property (at ***[DJS-1[226-233])*** confirms that the Company is the registered proprietor of the Property and the Company purchased the Property for a total consideration of £78,972,407 (excluding VAT) on 29 November 2016 (at ***[DJS-1[229]]***). There are no charges registered against the title.

39. I understand from a circular dated 3 June 2020 published by Chuang's Consortium International Limited on the Hong Kong Stock Exchange (the "**Circular**") that the Property was independently valued at £96,500,000 on 31 March 2020 ("**Independent Valuation**") (an extract of the Circular is exhibited at ***[DJS-1[234-248]]***). The Circular states that the Company's sole asset was the Property, and that the agreed value of the Property at £95,244,039 pursuant to the sale and purchase agreement signed on 30 April 2020 (being the consideration for Retain Prosper's acquisition of the entire issued share capital of the Company) represented a 1.3% discount to the Independent Valuation of the Property (at ***[DJS-1[245]]***).

40. I understand that the Property is an office building (which accordingly requires active management and control) with retail units on the ground floor and is known as "10 Fenchurch Street".

41. As part of our duties and functions, we consider that we should be taking steps designed to achieve the following:

    41.1 obtaining and maintaining secure physical access to the Property. This would include obtaining keys, fobs, alarm codes and access credentials;

    41.2 identifying and controlling any on-site security arrangements, and ascertaining who, if anyone, is currently accessing and controlling the building (and indeed

to ensure that the only persons that can access the Property are properly authorised);

41.3 ensuring that 24-hour security is put in place, which is important for the purposes of the insurance arrangements for the Property (as further discussed below);

41.4 ascertaining the position in relation to occupational leases, tenants, rental income, service charges and any ongoing occupational liabilities;

41.5 identifying and liaising with the providers of utilities and essential services, and avoiding interruption to gas, electricity, water, telecommunications, lifts, fire systems, security systems and related building services. As discussed below, we have had some communications with providers of utilities;

41.6 ascertaining the position regarding statutory compliance, health and safety, insurance, maintenance, testing, emergency lighting, fire alarm certification, lift maintenance and similar matters, and once ascertained, ensuring full compliance with all of the above;

41.7 obtaining and reviewing contracts with service providers, contractors, managing agents, insurers and facilities managers; and

41.8 ascertaining, protecting, and repatriating funds connected with the Property, subject to any sanctions and licensing requirements.

**Challenges in obtaining access to the Property**

42. On 26 February 2026, Thomas Sebastian Harbord and Nicholas White of Walkers, instructed by the JPLs, attended the Property in an attempt to gather further information and identify how access and control to the Property were being managed on the ground. I rely on Mr Harbord's witness statement and exhibit dated 9 June 2026 prepared in connection with the possession proceedings that the JPLs issued before this Court in respect of the Property on 15 June 2026 (the "**Possession Proceedings**"), copies of which are exhibited at ***[DJS-1[249-260]]***, as the source of my knowledge of what Mr Harbord and Mr White observed at the Property on that occasion. In summary, Mr Harbord and Mr White observed vehicles parked by a gate at the Property; interacted with a person purporting to act as a security guard stationed at the reception, but that individual declined to provide any information relevant to how access to the Property

was managed, nor would he identify by whom he was employed or instructed. On 25 March 2026, Max Jackson of Interpath reported to the JPLs that he had attended the Property on that day. I understand from Mr Jackson that he was unable to enter the building and that, while he did not encounter any individuals, there was a car parked in the building car park suggesting that someone was there. Accordingly, whilst it appears that the Property may have tenants or occupiers (as discussed in further detail below), the JPLs have limited visibility about who is in occupation and on what terms. Further, we have not been able to gain access to the Property.

43. As a consequence (and as I discuss further below), the JPLs are in a position of having only limited information about the Property and limited ability to take control of it. This is a matter of concern.

44. For example, we are concerned that the Property may currently be occupied by persons connected with the Prince Group or otherwise by persons who are not authorised to be there. Control of the Property remains unclear at this time.

45. We are also unable to ascertain the current internal condition of the Property, including whether there has been any damage, deterioration, or unauthorised alteration to the building or its contents, since we have not been able to access the Property or arrange for a survey or inspection.

46. The JPLs have experienced challenges in obtaining and maintaining adequate insurance for the Property due to our inability to access the Property, take control of it and arrange for a survey (including any site visit required by insurers) or a reinstatement valuation. The insurance which we have to date been able to procure has been arranged through Marsh (an insurance broker instructed by the JPLs) on an "open cover" basis on what I understand to be an interim footing pending the JPLs being able to put in place longer-term, building-specific cover at full value; I am informed by Marsh Limited that coverage under that policy is currently limited to £10,000,000 (see ***[DJS-1[261]]***). Given that the Independent Valuation valued the Property at £96,500,000, there is a significant gap between the current insurance coverage and the value of the Property. Moreover, I am informed that maintaining or extending appropriate cover will require the JPLs to satisfy certain underwriting requirements, including putting in place 24-hour security and providing required underwriting information, and that, in the absence of such measures, the cover and/or applicable loss limits may be materially reduced

over time. There is accordingly a risk that insurance cover for the Property may, in due course, be withdrawn or materially reduced unless these requirements can be met, exposing the Company's principal asset to potential uninsured or underinsured loss.

47. In view of the foregoing issues, the JPLs issued the Possession Proceedings. It is hoped that the Possession Proceedings will enable the JPLs to obtain physical control of the Property on behalf of the Company.

48. The matters described in Mr Harbord's Witness Statement reinforce the JPLs' concerns that persons who are not acting under the authority of the JPLs continue to have access to, or some degree of control over, the Property and that the identity and authority of those persons remain unclear.

