# EXHIBIT 5

**Joint Provisional Liquidators' BVI Skeleton Argument dated August 17, 2026**

**IN THE HIGH COURT OF JUSTICE** **CR-2026-004987**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF NOBLE TITLE LIMITED (IN BVI PROVISIONAL LIQUIDATION)**
**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**
**AND IN THE MATTER OF A REQUEST FROM THE EASTERN CARIBBEAN SUPREME COURT IN THE BRITISH VIRGIN ISLANDS DATED 17 JUNE 2026**

**BETWEEN:**

**(1) JAMES DRURY**

**(2) PAUL PRETLOVE**

**(3) DAVID STANDISH**

**(In their capacities as Joint Provisional Liquidators of Noble Title Limited (In BVI Provisional Liquidation))**

**Applicants**

**-and-**

**NOBLE TITLE LIMITED**

**(In BVI Provisional Liquidation)**

**Respondent**

---

**SKELETON ARGUMENT ON BEHALF OF THE APPLICANTS**

Interim Applications List 17 August 2026 10:30

---

*References are to the hearing bundle in the form [Tab/Page No./Para. No. (if applicable)]*
**Est. pre-reading:** 1 hour
**Suggested pre-reading**: (i) First Witness Statement of David John Standish dated 25 June 2026 ("**Standish 1**") **[5/A46]**; (ii) Second Witness Statement of David John Standish dated 12 August 2026 ("**Standish 2**") **[9/A760]**; (iii) Amended Draft Order provided with this skeleton argument.

## A. Introduction

1. By a letter of request dated 17 June 2026, issued by Mr Justice Wallbank KC, a Judge of the Eastern Caribbean Supreme Court in the territory of the British Virgin Islands (the "**BVI Court**"), this Court is asked to grant assistance to joint provisional liquidators (the

"**JPLs**") appointed by the BVI Court over a BVI-incorporated company, Noble Title Limited (the "**Company**"). The BVI Court's request for assistance is brought before this Court by the JPLs' application dated 25 June 2026 (the "**s.426 Application**") under s.426 of the Insolvency Act 1986 ("**IA 1986**"). The BVI is a "*relevant territory*" for the purposes of that provision.

2. The JPLs were appointed over the Company and 29 other BVI entities (the "**BVI Companies**") on 9 January 2026 upon the application of the Attorney General of the BVI (the "**Attorney General**"). The BVI companies are within a group known as the "*Prince Group*", of which a Mr Chen Zhi is believed to be ultimate beneficial owner and controller. As has been widely reported, Chen Zhi is alleged to have perpetrated fraudulent and criminal schemes including cryptocurrency investment fraud, wire fraud and bank fraud. He is also alleged to have engaged in human trafficking and forced labour in order to perpetrate such frauds, across numerous jurisdictions (Standish 1/¶10 **[4/A17/¶10]**). The Attorney General's position is that the BVI Companies have been used in connection with these fraudulent schemes, and in particular to launder the proceeds, by reason of which the Attorney General has petitioned to wind up the BVI Companies in the public interest and/or on the just and equitable basis, with the JPLs appointed in the interim.

3. The Company is the registered proprietor of a very substantial London commercial property, which was valued at a sum in excess of £95 million in 2020. In summary, the Court is requested:

   (1) to grant recognition of the provisional liquidation and of the JPLs appointment (Draft Order ¶1);

   (2) to order that the JPLs are permitted to exercise the powers that they are authorised to exercise under (i) the BVI Insolvency Act 2003 and (ii) the order of the BVI Court appointing the JPLs, insofar as these powers are permitted by the law of England and Wales (Draft Order ¶2); and

   (3) to order a stay on all proceedings, execution and enforcement against the company in this jurisdiction by applying the moratorium in s.130(2) of the IA 1986 to the Company (Draft Order ¶3).

4. Whilst, for form, the Company is named as the respondent to the s.426 Application, it has not been independently served with it, as such service would amount to service by the JPLs on themselves (see Standish 1/¶126 **[4/A45/¶126]**). No further substantive relief is sought against any third party at this stage, so no other parties are joined as respondent. However, without prejudice to the JPLs' position that they have no role to play in the s.426 Application, the JPLs have provided notice of the s.426 Application to Berkeley Square Solicitors ("**BSS**") (which firm asserts that it acts for Chen Zhi), and to the offshore firm acting for Mr Cos Borrelli, who has claimed that he is the current director of the Company. Copies of the s.426 Application and supporting evidence were sent to them more than 6 weeks ago, on 25 June 2026 **[8/A742]**. Notice of this hearing was sent on 3 August 2026 **[7/A751]**.