49. Given the difficulties described above, we seek recognition of the provisional liquidation and our appointment as JPLs over the Company, as we foresee that we may have to act in respect of the Property as the situation develops.

**Communications with Roger Sahota / BSS**

50. By email on 23 January 2026, Roger Sahota, a solicitor of Berkeley Square Solicitors ("**BSS**") was introduced to the JPLs by Campbells as English counsel connected with the Prince Group and as someone who had been involved with the Property on behalf of the Prince Group/Mr Chen Zhi (***[DJS-1[263]]***).

51. On 3 February 2026, Mr Pretlove had a telephone conversation with Mr Sahota in relation to the Property, the JPLs' appointment, and various practical issues affecting the building. On that call (and in subsequent correspondence), Mr Sahota asserted that he had been attempting to deal with issues concerning the Property after the JPLs appointment and the Sanctions designations, that he had been engaging with utility providers, that he was aware of monies apparently held in a Barclays client account with Cushman & Wakefield (that I discuss below) and that he was proposing or advocating the appointment of an alternative manager specialising in sanctioned properties. A more detailed summary of that call prepared shortly afterwards is exhibited at ***[DJS-1[264-265]]*** and a subsequent introductory email from Walkers to Mr Sahota at ***[DJS-1[266]]***.

52. Subsequently, Walkers wrote to Mr Sahota and BSS on 5 February 2026 putting them on notice that the JPLs had been appointed in relation to the Company and requesting, among other things, that they desist from taking any steps whatsoever in relation to the

Company and the Property without prior reference to the JPLs (at ***[DJS-272-274]***, sent under the covering email at ***[DJS-[267]]***).

53. By email dated 9 February 2026 (at ***[DJS-1[268]])***, Mr Sahota responded and expressly confirmed that he had written to a number of utility providers in relation to the Property *"to prevent any interruption to essential services at our client's building"*. He enclosed copies of correspondence sent by them as at that date to utility suppliers (Regent Gas Limited ("**Regent Gas**") (at ***[DJS-1[275-276]]***) (gas supplier for the Property), Ecotricity Group Limited ("**Ecotricity**") (at ***[DJS-1[277-278]]***) and SmartestEnergy (at ***[DJS-1[279-280]]***)) and confirmed copies of correspondence received in response would be forwarded to Walkers.

54. In the same email, Mr Sahota stated: *"Finally, we note that your clients' appointment as provisional liquidators is in the BVI and that they currently have no standing in this jurisdiction. We also note that you have failed to provide any documentation confirming your clients' appointment. Should your clients intend to apply for recognition here, please provide us with adequate notice in advance of any such application."*

55. On 10 February 2026, Walkers wrote to Mr Sahota (via BSS) providing evidence of the JPLs' appointment and requesting him to desist from taking any steps in relation to the Property and to provide information about any role he, or persons connected with him, have had in operational matters at the Property to date and any communications and dealings he has or they have had with third parties (at ***[DJS-1[281-282]]***).

56. Mr Sahota responded by email to Walkers on 17 February 2026 (at ***[DJS-1[269]]***) stating *"we have undertaken an initial review of our file and, on the basis of that review, we are not presently aware of any correspondence sent by us which we consider relevant or disclosable concerning the property or the affairs of the relevant companies since 9 January 2026"*, and noting he would take instructions from his client on other matters in Walkers' 10 February letter.

57. By email dated 18 February 2026 (at ***[DJS-1[270]]***), Walkers asked Mr Sahota whether there was any responsive correspondence pre-dating 9 January 2026, and attached a letter of the same date (at ***[DJS-1[283]]***) seeking agreement that any future steps would be subject to the JPLs' consent, not merely a notification requirement. Mr Sahota responded the same day (at ***[DJS-1[271]]***) to the effect that BSS reserved its right to apply to court to take actions not consented to by the JPLs.

58. By letter to BSS dated 19 February 2026 (at ***[DJS-1[284]***), Walkers reiterated its requests (a) for information relating to access to the Property, and (b) in relation to BSS' correspondence with Jones Day (who represent Cushman & Wakefield) and the issues with the Property known to Mr Sahota. As at the date of this witness statement, Mr Sahota has not responded to that letter.

59. By email dated 23 February 2026 (at ***[DJS-1[393]]***), Mr Sahota forwarded to me and to Walkers a copy of an invoice to the Company in relation to the Property received from Regent Gas in the amount of £720 including VAT for the *"Disconnection of Gas Supply / Disconnection of Gas Meter"*, leaving an outstanding balance of £18,234. Walkers subsequently emailed Regent Gas directly on 24 February 2026 (at ***[DJS-1[395]***) and in response on 25 February 2026, Regent Gas confirmed that their third party debt collection agency had attended the site on 12 February 2026 and left a letter of intent to disconnect the gas supply (at ***[DJS-1[395]***). They noted that while security guards on site did not grant access to the building, they accepted the letter.

60. By email dated 27 February 2026 (at ***[DJS-1[287]]***), Walkers asked Mr Sahota whether he had engaged in any correspondence with Guarding UK Limited ("**Guarding UK**"). As at the date of this witness statement, Mr Sahota has not responded to this email.

61. On 27 March 2026, Walkers received an email from Mr Sahota attaching an urgent notice of disconnection from Regent Gas dated 23 March 2026 in which they threatened to disconnect the gas supply to the Property as of 31 March 2026 unless payment of the overdue balance (then £18,234.20) was made by 31 March 2026 (the "**Regent Gas Letter**") (at ***[DJS-1[397]]***). The letter was addressed to *"Dear Sir / Madam"* at the address of the Property, not to Mr Sahota or his firm. I was concerned that Mr Sahota is apparently physically receiving and opening post addressed to the Property.