5. There has been no response on behalf of Mr Borrelli. However, on the evening of 10 August, without prior warning, the JPLs were provided with an unissued application by BSS, supported by a statement by Mr Sahota of that firm, which seeks an adjournment of the s.426 Application or, alternatively, unspecified "*directions*" (the "**BSS Application**") **[6/A728]**.[1] The application notice invited the Court to grant such (unspecified) relief without a hearing. Not only is that procedurally confused and improper (it seeks unilaterally to vacate the s.426 Application), it is also notable that the BSS Application does not seek the joinder of Chen Zhi to the s.426 Application, and it does not even purport to grapple with the question whether Chen Zhi has standing to intervene. The court is asked to note that when Chen Zhi purported to intervene in proceedings for possession of the property owned by the Company (detailed below), costs were ordered against him that he has failed to pay, accordingly he seeks to litigate risk free. As a person said only to be the shareholder of the parent company of the Company, it is denied that Chen Zhi has any standing to intervene in these proceedings.

6. This avoidance of the question of standing is particularly striking in circumstances where there is opacity as to the source of BSS's instructions: Mr Sahota says that he is being engaged by unnamed third parties who he says are "*appointed under a power of attorney granted by Mr Chen*" and that it is these unnamed third parties who have "*authorised*" him to make the statement **[7/A734/¶2]**. Mr Sahota has not evidenced the power of attorney from which it is said that these third parties derive their authority. Despite

[1] An issued version was provided on the afternoon of 11 August 2026.

repeated requests, inexplicably, BSS has refused to provide the JPLs with a copy of the alleged power of attorney.[2] Irrespective of this, the primary basis for seeking to delay the disposal of the s.426 Application is the contention that BSS has been unable to instruct any counsel – a contention which is hopeless.

## B. Background

### The worldwide proceedings

7. On 14 October 2025, the US Department of Justice (the "**DoJ**") unsealed an indictment against Chen Zhi charging him with conspiracy to commit wire fraud and money laundering (the "**DoJ Indictment**") **[5/A93]**. The DoJ Indictment alleges that, as chairman of the Prince Group, Chen Zhi orchestrated and profited from a large-scale transnational fraud and money-laundering enterprise from "scam compounds" in Cambodia. It is claimed that individuals were trafficked to these compounds and coerced into conducting online investment and romance scams, which targeted individuals worldwide. The scams are said to have generated more than $30 million per day ($11 billion per annum) in illicit proceeds **[4/A18/¶¶16 and 20]**.

8. The DoJ also filed a Civil Forfeiture Complaint in the US District Court for the Eastern District of New York, seeking forfeiture of the approximately 127,271 Bitcoin, valued at approximately $15 billion, alleged to constitute the proceeds of fraud **[4/A19/¶¶17 and 20]**.

9. Also on 14 October 2025, both the US and UK authorities imposed sanctions on 146 individuals and entities connected to the Prince Group, including Chen Zhi and the Company[3].

### The BVI Petitions and the appointment of the JPLs

10. On 5 January 2026, the Attorney General presented petitions to the BVI Court to wind up the Companies on the grounds that a winding up is in the public interest and/or that it

[2] References to Chen Zhi hereafter are accordingly necessarily without prejudice to the question of whether BSS has proper authority.

[3] Following their appointment, the JPLs have obtained broad licences allowing them to conduct court authorised liquidation activities.

is just and equitable to wind up the Companies **[5/A150]**. The BVI Insolvency Act 2003 provides, at section 162:

*"**<u>162. Appointment of liquidator by Court</u>***

*(1) The Court may, on application by a person specified in subsection (2), appoint a liquidator of a company under section 159(1) if –*

*(a) the company is insolvent;*

*(b) the Court is of the opinion that it is just and equitable that a liquidator should be appointed; or*

*(c) the Court is of the opinion that it is in the public interest for a liquidator to be appointed."*

11. The Attorney General may make an application under section 162(1), pursuant to s.162(2)(h) of the Insolvency Act 2003.

12. Accordingly, whereas in England and Wales, the Secretary of State may apply to wind up a company on public interest grounds under s.124(4) / 124A of the IA 1986, that role is fulfilled by the Attorney General in the BVI.

13. The Attorney General obtained *ex parte* orders for the appointment of the JPLs over the BVI Companies on 9 January 2026 (the "**Appointment Orders**"). The order in respect of the Company is at **[5/A196]**. It specifically provides that the JPLs may seek recognition of their appointment in certain jurisdictions, including England and Wales, for the purposes of securing, realising and remitting assets to their control, and obtaining access to and control of the records of the Company.