62. On the same date, Mr Sahota's firm sent an email to Regent Gas, copying the JPLs and Walkers, notifying them that liquidators had been appointed in the BVI and that future correspondence should be addressed to them.

63. By letter dated 10 April 2026 (at ***[DJS-1[288]]***), PCB Byrne LLP ("**PCB Byrne**"), acting for the JPLs in the Possession Proceedings, wrote to BSS seeking urgent clarification regarding access to and occupation of the Property. In that letter, PCB Byrne noted that BSS's email of 27 March 2026 had attached a photograph of a hard-copy letter from Regent Gas dated 23 March 2026 addressed to the Property, which

indicated that someone has access to, or is in occupation or control of, the Property. PCB Byrne stated that it had been advised that a person resembling a security guard has been stationed in the reception area at the Property and that the Property may be occupied by unidentified persons. The letter emphasised that Mr Sahota's client is not authorised to take any steps in relation to the Property and, in particular, is not authorised to access the Property or to permit any other person to do the same, and that any previous permission granted to access and/or remain on the Property is revoked. PCB Byrne requested that BSS confirm by 4pm on 15 April 2026 how they came to be in possession of the Regent Gas Letter, whether they are in contact with the person currently purporting to provide security at the Property, who is employing and paying that person given that the owner of the Property is sanctioned, and whether they or any representative of their client currently has access to, or is aware of any person in possession of, the Property.

64. On 15 April 2026, BSS responded to PCB Byrne's letter, declining to answer their questions about the Regent Gas Letter and stating: *"We do not propose at this stage to enter into a detailed response to all the matters raised in your letter because as you are aware the Joint Provisional Liquidators' appointment is presently the subject of a legal challenge, which is listed to be heard in the BVI on 16 April 2026"* (***[DJS-1[290]]***).

65. On 13 May 2026, PCB Byrne received an email from Mr Sahota at BSS attaching a photograph of what appears to be a warrant granted by Birmingham Magistrates Court to a company called AMS Nottingham Limited on 8 May 2026 (the "**Warrant**") (at ***[DJS-1[292-293]]***). The application for the Warrant was made without notice to the JPLs and Mr Sahota's email was the first we had heard of it. As with the Regent Gas Letter, it appears that the photograph of the Warrant was taken by somebody stationed at the Property on a smartphone, who sent a copy to Mr Sahota.

66. By letter from BSS to PCB Byrne dated 15 June 2026, BSS asked that they be given notice of any application for recognition in this jurisdiction (***[DJS-1[294]]***). The JPLs will therefore give BSS notice of this Application.

67. The matters described above give rise to further concern that persons who are not acting under the authority of the JPLs continue to have access to, influence over, or involvement in the management of the Property and relationships with service providers. There are therefore serious governance and asset-protection risks.

**Engagement with C&W**

68. The JPLs have identified that Cushman & Wakefield ("**C&W**") – an international enterprise engaged in the provision of real estate services, who acted as property manager in relation to the Property until 14 October 2025 (when it ceased to act following the imposition of the Sanctions) – holds client account funds on behalf of the Company in connection with the Property.

69. On or around 5 February 2026, Walkers, acting on behalf of the JPLs, first contacted Jonathan Huckstep, a partner of C&W with responsibility for the Property, by email seeking engagement and handover information in relation to the Property (***[DJS-1[299]]***).

70. By email sent on 6 February 2026, Joshua Fletcher-Flood (a Partner and internal legal counsel of C&W) confirmed to the JPLs that C&W had terminated the management contract immediately upon becoming aware of the Sanctions.

71. Subsequent correspondence was exchanged between Walkers and Jones Day LLP ("**Jones Day**"), C&W's legal representatives.

72. By emails dated 6 February 2026 and 15 February 2026, Walkers provided Jones Day with copies of the Appointment Order and Continuation Order respectively at ***[DJS-1[306]***).

73. By letter dated 10 February 2026 (at ***[DJS-1[307-308]]***), Walkers sent Jones Day a list of initial questions relating to the Property, including: (i) whether C&W had access to the Property and whether access could be granted to the JPLs; (ii) as to the current occupiers; (iii) as to a client account held with C&W by the Company; (iv) as to any suppliers, utility providers and facilities service providers; and (v) whether there were any major issues with the Property.

74. By email dated 18 February 2026 (at ***[DJS-1[306]]***), Jones Day confirmed to Walkers that C&W had terminated its management contract with the Company after it became subject to sanctions and that C&W was not aware whether the Property remained occupied. Enclosed with that letter were two documents stated to "comprise the Client Statement Reporting" (the "**Client Statement Reporting Documents**"), being a PDF document (at ***[DJS-1[309-349]]***) and an Excel spreadsheet (at ***[DJS-1[350-370]]***) containing information about the cash position of certain client account ledgers held by C&W on behalf of the Company. The Client Statement Reporting Documents refer to

payments received from certain named tenants and to payments out to certain suppliers including of utilities, facilities and office services, and disclose a total balance carried forward across all sub-ledgers of £1,482,570.17 (the "**C&W Client Account Funds**").

75. Walkers responded by email dated 19 February 2026 (at ***[DJS-1[304]]***) asking whether C&W intended to provide further information or documents in response to their outstanding queries.

76. Walkers wrote to Jones Day again by email dated 21 February 2026 (at ***[DJS-1[304]]***) asking: (i) whether C&W currently holds cash on behalf of the Company; (ii) the amount of any current balance; and (iii) details of the Company's bank accounts and transfers to and from C&W. As far as I am aware, no substantive response addressing those requests has been received from C&W to date.