14. The Appointment Orders were continued by the BVI Court at an on notice hearing on 29 January 2026 **[5/A211]**. At that hearing, Campbells LLP ("**Campbells**") appeared and stated that they represented 25 of the BVI Companies (the "**25 Campbells Companies**"), including the Company. Campbells claims that the firm had been instructed by the current director of the 25 Campbells Companies, who was said to be Mr Borrelli. Mr Borrelli is said by Campbells to have been appointed pursuant to a power of attorney granted by Chen Zhi to unnamed individuals prior to his arrest and incarceration. The JPLs have not seen a copy of the power of attorney despite repeated requests for a copy (redacted or unredacted) and attempts to agree a confidentiality ring following an order in the US recognition proceedings **[9/A766/¶¶38-41]**.

15. The Attorney General's petitions were heard before Wallbank J on 16/17 April 2026 and written submissions were filed by 15 May 2026. Judgment is awaited. In the meantime, the Appointment Orders remain in effect and there is no stay upon the provisional liquidations. Consequently, it remains the role (indeed, duty) of the JPLs to act in accordance with the Appointment Orders.

**Borrelli's attempts to intervene**

16. This notwithstanding, there have been sustained attempts to interfere with the discharge by the JPLs of their functions.

17. In that regard, when the JPLs applied for Chapter 15 recognition in the USA, on 4 May 2026, this was objected to by Mr Borrelli, who claimed that he was acting in the name of the 25 Campbells Companies.

18. It is thus to be noted that although the BVI Court concluded that it was appropriate to appoint the JPLs to take over control of the BVI Companies in place of its board, a person claiming to be a director of the BVI Companies has taken the stance that he should be permitted to interpose to object to their actions, and to do so purportedly in the name of the BVI Companies themselves.

19. In light of these tactics, the JPLs applied to the BVI Court for directions on the question of (amongst other things) whether the directors of the BVI Companies retained authority to cause the BVI Companies to oppose or otherwise interfere with the exercise by the JPLs of their powers granted to them in the Appointment Orders, including the power to seek recognition. At a hearing on 14 May 2026, Wallbank J granted the relief sought by the JPLs, confirming that the BVI Companies' directors do not retain the power to oppose, in the name of the BVI Companies, the exercise by the JPLs of their powers granted in the Appointment Orders. The directors retain a power to apply to the BVI Court to vary or discharge the Appointment Orders, in the BVI Court, but not by intervening in foreign proceedings seeking recognition. Although permission to appeal was granted by Justice Wallbank, the appeal has not yet been listed **[9/A765/¶¶29-32]**.

**The Company**

20. The Company was incorporated on 12 October 2016 in the BVI. It was registered as an overseas entity in the UK Register of Overseas Entities on 23 December 2022. The sole shareholder of the Company is Retain Prosper Limited ("**Retain Prosper**"), which is

another of the BVI Companies over which the JPLs have been appointed. The sole shareholder of Retain Prosper is Chen Zhi.

21. The Company is the registered proprietor of the freehold of a substantial commercial property in the City of London at 6-12 Fenchurch Street and 1 Philpot Lane (the "**Property**"). The Property was purchased for the sum of £78,972,407 excluding VAT, on 29 November 2016 and was valued at £95,244,039 on 31 March 2020 **[4/A24/¶39]**. The JPLs faced significant difficulties in gaining access to the Property, which appeared to be in the control of individuals and entities connected to the Prince Group, as is explained in detail at ¶¶42-68 of Standish 1 **[4/A25]**.

22. Prior to the imposition of sanctions, the Property was managed by property managers Cushman and Wakefield ("**C&W**"). The JPLs have discovered that C&W hold information relating to the Company and its affairs, as well as c.£2million of Company money **[9/A767/¶42]**. At present, the JPLs have not been able to access either the records or the money, as is explained at ¶¶68-84 of Standish 1 **[4/A31]**.

23. The JPLs and their legal advisors have also been in communication with Regent Gas, who supplied gas to the Property. Regent Gas were taking steps to enforce a debt owed to them of c.£18,000, despite the JPLs repeatedly explaining the current situation in which the Company found itself owing to the appointment of the JPLs. It appears that Regent Gas obtained a warrant from the Magistrates Court and removed the gas meter from the Property **[5/A465]**. There is a concern that Regent Gas will continue to attempt to enforce its debt against the Property, as is explained at ¶¶86-95 of Standish 1 **[4/A34]**.