77. Walkers subsequently wrote to Jones Day again by email dated 27 February 2026 (at ***[DJS-1[301-303]]***) with a list of supplementary questions intended to assist the JPLs in gaining access to the Property and in securing and maintaining its value, including as to: (i) persons who may be able to assist the JPLs in obtaining access to the Property; (ii) steps taken by C&W on termination of its management contract in relation to access, including as to any handover of keys, alarm codes, access fobs and security systems; (iii) steps taken by C&W to notify tenants and suppliers of its ceasing to act as managing agent; (iv) the operational details of any building management system; (v) the building's condition and maintenance status; (vi) the status of tenancies; (vii) service providers and outstanding invoices and payments; (viii) business rates; (ix) neighbouring developments; and (x) on-site staff. As at the date of this witness statement, C&W has not provided substantive responses to a number of those requests.

78. In addition, I understand based on correspondence with C&W that there may be additional sums due to the Company or held in connection with the management of the Property, which have variously been described in internal and external communications with C&W as a building management receivable or residual balance (the "**C&W Receivable**"). The JPLs have not yet been able to obtain full information about and the present status of those funds. The JPLs understand that the C&W Client Account Funds and the C&W Receivable together amount to approximately £2 million.

79. It is clear that there are Company monies connected with the Property which the JPLs have not yet been able fully to identify, account for, or bring under our control, and that those monies are material in amount.

80. By email dated 13 March 2026 (at ***[DJS-1[301]]***), Jones Day informed Walkers that the Company's funds held by C&W would remain frozen until appropriate licences from each of OFSI and OFAC have been obtained.

81. On 30 March 2026, Jones Day wrote to PCB Byrne stating that C&W will offer no assistance to the JPLs and will not engage with requests for information from the JPLs in the absence of licences from both OFAC and OFSI, though it would consider taking action if directed to do so by OFAC and/or OFSI (***[DJS-1[371-372]]***).

82. On 28 April 2026, PCB Byrne wrote to Jones Day to provide confirmation of the licences that we have obtained, restating the JPLs request for information and asking Jones Day to confirm that its client will, on request, transfer the funds it currently holds on behalf of the Company to an account controlled by the JPLs or their agents (***[DJS-1[373-374]]***). Jones Day responded on 6 May 2026, providing some limited further information about the Property, and stating: *"As you know, our client has no existing duty, and in particular, no duty of care, to your clients, and the information enclosed with this letter is provided on this basis and out of professional courtesy to you. Our client will review your further information requests against the terms of the OFSI and OFAC licences, and will revert back to you on the information that it can provide without undue expenditure as well as its timetable for doing so. In the interests of time, we would encourage you to prioritise and reduce the number of requests you have made"* (***[DJS-1[375]]***).

83. On 10 June 2026, as no further correspondence had been received from Jones Day, PCB Byrne followed up by email requesting confirmation that C&W are now willing to transfer those funds to the JPLs, given that the General Licence has now been granted (***[DJS-1[377]]***). At the date of this witness statement, we have not received any response.

84. The JPLs seek recognition and assistance from this Court so that we will be in a position to compel C&W to provide answers to our questions, which we anticipate will assist us in taking steps to protect the Property and the Company's other assets, including the C&W Client Account Funds and the C&W Receivable. Recovery of funds held by

C&W would enable the JPLs (among other things) to meet ongoing expenses in relation to the Property, including crucially insurance costs.

**Further engagement with Counterparties and Utility Suppliers**

85. The JPLs have engaged ourselves or via our legal representatives, in correspondence with third-party service providers, utility suppliers, and tenants in relation to the Property, including Regent Gas, Ecotricity, SmartestEnergy, Guarding UK, Matthews Daniel International (London) Ltd ("**MatthewsDaniel**"), and QOB Interiors, in order to put them on notice of the JPLs' appointment, correct any misinformation they may previously have received from other parties, and request information they may have in relation to the Property.

**i.** ***Regent Gas***

86. On 5 February 2026, Walkers wrote to Regent Gas introducing the JPLs and advising that Mr Sahota and BSS did not have authority to act on behalf of the Company. Walkers noted that Regent Gas was previously in correspondence with Mr Sahota regarding the gas supply to the Property and that there was a risk of imminent disconnection following non-payment of invoices. The letter requested that Regent Gas confirm the gas supply would remain operational pending further discussions and that future correspondence be addressed to Walkers only (at ***[DJS-1[382-383]]***).

87. By email dated 9 February 2026, Regent Gas requested documentation including a letter of authority, confirmation of the JPLs' role and a photograph of the gas meter. Walkers confirmed that the JPLs did not have access to the Property and were therefore unable to provide a meter photograph, and suggested a call to explain the complex factual background (at ***[DJS-1[384-385]]***).

88. On 10 February 2026, the JPLs wrote directly to Regent Gas confirming that the JPLs' appointment did not change the Company's contractual obligations and that the JPLs acted as agents without personal liability. The JPLs reiterated their willingness to resolve issues relating to the gas supply urgently (at ***[DJS-1[389-390]]***).

89. By email dated 25 February 2026, Regent Gas confirmed that it had removed Mr Sahota's email address from its mailing list and that, on its solicitors' advice, Regent Gas intended to disconnect the gas supply and remove the gas meter. Regent Gas also confirmed that its third-party debt collection agency had attended the Property on 12

February 2026 and left a letter of intent to disconnect, which was accepted by security guards at the site who did not grant access to the building (at ***[DJS-1[391]]***).