**The Letter of Request**

24. Against that background, the JPLs sought possession of the Property (as discussed below) and also applied to the BVI Court for a letter of request, asking that this Court act in aid of and be auxiliary to the BVI Court in connection with the provisional liquidation of the Company, in particular seeking recognition in England and Wales of the provisional liquidation in the BVI and consequential relief. The application was granted by Wallbank J, and a letter of request issued, on 17 June 2026 (the "**LoR**") **[2/A7]**.

25. The s.426 Application was filed thereafter on 25 June 2026 **[1/A3]**. As explained in Standish 2 **[9/A7656/¶¶33-37]**, there has been an attempt by the 25 Campbells

Companies to set aside the LoR, but that has not been determined – indeed, the JPLs have cross-applied to strike out that set-aside application.

**The Possession Proceedings**

26. On 15 June 2026, the JPLs caused proceedings for possession to be issued in the name of the Company against "persons unknown" (i.e. the occupiers) (the "**Possession Proceedings**"). The claim was listed for hearing before Leech J on 25 June 2026. The s.426 Application was issued on the same day.

27. At the hearing of the Possession Proceedings, counsel attended on behalf of Chen Zhi, instructed by BSS, in opposition to the claim. Despite recognising that it was not obvious that Chen Zhi had any interest in the proceedings, it was argued that there were significant issues to be addressed, that the time available was insufficient, and that possession should not be granted because the JPLs appointment was not recognised in this jurisdiction. It was submitted that assistance under s.426 of the IA 1986 would not be available to the JPLs.

28. In circumstances where the claim was brought by the Company, questions of control over a company are determined by the law of its incorporation, and the Company's board has been replaced by the appointment of the JPLs in the relevant jurisdiction, Leech J rejected the argument that formal recognition was necessary before the Court would accept the authority of the JPLs to bring the claim. He granted a possession order (the "**Possession Order**") **[10/A815]**, which was enforced on 23 July 2026 **[9/A764/¶20]**.

29. Despite this, on 21 July 2026, Chen Zhi filed an application for permission to appeal from the Court of Appeal in respect of the Possession Order **[9/A763/¶17]**. Ground 1 of Chen Zhi's Grounds of Appeal contends that the provisional liquidation and the JPLs appointment is not recognised in this jurisdiction and so the order should not have been made. The application for permission to appeal is yet to be considered by the Court of Appeal.

**The listing of the s.426 Application**

30. The s.426 Application was filed on 25 June 2026. A copy of it and the supporting evidence were sent to BSS and Campbells by way of notice that day.

31. The Court originally listed the s.426 Application for 7 May 2027, 10 months post issue. In light of this, and in particular owing to the position taken by Chen Zhi in the Possession Proceedings, the JPLs sought an earlier listing **[9/A762/¶¶7-8]**. On 3 August 2026 the Court listed this hearing for 17 August 2026 and the JPLs gave notice of the hearing to BSS. It is therefore incorrect for Mr Sahota to say that the JPLs delayed in giving notice. They gave notice of the hearing on the same date that they received notice from the Court.

## C. The BSS Application

32. As noted above, Chen Zhi has not applied to be joined and there are significant questions as to whether he standing to intervene. The failure to address this is striking – especially where it was previously identified as an issue in the Possession Proceedings. Counsel for Chen Zhi's skeleton argument expressly "*recognised*" that *"Mr Chen is the ultimate shareholder in [the Company] and as such would not ordinarily be heard in a possession claim between a company indirectly owned by him and persons unknown"*. The Court was however invited to hear his submissions which were said to go to the Court's jurisdiction to grant the order sought.

33. As with the Possession Proceedings, the basis upon which Chen Zhi has standing to interpose himself in an application considering the BVI Court's LoR is far from clear. However, even leaving the issue of standing aside, it is submitted that there is no good basis to accede to the BSS Application:

34. **First**, it is ill considered and procedurally confused. It asks for an adjournment for no specified period, or alternatively that the hearing be used for "*directions*", but none are proposed. No draft order has been provided (which the application notice makes clear is deliberate) and yet it also asked for this unspecified relief to be granted "*without a hearing*".