90. On 23 March 2026, Regent Gas sent a formal Disconnection Notice to Walkers (***[DJS-1[393] and [397] ]***). Walkers responded on 30 March 2026 attaching a letter and enclosures including a copy of the OFSI Sanctions Notice, and requesting to speak with Regent Gas' legal advisers urgently (at ***[DJS-1[402-403]]***, ***[DJS-1[404-411]]*** and ***[DJS-1[398-399]]*** *respectively)*. Regent Gas did not respond to this email. Walkers followed up to request a response on 1 April 2026 and 7 April 2026, but no response was received (at ***[DJS-1[412]]*** and ***[DJS-1[413]]***). On 1 May 2026, Regent Gas responded to confirm that they did not disconnect the gas supply on 31 March 2026 and attached a further Disconnection Notice dated 1 May 2026 (at ***[DJS-1[414]]***). Walkers responded on the same day to request the contact details for Regent Gas' solicitors. By further email on 1 May 2026, Regent Gas responded to that request to confirm that they could not authorise Walkers to communicate directly with their solicitors. Regent Gas instead requested that Walkers liaise with them directly and confirmed that they had already sought legal advice from their solicitors, who had reviewed all the documentation provided by Walkers to date. There has been no further communication between Regent Gas and Walkers since then.

91. On 11 May 2026, PCB Byrne wrote to Regent Gas explaining that the JPLs were making significant progress in addressing the issues preventing payment being made and expressing the JPLs' concern that, despite the evident legal complexity of the situation, it did not appear that this matter had been escalated to Regent Gas' legal team (at ***[DJS-1[415-417]])***. In its letter, PCB Byrne sought urgent confirmation that the supply to the Property would not be cut off without 28 days' notice to the JPLs. It reserved the JPLs' rights to seek to recover compensation / damages for any loss caused by Regent Gas proceeding to disconnect the gas supply.

92. An email exchange between PCB Byrne and Regent Gas on 12 May 2026 is exhibited at ***[DJS-1[418-420]]***, in which Regent Gas requested payment from the JPLs.

93. Notwithstanding PCB Byrne's letter of 11 May 2026, on 13 May 2026, PCB Byrne received:

93.1 an email from Mr Sahota at BSS attaching a photograph of the Warrant, as explained at paragraph 65 above; and

93.2 confirmation from Regent Gas that the gas supply to the Property had been disconnected and that the gas meter had been removed on 12 May 2026 (at ***[DJS-1[418]]***).

94. Despite the efforts of the JPLs and their advisers to engage with Regent Gas and preserve essential services at the Property, those steps were taken without notice that an application for a warrant was being heard.

95. Given the actions of Regent Gas to date, we consider there is a risk that Regent Gas may take steps to enforce its debt against the Company or the Property. If the JPLs obtain recognition of our appointment in England and Wales, pursuant to the Letter of Request and under section 426 of the Insolvency Act 1986, the JPLs will be in a position to seek a stay of any enforcement proceedings. Such relief would assist in preventing Regent Gas from pursuing enforcement action against the Company or its assets in priority to other creditors. Recognition would also assist the JPLs in securing Company funds from C&W, which can be used to discharge debts which rank as expenses of the Company's provisional liquidation.

**ii. *Ecotricity***

96. On 9 February 2026, Walkers wrote to Ecotricity, the electricity supplier to the Property, introducing the JPLs, advising that Mr Sahota and BSS had no authority to act on behalf of the Company, and requesting that the electricity supply remain operational pending further discussions (at ***[DJS-1[423-424]]***).

97. By email dated 11 February 2026, Ecotricity acknowledged Walkers' correspondence and advised that, before it could take action or provide information, the Company's liquidation would need to be reflected at Companies House (at ***[DJS-1[425]]***). The JPLs continue to engage with Ecotricity regarding the electricity supply.

***iii. SmartestEnergy***

98. On 9 February 2026, Walkers wrote to SmartestEnergy Ltd, a further electricity supplier to the Property, in similar terms to the correspondence with Ecotricity (at ***[DJS-1[426-427]]***). As at the date of this witness statement, the JPLs have not received a substantive response from SmartestEnergy.

**iv. *Guarding UK***

99. The JPLs understand from the Client Reporting Statement (at ***[DJS-1[309-349]]***) provided by C&W that a business trading as "Guarding UK" was providing security services in relation to the Property.

100. On 2 March 2026, the JPLs wrote to Guarding UK, to understand the circumstances in which those services came to an end (at ***[DJS-1[469-470]]***).

101. On 17 March 2026, Ms Michelle Smith, Chief Executive of Guarding UK, responded by email (at ***[DJS-1[471]]***) confirming that Guarding UK had provided security services at the Property under contract to C&W. Those services ceased at midnight on 19 October 2025, upon Guarding UK becoming aware of the UK sanctions designation. The following day, representatives of Guarding UK attended the Property with a representative of C&W and informed the parties present on site that Guarding UK would not continue to provide security services. Ms Smith stated that those parties *"subsequently took over the management of the site."* Ms Smith did not, however, identify those parties and, as I understand it, did not know who they were or by whom they were instructed. Guarding UK thereafter ceased providing services at the Property and I understand has not attended the Property since.

102. On 17 March 2026, Mr Max Jackson of Interpath spoke with Mr Peter Rees, Chief Operating Officer of Guarding UK, who I am informed is ex-military and a former police officer. Mr Jackson reported this conversation to me and to Walkers (copying the JPLs) by email dated 11 April 2026, a copy of which is exhibited at ***[DJS-1[475]]***. Mr Rees informed Mr Jackson that on 19 October 2025 (Guarding UK's last shift at the Property and, according to Mr Rees, the last time any Guarding UK representative attended the property), he had encountered suspicious individuals who appeared to be using untenanted parts of the Property for storage, one of whom introduced himself as "Mr Lee". Mr Rees described these individuals as behaving in a confrontational manner. According to Mr Rees, Mr Lee went directly to what Mr Rees described as "vaults" on the first floor of the Property. Mr Rees also informed Mr Jackson that there were refrigerators full of cigars in the basement of the Property. Mr Rees stated that he, the Guarding UK team, and an employee of the company then occupying the 10th floor of the Property (MatthewsDaniel, detailed below) all left the building. Mr Rees reported

the matter to the police. The JPLs have also passed this information on to the National Crime Agency.