35. **Second**, it is not justified in any event. Significant reliance is placed upon the contention that BSS has been unable to instruct counsel – a position which is hopeless and transparently self-generated, not least as it is appears that since 3 August, BSS have only approached *a single set of chambers*. The Court does not need to be told that there are a great many barristers specialising in insolvency, practising from a number of sets of chambers. Thus, there is no suggestion that BSS has approached any of Maitland Chambers, Wilberforce Chambers, 4 Stone Buildings, Erskine Chambers, Radcliffe Chambers, Serle Court, Enterprise Chambers, Gatehouse Chambers, 4 New Square

Chambers, 3VB, Littleton Chambers, Selborne Chambers, No5 Barristers' Chambers, Outer Temple Chambers, Twenty Essex, Exchange Chambers, XXIV Old Buildings, 3 Hare Court, Quadrant Chambers or New Square Chambers (to name a selection). Any contention that no appropriate counsel can be located at the London bar is without foundation.

36. **Third**, whilst it is suggested that the s.426 Application "*raises substantial issues of law and fact*", no issues of fact are actually identified. This is even though the s.426 Application and supporting evidence was provided to BSS more than 6 weeks ago.

37. Further, the supposed issues of law are, with respect, hopeless. It is said that there is a question whether s.426 "*is available in respect of these particular BVI proceedings*", apparently on the basis that the JPLs were appointed upon the application of the Attorney General of the BVI, whereas in England similar petitions are initiated by the Secretary of State. There is nothing to this point (which was also floated at the hearing of the Possession Proceedings), which misunderstands s.426, as addressed at ¶¶53-59 below.

38. Beyond that, it is said that the "*issues include*" whether recognition can be obtained under the *Cross-Border Insolvency Regulations 2006* in circumstances where (it is said by BSS) that the Company is solvent. This is particularly bizarre: the JPLs are not applying for recognition under the CBIR. The s.426 regime is entirely distinct.

39. **Fourth**, it is said that there are issues as to whether it would be "*premature*" to determine the s.426 Application before Wallbank J has handed down judgment on the BVI winding-up petitions. Aside from the fact that it was Wallbank J who issued the LoR, there is no stay of the provisional liquidation orders, and the orders (which are interim in nature) remain in force. It is wrong to suggest that this Court should refuse a foreign court's request to grant assistance to its officeholders on the basis that it is conceivable that at some future stage the appointment might be brought to an end. That is tantamount to saying that assistance should not be granted where there has been an interim appointment, which is clearly wrong. It also of course ignores the reasons why assistance is sought. Further, the draft order (conventionally) makes clear that the assistance is limited to the period that the JPLs are in office, and accordingly the JPLs are only seeking recognition

of the provisional liquidation and if the provisional liquidation were to come to an end, so would the recognition[4].

40. **Fifth**, equally without merit are the (internally inconsistent) suggestions: (a) that the s.426 Application should be delayed whilst Chen Zhi seeks permission to appeal against the Possession Order, and (b) that relief is not needed because possession of the Property has now been obtained. In seeking permission to appeal the Possession Order, Chen Zhi is himself seeking to argue that possession should not have been granted prior to recognition of the JPLs. Accordingly, on Chen Zhi's own case, recognition would need to be dealt with even if he succeeds in the appeal. Further, the contention that there is no need for relief upon the s.426 Application since possession of the Property has now been obtained: (a) (again) ignores that it is Chen Zhi's own case that recognition is necessary for the Possession Order to stand; and (b) also ignores the point that the assistance sought goes wider than seeking possession of the Property. As is set out above, the following matters also necessitate the relief sought:

(1) The JPLs are investigating, and intend to collect in, both information/records relating to the Company and Company monies in the sum of c.£2million, held by C&W;

(2) Regent Gas have already removed the gas meter from the Property and the JPLs have concerns that they will continue to try and enforce their debt absent the moratorium on proceedings against the Company sought by the Draft Order;

(3) There are other suppliers who have provided services in connection with the Property (e.g. Ecotricity, Guarding UK – see Standish 1/ ¶¶96-104 **[4/A36]**), the JPLs may need to deal with these suppliers and the respective debts owed to them;

(4) Mr Sahota (on behalf of Chen Zhi) has expressly stated that the JPLs have no standing in this jurisdiction because they have not obtained recognition (see Standish 1/¶54 **[4/A28]**) as such recognition is sought in order that relevant parties recognise the authority of the JPLs.

41. Moreover, plainly there would be prejudice to the JPLs if the BSS Application were granted, not only would it serve to increase the court time and costs of dealing with the

[4] If the Company were to enter liquidation, the liquidators would need to apply for recognition of the liquidation by way of separate application – see *Re RTI Limited (In Provisional Liquidation)* [2025] EWHC 3409 (Ch) (ICC Judge Greenwood) and *Re RTI Limited (In Liquidation)* [2026] EWHC 1351 (Ch) (ICC Judge Burton).

s.426 Application, Chen Zhi has a vested interest in delaying the question of whether the JPLs appointment should be recognised in this jurisdiction, given the basis of his application for permission to appeal the Possession Order is that the Possession Order cannot stand absent recognition.