103. The JPLs are concerned by this information. It indicates that, following the cessation of legitimate security arrangements in October 2025, unknown individuals – who are not authorised by the JPLs and whose identity and connection to the Company (if any) is unknown – may have assumed physical control of the Property. The JPLs have no means of ascertaining the current state of occupation or condition of the Property, nor of verifying whether Company assets within the Property are being preserved or dissipated. We understand that Guarding UK is owed the sum of £30,379.43.

104. On 9 April 2026, PCB Byrne wrote to the trespassers at the Property, informing them of the JPLs' appointment, explaining that they were trespassing and requesting that they vacate the Property immediately (the "**9 April Letter**") (at ***[DJS-1[498]]***). The letter expressly terminated any licence that may have been validly granted in advance of the JPLs' appointment and indicated the JPLs' intention to obtain a possession order, should the trespassers fail to vacate. It gave a deadline of 4pm on Wednesday 15 April 2026 for the trespassers to contact PCB Byrne, should they believe they had the right to occupy the Property. The 9 April Letter was delivered by a process server on 10 April 2026. PCB Byrne did not receive any response to the 9 April Letter.

**v. *Matthews Daniel***

105. On 18 March 2026, the JPLs wrote to MatthewsDaniel, the former tenant of the 10th floor of the Property, requesting information regarding: (a) a copy of the executed lease and any supplemental documents; (b) the identity of the landlord named in the lease; (c) whether the lease has been surrendered, assigned or otherwise amended; (d) whether MatthewsDaniel is still in occupation; (e) whether all rent and other payments have been made and where such payments have been directed since October 2025; and (f) details of any communications with any person purporting to act on behalf of the Company since 14 October 2025 (at ***[DJS-1[499-500]]***). MatthewsDaniel did not provide a substantive response to the JPLs' letter.

106. No substantive response having been received, on 29 April 2026, PCB Byrne wrote to Pinsent Masons, solicitors to MatthewsDaniel (at ***[DJS-1[501-502]]***). In particular, it was necessary to ascertain whether MatthewsDaniel asserted any right to possession of the 10th floor, which would necessitate it joining as a claimant in the Possession

Proceedings. Pinsent Masons responded on 1 May 2026, confirming that MatthewsDaniel considered that its leases to the 10th floor and basement storage area had been terminated, on the basis that they were frustrated following the imposition of sanctions, or alternatively that they were surrendered by operation of law or repudiated by the Company (at ***[DJS-1[503-504]]***).

**vi.** ***QOB Interiors***

107. As described in the Harbord Witness Statement (at ***[DJS-1[249-251]]***), during the attendance by representatives of Walkers at the Property on 26 February 2026, the individual at the reception desk was observed by Mr Harbord's colleague to be wearing a lanyard bearing the handwritten words "Daniel Sartori, QOB". On 2 March 2026, the JPLs wrote to QOB Interiors ("**QOB**"), requesting confirmation as to whether QOB was providing services at the Property, the nature and scope of any such services, and from whom they had received instructions (at ***[DJS-1[505-506]]***).

108. By email dated 12 March 2026, Mr Steven Argent, the Managing Director of QOB, responded confirming that QOB had been employed to undertake fit-out works at the Property under a JCT form of contract with the Company as employer. Mr Argent stated that QOB was informed of the UK sanctions designation on 14 October 2025, immediately ceased works, and terminated the contract on 23 October 2025 citing frustration and illegality arising from the sanctions. Mr Argent confirmed that QOB had not had any attendance at the Property since that date and that the suggestion of a QOB individual being present on site was incorrect (at ***[DJS-1[507]]***).

**Engagement with Campbells LLP**

109. Campbells, purporting to act for certain of the JPL Entities as described at paragraphs 23 and 24 above, wrote to Walkers on 24 February 2026 asserting that Mr Cosimo Borrelli ("**Mr Borrelli**") of Admiralty Asia Partners had been appointed as director of 25 of the JPL Entities, including the Company, and would be appointed as a director of the remaining companies shortly thereafter. Campbells indicated that copies of the relevant appointment resolutions would be provided once collated, and that Mr Borrelli was *"currently working on the joint provisional liquidators' requests for information"* (at ***[DJS-1[510]]***). On the same date, Campbells sent a further letter to the JPLs raising a series of detailed questions and requesting documents regarding the JPLs' costs, steps taken to safeguard assets, any proposed dealings with assets (in respect of which

Campbells requested prior notification), and compliance with applicable sanctions regimes (at ***[DJS-1[511]]***).

110. By letter dated 25 February 2026 (at ***[DJS-1[515]]***), Walkers responded noting that the JPLs had been appointed in the context of serious criminal allegations against Mr Chen Zhi and his associates, and had been granted powers to facilitate the protection of assets and investigation of the JPL Entities' affairs. Walkers emphasised that it was critical for the JPLs to understand the composition of the boards of those companies over which they are appointed and the basis upon which legal representatives have acted, or continue to act, in the JPL Entities' names.