42. Ultimately, this is a repackaging of the attempts previously made to delay the disposal of the Possession Proceedings, in which it was submitted on behalf of Chen Zhi that **[10/A799]**:

> *"the JPLs' right to bring proceedings or seek relief in this jurisdiction gives rise to complex issues, which are not acknowledged on the face of the proceedings. There are important points of some complexity that must be drawn to the Court's attention and given proper consideration. An hour is not sufficient to resolve these issues justly; that is particularly the case given the provisional nature of the JPLs' appointment, which is itself further contingent on delivery of a reserved judgment in BVI, and an appeal on another material issue pending before the Court of Appeal of the Eastern Caribbean Supreme Court."*

43. This strategy of delay was rightly rejected by Leech J.

## D. The s.426 Application

### Relevant principles

44. The Court will be familiar with s.426 of IA 1986, which provides, insofar as relevant:

> *"(4) The Courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.*
>
> *(5) For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction*
>
> *In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law. ...*
>
> *(10) In this section "insolvency law" means –*
>
>> *(a) in relation to England and Wales, provision extending to England and Wales and made by or under this Act or in sections 1A, 6 to 10, 12 to 15, 19(c) and 20 (with Schedule 1) of the Company Directors Disqualification Act 1986 and sections 1 to 17 of that Act as they apply for the purposes of those provisions of that Act;*
>>
>> ...

> *(d) in relation to any relevant country or territory, so much of the law of that country or territory as corresponds to provisions falling within any of the foregoing paragraphs; ...*
>
> *(11) In this section "relevant country or territory" means – ...*
>
> *(b) any country or territory designated for the purposes of this section by the Secretary of State by order made by statutory instrument."*

45. As has been explained in the case-law, s.426 is designed "*to give effect to the principle of modified universalism*", *Re RTI Limited (In Liquidation)* [2026] EWHC 1351 (Ch) at [13].

46. Analytically, it is a request for assistance by the foreign court. Accordingly, whilst the Court retains a discretion *"the discretion is a limited one"* and it *"should be exercised in favour of assisting a foreign court unless it would be improper to do so*"; *New Cap Reinsurance Corp Ltd* [2011] EWHC 677 (Ch) at [32].

47. As to the application of s.426, and as explained in *Hughes v Hannover Rucksversicherungs-Aktiengesellschaft AG* [1997] BCC 921 per Morritt LJ at 937E – 938D:

    (1) Where a relevant request is made, s.426(4) imposes the requirement to provide assistance. It identifies which courts may be obligated to provide assistance and the courts who may seek that assistance. The assistance that is to be given under s.426(4) includes all of the English Court's usual jurisdiction and powers;

    (2) This is then expanded by s.426(5) which additionally confers upon the requested court the ability to do more than apply its domestic law, and to also apply the law of the requesting court;

    (3) Accordingly, a court in this jurisdiction, faced with a letter of request for assistance, may apply: (a) its own general jurisdiction and powers (for example, it may exercise its general equitable jurisdiction to grant a worldwide stay of actions or proceedings by the defendants to a claim) *and* (b) the insolvency law of England and Wales as defined at s.426(10), or (c) so much of the insolvency law of the relevant country as corresponds to those laws;

    (4) If the English Court chooses to apply English insolvency law, the English court can proceed on certain assumptions as to jurisdiction in the application of English

insolvency law (e.g. in *Re Dallhold Estates* [1992] BCC 394, Chadwick J held that, if asked by a relevant court to grant assistance, an English Court can apply English insolvency law to make an administration order despite the company in question not being an English incorporated company to which the IA 1986 applies, the court simply makes an assumption that the international element is not a jurisdictional bar to applying English law)[5]. If the court chooses to apply foreign insolvency law, it can likewise proceed upon certain assumptions.