111. Campbells had represented, in letters to Walkers dated 24 February and 10 March 2026 (at ***[DJS-1[510]]*** and ***[DJS-1[517]]***), that it was instructed by Mr Borelli, and that Mr Borrelli had been or would be appointed in relation to, 25 of the JPL Entities, including the Company. The 10 March 2026 letter asserted that Mr Borrelli had been appointed as sole director of each of the 25 companies by way of members' resolutions – in the case of the Company, dated 23 February 2026 – executed pursuant to powers of attorney said to have been granted by Mr Chen Zhi to certain unnamed individuals (see also Campbells' letter to Walkers of 25 March 2026 at ***[DJS-1[522-524]]***).

112. Walkers has repeatedly requested copies of the powers of attorney and the identity of the persons in whose favour they were granted on behalf of the JPLs – including by letters dated 25 February and 19 March 2026 (at ***[DJS-1[515-516]]*** and ***[DJS-1[527-530]]***). Campbells has persistently declined to provide this information, even on a redacted basis. In the case of the Company, however, the JPLs have obtained a copy of the written resolution dated 23 February 2026 (at ***[DJS-1[676-682]]***), which reveals that Mr Borrelli was appointed as an additional director by Sheng Haoran, the then sole director of the Company, by way of a written resolution of the sole director, rather than by way of a members' resolution executed pursuant to a power of attorney as Campbells had represented. In respect of the remaining JPL Entities, I am not aware of the identity of the persons who purportedly appointed Mr Borrelli as a director by way of members' resolutions under powers of attorney, nor have I seen evidence of those persons' authority to make the appointments. For completeness, however, I note that, at the recognition hearing on 9 June 2026 in relation to the Chapter 15 Petition (as defined in paragraph 116 below), Boies Schiller Flexner LLP, acting on behalf of Mr Borrelli, agreed to provide copies of the powers of attorney to the JPLs and their legal

representatives pursuant to a Protective Order by Chief Judge Martin Glenn of the United States Bankruptcy Court. As at the date of this witness statement, no deadline for production has been set and the terms of the Protective Order are still being finalised.

113. In a letter dated 1 April 2026, Campbells, stated to be acting on behalf of Mr Borrelli in his capacity as a director of the Company, wrote to Walkers in relation to the Property (at ***[DJS-1[531-532]]***). In that letter, Campbells referred to (a) communications between BSS and certain utility providers in relation to the Property, (b) communications between BSS and the JPLs, (c) the condition of the Property's lifts, (d) outstanding bills relating to the Property, and (e) the disconnection of the gas supply to the Property.

114. This reinforced the JPLs' concerns that there is a risk of competing actors purporting to take or direct steps (or actually taking or directing such steps) in relation to assets and entities in the United Kingdom within the JPLs' remit.

115. By letter dated 13 April 2026 (at ***[DJS-1[533-534]]***), Walkers responded to Campbells on behalf of the JPLs. The letter made clear that BSS has had no authority to take any steps in relation to the Property since the JPLs' appointment, given that Mr Chen Zhi ceased to be a director of the Company in February 2022 and that authority to deal with the Company's affairs now vests solely with the JPLs. The letter noted that BSS has repeatedly failed to comply with the JPLs' requests for information, appears to have intercepted correspondence from service providers, and has made improper attempts to contact such providers – prompting the former managing agent, C&W to instruct solicitors to prevent further contact with them. The letter also observed that the content of Campbells' correspondence suggests that Mr Borrelli is receiving information from an unidentified source, suspected to be BSS.

## VI. OTHER FOREIGN PROCEEDINGS

116. The JPLs have obtained recognition of the provisional liquidation in relation to the Company and the other JPL Entities in the United States Bankruptcy Court for the Southern District of New York, under Chapter 15 of the United States Bankruptcy Code (the "**Chapter 15 Petition**") (at ***[DJS-1[535]]***). Those cases are jointly administered, for procedural purposes, under *In re Prince Global Holdings Limited et al.*, Chapter 15 Case No. 26-10769 (MG) (Jointly Administered). Following a hearing on 22 April 2026 and a Memorandum Opinion dated 23 April 2026, Chief United States Bankruptcy

Court Judge Martin Glenn entered an Order Granting Provisional Relief, dated 30 April 2026, under section 1519 of the United States Bankruptcy Code (at ***[DJS-1[559]***). The relief initially granted was provisional relief pending determination of the Chapter 15 recognition petitions. On 21 May 2026, Boies Schiller Flexner LLP, acting on behalf of Mr Borrelli in his purported capacity as the sole director of 25 of the JPL Entities (including the Company), filed an objection to the Chapter 15 Petition (at ***[DJS-1[565]]***). On 11 June 2026, Judge Glenn issued a Memorandum Opinion (at ***[DJS-1[610]***) overruling Mr Borrelli's objection and recognising the BVI Proceedings as foreign main proceedings. Judge Glenn found that Borrelli lacked standing to object to recognition because he was not authorized under BVI law to oppose the Chapter 15 cases on behalf of the 25 JPL Entities and he failed to identify any personal right that would be affected by recognition. Judge Glenn has issued an order granting recognition on 18 June 2026. Following a hearing before the United States Bankruptcy Court for the Southern District of New York on 9 June 2026 and the Memorandum Opinion, dated 11 June 2026 (at ***[DJS-1[610]]***), Judge Martin Glenn entered an order and accompanying memorandum opinion, on 18 June 2026 granting the JPLs' petition for recognition and ordering, that: (a) the JPLs are authorised to act on behalf of the JPL Entities; (b) the JPLs may conduct discovery without seeking further court approval on a request-by-request basis; and (c) the JPLs may seek documents located outside of the U.S. from persons subject to the Court's jurisdiction. The Court also expressly rejected Mr Borrelli's efforts to limit the JPLs' discovery authority and stated that interference with the JPLs' discovery efforts "will not be tolerated". Exhibited hereto at ***[DJS-1[650-656]]*** is a copy of that order.