48. *Dicey, Morris and Collins on the Conflict of Laws*, 16th edn, explains at ¶¶30-167 and 30-168 as follows:

> ***30-167*** *Issues may arise as to when a rule of foreign insolvency law "corresponds" to a relevant provision of English insolvency law, so that the English court is able to apply it under s.426(5). In Re Business City Express Ltd, a request for assistance was received from an Irish court in which the English court was asked to make a scheme of arrangement, entered into in Ireland after a company had gone into examinership there, binding upon English creditors. There was no provision of English law by which this could be done. The court applied Irish law to the English creditors without discussing the question of whether the Irish law corresponded to any provision made by or under the Insolvency Act 1986.*

> ***30-168*** *It is not necessary that the foreign insolvency law be the same as English insolvency law, for if this were the case (and it is in any event contradicted by the decision in Re Business City Express Ltd) the notion of applying foreign insolvency law would be redundant. Accordingly, the most appropriate solution is to interpret "corresponds" in a broad fashion and to determine in the particular case whether it is appropriate in the light of the matters specified in the request, for the court to exercise its discretion to provide assistance as specified under the relevant foreign law.*

49. As explained by ICCJ Greenwood in *Re RTI Limited* and developed by ICCJ Burton in a later decision in that matter, when considering a request for assistance in the context of s.426:

(1) First, there must be a relevant request which must state the relief being sought from the English court by reference to particular matters or classes of matters set out in the request.

[5] As was accepted by Morritt LJ in *Hughes* at 933C-F, 934B, and 938E

(2) Second, the matters specified in the request, or comparable matters, must fall within the insolvency jurisdiction of the English court.

(3) Third, the court must decide whether or not to exercise its discretion in favour of assistance (noting that there is a strong presumption in favour of granting the assistance sought) and in doing so must determine which system of law to apply.

**Chen Zhi's argument**

50. Chen Zhi submitted at the Possession Proceedings hearing that "[s.426 assistance] *is unavailable because the BVI proceedings were opened at the instance of the AG. This is permitted in BVI under s.162(2)(f) of the Insolvency Act 2003*[6] *... but there is no equivalent provision in England. Accordingly the provisional liquidation does not fall within the meaning of "insolvency law" as defined by s.426(10)(d) of the IA 1986"*.

51. This argument misunderstands the construction and operation of s.426.

52. Section 426(4) provides that "*The Courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory"*.

53. Accordingly, for the English court to grant assistance, s.426(4) requires the following:

(1) A request for assistance must be made to the English court exercising insolvency jurisdiction in relation to insolvency law (being the court exercising jurisdiction in relation to the Insolvency Act 1986, certain provisions of the Company Directors Disqualification Act 1986, and subordinate legislation made under those provisions). That is obviously satisfied here, the request having been made to the English Companies Court.

(2) The request must be from a court in another part of the UK or any "*relevant country or territory*". This is satisfied as the BVI is a '*relevant country or territory'*, designated by the *Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986* (SI 1986/2123).

(3) Further, the requesting court must itself be a court with jurisdiction in insolvency matters. This is explained in *Cross-border Insolvency* by Richard Sheldon KC, 4th edn, at ¶4.20: the reference to insolvency law in s.426(4) "*serves simply to identify*

---

[6] Presumed to be a typo for s.162(2)(h) of the Insolvency Act 2003

*the foreign courts from which a request must emanate if the section 426 jurisdiction is to be invoked*", and as such "*The court which makes the request for assistance must therefore be a court 'having the corresponding jurisdiction' to the English court's jurisdiction in relation to 'insolvency law'. Thus, the foreign court must be the court with jurisdiction in insolvency matters*". Plainly the BVI Court, which deals with liquidation proceedings in the BVI, is such a court. Indeed, the BVI Court confirms that it is the court "*exercising jurisdiction in relation to insolvency law in the Territory of the Virgin Islands*" at ¶1 of the LoR **[2/A7]**.

54. What is not required by s. 426(4) is that the requesting court is actually exercising its insolvency jurisdiction. As explained in *Sheldon* at ¶4.21:

> *"It need not be a court which is actually exercising that jurisdiction, and so there do not need to be insolvency proceedings on foot in the foreign court before a request can be issued. Also, the foreign court need not be a court which would have jurisdiction to do what is requested of the English court. Otherwise, the English court's power to assist would be limited to such orders as the foreign court might have made under its own law, and section 426 is plainly not so limited".*

55. Accordingly, the suggestion that it is somehow relevant that the BVI Attorney General applied for the appointment of the JPLs (and that in England it would be the Secretary of State) is misplaced. There is not even a requirement that insolvency proceedings are on foot in the requesting court such that the requesting court is actually exercising an insolvency jurisdiction at all.

56. Nor if there are insolvency proceedings on foot, is it necessary that they are proceedings of precisely the same type as exist under English law. Hence why in *Re Integrated Medicial Solutions Ltd* [2012] BCC 215 the English court gave assistance to an interim examiner of an Irish company (an office not known in this jurisdiction) in response to a letter of request from the Irish High Court.