117. The JPLs are also taking steps to seek recognition of the provisional liquidation of the JPL Entities (including the Company) elsewhere, including in Hong Kong.

118. As a step towards recognition in Hong Kong, the JPLs applied to the BVI Court on 19 May 2026 (the "**Hong Kong Application**") for a letter of request to be issued by the BVI Court to the High Court of the Hong Kong Special Administrative Region of the People's Republic of China (the "**Hong Kong High Court**"). On 26 May 2026, Campbells filed in the BVI Court a Notice of Intention to Oppose the Hong Kong Application, together with a Second Affidavit of Mr Borrelli, on behalf of 25 of the JPL Entities (including the Company). The JPLs do not accept that those steps were properly taken on behalf of the JPL Entities concerned, in light of the 14 May Ruling (referred

to at paragraph 27 above). The Hong Kong Application was accepted by the BVI Court by order dated 29 May 2026 entered on 5 June 2026 (at ***[DJS-1[657]]***), pursuant to which the BVI Court ordered that the assistance of the Hong Kong High Court be sought and that the BVI Court request the Hong Kong Court to act in aid of the BVI Court for the purpose of maintaining the value of assets owned or managed by JPL Entities (including the Company) pursuant to a letter of request in the form proposed by the JPLs (the terms of which were approved). The BVI Court subsequently issued the letter of request to the Hong Kong High Court on 9 June 2026 (at ***[DJS-1[668]]***), which request will be put before the Hong Kong High Court shortly.

119. As mentioned in paragraph 28 above, on 29 May 2026 Campbells also issued a fresh application to vary the Appointment Orders including, in relation to the JPLs' power to seek recognition in Hong Kong.

## VII. THE NEED FOR ASSISTANCE

120. For the reasons set out above, the JPLs require the assistance of this Court. The Property is believed to the Company's principal asset, and we consider that the relief sought will assist us in fulfilling our functions and exercising powers conferred on us by the BVI Insolvency Act 2003 (the "**BVI Act**") and the Appointment Orders. The BVI Court has, by the Letter of Request, asked this Court to recognise the provisional liquidation and our appointment, and to authorise us to exercise those powers in England and Wales for the purpose of maintaining the value of the Company's assets.

121. First, the Letter of Request asks this Court to authorise the JPLs to gain entry into and take custody and exclusive control of the Property, to carry on the Company's business in relation to the Property, and to obtain information relating to the Property from any third party. As described above, the JPLs have been unable to secure access to or control of the Property, the Property appears to be occupied by unidentified persons not authorised by us, and at least one third party has declined to engage on the footing that our appointment currently has no standing in this jurisdiction. Recognition would remove that obstacle and enable the JPLs to obtain the information that has so far been withheld, in order to protect the interests of creditors.

122. Secondly, the Letter of Request asks this Court to authorise the JPLs to identify, retrieve and preserve the Company's assets, including the C&W Client Account Funds and the C&W Receivable. As described above, those funds, which the JPLs understand to be

approximately £2 million, have not been released to us, and C&W has declined to assist absent recognition. Recognition would assist the JPLs in securing those funds, which are connected with the Property.

123. Thirdly, the Letter of Request asks this Court to authorise the JPLs to prevent, or seek a stay of, enforcement against the Company's assets, and to conduct proceedings in the Company's name where necessary to protect them. As described above, Regent Gas has already disconnected the gas supply to the Property and removed the meter, and there is a continuing risk that Regent Gas or other creditors may take further enforcement steps against the Property. Recognition would enable the JPLs to seek a stay of such enforcement and so to protect the Property's value.

124. Given the position at the Property and the Possession Proceedings now on foot, the JPLs may need to act quickly as matters develop, and the Letter of Request accordingly also asks this Court to authorise the JPLs to apply for such further directions and orders as we think fit. The recognition and assistance sought are necessary to enable the JPLs to take and maintain control of the Property, to discharge our duties under the Act and the Appointment Orders, and to protect the Company's assets in the interests of its creditors.

125. Furthermore, the JPLs are concerned that creditors and counterparties may continue to take enforcement or self-help measures affecting the Company's assets in England and Wales. In particular, Regent Gas has already disconnected the gas supply to the Property and removed the gas meter in light of an outstanding debt which Regent Gas alleges is due from the Company (as described at paragraphs 86 to 95 above and the notices exhibited at ***[DJS-1[397]]*** and ***[DJS-1[414]]***). Regent Gas has alleged that the outstanding debt owed by the Company amounts to approximately £26,000. The JPLs are also concerned that Regent Gas, or other creditors, may seek to pursue claims against the Company or take further steps in relation to the Company's assets in this jurisdiction. The events described above demonstrate the practical difficulties faced by the JPLs in seeking to protect and preserve the Company's assets in this jurisdiction in the absence of recognition and effective assistance from this Court.

## VIII. SERVICE

126. Given that we are appointed as JPLs over the Company, we do not propose to serve this Application on the Company, as doing so effectively amounts to service on ourselves as JPLs.

## IX. CONCLUSION

127. For the reasons set out above, I respectfully consider that the requirements for recognition under section 426 of the Insolvency Act 1986 are met, and that the recognition described above and as set out in the draft Order is necessary and appropriate and is in the interests of potential creditors and stakeholders of the Company.

128. I therefore respectfully ask this Court to grant the assistance sought in this Application.

## STATEMENT OF TRUTH

129. I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**Signed**

Signature: ______________________________

**DAVID JOHN STANDISH**

on 25 June 2026