**Analysis**

57. The threshold conditions for granting assistance are satisfied: (a) a request has been made by a court of a relevant country or territory (the LoR has been issued by the BVI Court); and (b) the request has been made by a court exercising insolvency jurisdiction in that relevant country to the Companies Court (being the court which exercises insolvency jurisdiction in England and Wales). Therefore, the issue before the Court is the question

of whether the Court should exercise its discretion. The Court should exercise its discretion in favour of granting the order sought by the JPLs for the following reasons.

58. **First**, the BVI Court has granted the JPLs application for a letter of request and issued the LoR, which is a weighty factor to be taken into account and which is to be given a high degree of respect.

59. **Second**, the relief sought is deliberately simple. The JPLs seek recognition; powers to collect and deal with the assets of the Company (the same powers as they are given by the Appointment Order); and prohibitions on execution or enforcement against the Company and its assets.

60. There is no possible objection to recognition. As was said by Patten J (as he then was) in *Re Trading Partners Ltd* [2002] 1 BCLC 655 when recognising BVI liquidators under s426:

*"[6] ... The policy behind this section of the Act must be to encourage the English court to recognise the appointment of a foreign liquidator from an approved jurisdiction unless the only purpose of such recognition is to permit that liquidator to operate within the jurisdiction in a manner which this court would regard as impermissible. No such difficulties exist in the present case. The reality of the situation is that TPL, although a BVI company, appears to have conducted all its operations in England largely through the medium of VTFL. The joint liquidators are therefore appointees under the order of the BVI court and are subject to its supervision. But their duties and functions cannot property be carried out unless they are free to operate in England and to have access to the powers available under the Insolvency Act to assist them in that regard. Whether they should be granted the relief available to office holders under s.236 will then be a matter for this court."*

61. The JPLs seek no more than they would be permitted under English law, were the Company subject to an insolvency process in this jurisdiction (as is expressly stated at ¶2 of the Draft Order). Further, the JPLs are not seeking any remedy in English law that is not available to them in the BVI. The Court is not being asked to apply foreign law in this jurisdiction that is otherwise unknown to this legal system, which would necessarily involve greater comfort before the Court would exercise its discretion.

62. **Third**, the recognition of the provisional liquidation and the appointment of the JPLs does not require any positive assistance to be given by this court at this stage. They are not seeking any orders against third parties (e.g.) for examination, at this time.

63. Therefore although the JPLs would be granted the power to act, in this jurisdiction, in the way permitted by the Appointment Order (e.g. collecting and preserving Company

assets, pursuant to ¶2 of the Draft Order), the reality is that the JPLs would have to come back to court to exercise any particular power in the IA 1986 e.g. to exercise their powers under to s.236 IA 1986. An objection to the exercise of such powers can be taken at the time such an application is made.

64. **Fourth**, the request that the JPLs have powers to collect in the assets, records, and information belonging to or concerning the Company and its affairs, should be uncontroversial in circumstances where it is the function of the JPLs to collect in and preserve the assets of the Company and its assets are all located in this jurisdiction (so far as the JPLs are aware). Entities and individuals in this jurisdiction are highly likely to hold information and records concerning Company given the JPLs investigations to date, as detailed in Standish 1.

65. **Fifth**, as to the request that the court apply s.130(2) of the IA 1986 to the provisional liquidation in this jurisdiction: this is necessary to prevent enforcement against the assets of the Company in circumstances where the role of the JPLs is to protect its assets pending final determination of the Attorney General's petition. The protection of its assets is to the benefit of whomever ultimately becomes entitled to them (or their proceeds), whether the Company ultimately ends up in liquidation or is returned to the control of its former management.

66. **Sixth**, although the JPLs now have possession of the Property, it is submitted that this does not alleviate or remove the need for the assistance sought. It is plain that recognition continues to be necessary, if not more necessary, given the submissions in the Possession Proceedings. Further, there are other important elements of relief, such as collecting in the c.£2m held by C&W, together with company records they hold.

67. In the circumstances, the Court is respectfully invited to exercise its discretion in favour of granting the s.426 Application.

## E. Conclusion

68. For the reasons set out above, the Court is asked to refuse the BSS Application and to grant the relief as set out in the updated draft order accompanying this skeleton argument.

**13 August 2026**

**TONY BESWETHERICK KC**
**South Square**

**KATE ROGERS**
**Radcliffe Chambers**
krogers@radcliffechambers.com