# Joint Appendix

# VOLUME 1 OF 23

**In re: PRINCE GLOBAL HOLDINGS LIMITED, *et al.***

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Southern District of New York

Case number (*If known*): _______________________ Chapter 15

❑ Check if this is an amended filing

# Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding

**12/15**

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).**

1. **Debtor's name** PRINCE GLOBAL HOLDINGS LIMITED

2. **Debtor's unique identifier**

   **For non-individual debtors:**

   ❑ Federal Employer Identification Number (EIN) ___ ___ – ___ ___ ___ ___ ___ ___ ___

   ☑ Other 1988528. Describe identifier BVI Company Number.

   **For individual debtors:**

   ❑ Social Security number: xxx – xx– ____ ____ ____ ____

   ❑ Individual Taxpayer Identification number (ITIN): **9** xx – xx – ____ ____ ____ ____

   ❑ Other ________________________. Describe identifier ____________________________.

3. **Name of foreign representative(s)** James Drury, Paul Pretlove and David Standish

4. **Foreign proceeding in which appointment of the foreign representative(s) occurred** _Liquidation before the Eastern Caribbean Supreme Court in the High Court of the BVI, Commercial Division, pursuant to section 170 of the Insolvency Act 2003, Case No. BVIHCOM2026/0019

5. **Nature of the foreign proceeding**

   *Check one:*

   ☑ Foreign main proceeding
   ❑ Foreign nonmain proceeding
   ❑ Foreign main proceeding, or in the alternative foreign nonmain proceeding

6. **Evidence of the foreign proceeding**

   ☑ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

   ❑ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

   ❑ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.

   ______________________________________________________________

   ______________________________________________________________

7. **Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

   ❑ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)

   ☑ Yes

Debtor PRINCE GLOBAL HOLDINGS LIMITED
Name

Case number *(if known)*

**8. Others entitled to notice**

Attach a list containing the names and addresses of:

(i) all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii) all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii) all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

**Country where the debtor has the center of its main interests:**

British Virgin Islands

**Debtor's registered office:**

Vistra Corporate Services Centre
Number Street

Wickhams Cay II
P.O. Box

Road Town, Tortola
City State/Province/Region ZIP/Postal Code

British Virgin Islands, VG1110
Country

**Individual debtor's habitual residence:**

Number Street

P.O. Box

City State/Province/Region ZIP/Postal Code

Country

**Address of foreign representative(s):**

10 Fleet Place
Number Street

P.O. Box

London, EC4M 7RB
City State/Province/Region ZIP/Postal Code

England, UK
Country

**10. Debtor's website** (URL)

**11. Type of debtor**

*Check one:*

☑ Non-individual (*check one*):

☑ Corporation. Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

☐ Partnership

☐ Other. Specify: ____________________

☐ Individual

Debtor PRINCE GLOBAL HOLDINGS LIMITED
Name

Case number (if known) ______________________

**12. Why is venue proper in *this district*?**

*Check one:*

☑ Debtor's principal place of business or principal assets in the United States are in this district.

☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:

______________________

☐ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:

______________________

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✗ [signature]
Signature of foreign representative

PAUL LEWIS PRETLOVE
Printed name

Executed on 04/08/2026
MM / DD / YYYY

✗ ______________________
Signature of foreign representative

______________________
Printed name

Executed on ______________
MM / DD / YYYY

**14. Signature of attorney**

✗ [signature]
Signature of Attorney for foreign representative

Date 04/08/2026
MM / DD / YYYY

Andrew G. Dietderich
Printed name

Sullivan & Cromwell LLP
Firm name

125 Broad St
Number Street

New York
City

NY
State

10004
ZIP Code

(212) 558-4000
Contact phone

dietdericha@sullcrom.com
Email address

2850584
Bar number

NY
State

**Case Number :BVIHCOM2026/0019**

FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

**Submitted Date:13/01/2026 16:00**

**Filed Date:14/01/2026 08:30**

**Fees Paid:0.00**

REGISTRAR HIGH COURT
COMMERCIAL DIVISION
VIRGIN ISLANDS

Case Number :BVIHCOM2026/0019

FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

IN THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

COMMERCIAL DIVISION

CLAIM NO BVIHC (COM) 2026/0019

Submitted Date:12/01/2026 13:36

Filed Date:12/01/2026 13:36

Fees Paid:0.00

BETWEEN:

IN THE MATTER OF PRINCE GLOBAL HOLDINGS LIMITED

AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS.

THE ATTORNEY GENERAL

Applicant

-v-

PRINCE GLOBAL HOLDINGS LIMITED

Respondent

---

ORDER APPLICATION FOR JOINT PROVISIONAL LIQUIDATORS

---

BEFORE: THE HONOURABLE JUSTICE ABBAS MITHANI

DATED: THE 9th DAY OF JANUARY, 2026

ENTERED: THE 12th DAY OF JANUARY, 2026

**PENAL NOTICE**

The effect of this Order is that the directors, former directors, office holders and former office holders of the Respondent, PRINCE GLOBAL HOLDINGS LIMITED ("the Company") are replaced by the joint provisional liquidators and that the directors, former directors, office holders and former office holders are prohibited from taking any action in relation to the Company's affairs without prior consent of the joint provisional liquidators.

If you, the directors, former directors, office holders and former office holders of the Company fail to comply with the terms of this order, proceedings may be commenced against you for contempt of court and you may be liable to be imprisoned, fined or have your assets seized.

**This order must be complied with by any person affected by it upon whom it is served. Any other person who knows of this order and does anything which helps or permits the directors, former directors, office holders and/or former office holders of the Company to breach its terms may also be held to be in contempt of Court and may be imprisoned, fined or have their assets seized.**

**UPON THE ORDINARY APPLICATION** filed by the Applicant on 5 January 2026 seeking the appointment of James Drury of Interpath (BVI) Limited, PO Box 4571, 4th Floor, LM Business Centre, Fish Lock Road, Road Town, Tortola, Virgin Islands, VG1110, Paul Pretlove and David Standish, both eligible overseas insolvency practitioner of Interpath Ltd, 10 Fleet Place, London EC4M 7RB, England as joint provisional liquidators of the Company pursuant to section 170 of the Insolvency Act 2003, ("**the Application**") coming on for hearing.

**AND UPON HEARING** Paul B. Dennis K.C. and with him Nadine Whyte Laing and Koya Ryan of O'Neal Webster for the Applicant.

**AND UPON** the Attorney General Dawn J. Smith being present.

**AND UPON** Mr. Paul Pretlove and Mr. James Drury, two of the proposed joint provisional liquidators being present.

**AND UPON READING** the Application, the originating application to appoint liquidators of the Company, the first affidavit of the Attorney General, the affidavit of Jeni-Lee Watson and the other documents on the Court file.

**AND UPON** the Application being heard ex parte.

**IT IS HEREBY ORDERED THAT:**

1. James Drury, Paul Pretlove and David Standish be appointed jointly and severally as provisional liquidators (the "**Joint Provisional Liquidators**") of the Company until further order.

2. The Joint Provisional Liquidators have the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned by the Company and to carry out the functions for which they are appointed.

3. In addition to the powers outlined in 2 above, the Joint Provisional Liquidators shall have the following specific powers which may be exercised without further sanction or intervention of this Honourable Court:

a. to gain entry to the Company's premises and take possession of and preserve the books and records of the Company;

b. to identify any assets which may remain in the possession or control of the Company, and to take such steps as may be necessary to protect any such assets from removal or dissipation;

c. to seek the recognition (or its equivalent) of the appointment of the Joint Provisional Liquidators in the United States, United Kingdom, Singapore, Hong Kong, Taiwan Thailand and Cambodia or elsewhere for the purposes of securing, realising and remitting assets to the control of the Joint Provisional Liquidators and for the purpose of obtaining access to and control of the records of the Company;

d. to commence, continue, discontinue or defend, including by way of counterclaim or similar response, any action or other legal proceedings in the name and on behalf of the Company in so far as necessary to protect the assets and information of the Company including:

(i) issuing proceedings against the directors, former directors, office holders and former office holders of the Company, if so advised.

(ii) intervening (if so advised) in ongoing proceedings which involve the Company and/or its directors, former directors, office holders and/or its former office holders.

e. to vote the shares of the Company in order to prevent the dissipation of its assets.

f. to carry on the business of the Company so far as may be necessary for its beneficial provisional liquidation;

g. to take all necessary steps to obtain from any person documents or copy documents which belong to the Company or have been created or maintained on its behalf or which the Company has a right to obtain or inspect.

h. to appoint an agent including a solicitor, or accountant to do any business that the Joint Provisional Liquidators are unable to do themselves in discharge of their duties, or which can be more conveniently done by an agent;

i. to investigate the affairs of the Company so far as necessary to protect and, if necessary, retrieve the assets and records of the Company;

j. to retain, manage and operate the existing bank accounts of the Company including, without limitation, the power to change, remove and replace the signatories of these accounts and, where necessary, to open new bank accounts;

k. The Joint Provisional Liquidators may draw down payments on account of their remuneration, expenses and disbursements from time to time at a rate of 80% of their time costs and 100% of their expenses and disbursements, subject to these being subsequently approved by the court, and in the event that such sums are not approved, the unapproved sums be repaid to the Company within 7 days;

l. to apply to the Court for directions concerning any matter arising out of the exercise of the above powers; and

m. to do all other things as may be incidental to the exercise of the above functions and powers.

n. to consult and share information with the Applicant to facilitate effective cooperation in relation to potential and ongoing criminal investigations and prosecutions connected to the affairs of the Company.

o. to cooperate and communicate with law enforcement and regulatory authorities in the Virgin Islands and in other jurisdictions.

4. The Joint Provisional Liquidators are authorised and directed to implement the protocol for consultation and information sharing between them and the Applicant in the draft which is attached hereto **("the Protocol")**.

5. Any disclosure of information by the Joint Provisional Liquidators to the Applicant made in good faith and in accordance with the Protocol shall be deemed authorised by the Court and shall not constitute a breach of duty, confidence, data protection obligations or contractual restrictions binding upon the Company.

6. The Joint Provisional Liquidators shall not be required to disclose material subject to legal professional privilege or litigation privilege.

7. The Joint Provisional Liquidators and the Applicant have liberty to apply on short notice for directions, variation or termination of the Protocol.

8. The costs of the provisional liquidation, including the proper fees and disbursements of the Joint Provisional Liquidators and the Applicant's costs of complying with the Protocol be paid out of assets of the Company in priority to all other claims.

9. The powers set out in paragraph 3 above are to the exclusion of any power exercised or purported to be exercised by any existing director of the Company in so far as such power concerns the affairs of the Company and its assets within the jurisdiction of the Virgin Islands.

10. Save as provided in paragraph 3 above the Joint Provisional Liquidators may not exercise any of the powers set out at Schedule 2 to the Insolvency Act, 2003 without sanction of the court.

11. Pursuant to section 174 of the Insolvency Act, 2003 alternatively pursuant to the inherent jurisdiction of the Court, all actions, suits or proceedings of any nature whatsoever against the Company be and are hereby restrained until further order of the Court.

12. During the period of their appointment, any act required or authorized to be done by the Joint Provisional Liquidators may be done by any one or more of them.

13. This order was made at a hearing without notice to the respondent. There will be a further hearing in respect of the order on or before 29th January 2026 with a time estimate of 30 minutes, for directions only (**the Return Date**).

14. The Joint Provisional Liquidators are to file and serve a report within one clear day before the Return Date summarising steps taken, any immediate concerns and recommended next steps.

15. The Company is at liberty to apply to vary or discharge the order upon giving 72 hours' notice to the Applicant and the Joint Provisional Liquidators.

16. The Joint Provisional Liquidators are at liberty to apply to vary or discharge the order if the allegations set out above are not substantiated or for some other reason upon giving 72 hours' notice to the Applicant and the Company.

17. The Applicant is not required to give an undertaking in damages.

18. The costs of this Application be costs in the provisional liquidation.

19. The Joint Provisional Liquidators are not required to pay or provide security.

**BY THE COURT**

**REGISTRAR**

**Protocol for Consultation and Information-Sharing Between the Liquidators and the Attorney General**

This Protocol is annexed to and forms part of the Order of the BVI Commercial Court (the **Court**) made on 9 January 2026 in Claim No. BVIHC (COM) 2026/0019 **("the Order").** Capitalised terms bear the meanings given in the Order unless the context otherwise requires.

***1. Purpose and status***

This Protocol sets out a consultative framework between the Liquidators and the Attorney General to facilitate effective cooperation in the public interest, including in relation to potential and ongoing regulatory or criminal investigations and prosecutions connected to the affairs of Prince Global Holdings Limited **("the Company")** For the avoidance of doubt, this Protocol is made pursuant to and with the approval of the Court, and disclosures made in good faith in accordance with this Protocol are deemed authorised by the Court.

***2. Guiding principles***

The Liquidators shall remain independent and act in the interests of the Company's creditors as a whole and the integrity of the winding up. The Attorney General's participation under this Protocol is consultative and does not fetter the Liquidators' statutory powers or duties, nor the Attorney General's independent functions. Both parties shall conduct themselves with candour, proportionality and respect for legal professional privilege, confidentiality, data protection and rule of law.

Nothing in this Protocol is intended to limit or restrict the ability of the Company's stakeholders to constitute a creditors' committee.

***3. Definitions***

- Attorney General means the Attorney General of the Virgin Islands and includes designated officers acting on the Attorney General's behalf for the purposes of this Protocol.
- The Company means Prince Global Holdings Limited which is the subject of the Order.
- Confidential Information means non-public information concerning the Company, the liquidation, related investigations, counterparties and assets, including personal data and material subject to confidentiality obligations owed by the Company or the Liquidators.

- **Privileged Material** means material subject to legal professional privilege or litigation privilege, or any analogous protection recognised by the Court.

***4. Appointment and representation***

The Attorney General shall constitute a consultative committee and may nominate up to three designated representatives for liaison with the Liquidators, with at least one senior contact identified (the **AGs Committee**). The Attorney General may change representatives on notice to the Liquidators.

The AGs Committee shall serve alongside any creditors' committee (if one is formed), and the Liquidators shall have equal regard to the views expressed by both the AGs Committee and the creditors' committee (if formed).

***5. Consultation framework***

5.1 Meetings. The Liquidators shall convene regular consultation meetings (in person or virtual) with the Attorney General not less than once per quarter, and ad hoc meetings as reasonably required. The Liquidators shall chair meetings and circulate a brief agenda in advance. These meetings may be consolidated with meetings of the creditors' committee (if one is formed).

5.2 Attendance. The Liquidators may invite professional advisers and members of the liquidation team. The Attorney General may invite relevant law enforcement or regulatory personnel, provided confidentiality undertakings are observed.

5.3 Minutes. The Liquidators shall keep concise minutes recording attendees, topics discussed and any agreed actions, subject to privilege and sensitivity redactions where appropriate.

***6. Reporting***

6.1 Periodic reports. The Liquidators shall provide to the Attorney General a confidential report not less than once per quarter covering, to the extent appropriate and not prejudicial to the estate:

- status of asset identification, recovery actions and investigations;
- key applications to the Court and outcomes;
- known factual matters relevant to potential criminal offences or regulatory breaches; and
- anticipated steps in the next period.

6.2 Urgent matters. The Liquidators shall promptly notify the Attorney General of matters reasonably judged to be urgent, including (but not limited to) risk of dissipation, destruction of records, or flight of suspects.

6.3 Templates. The Liquidators may adopt reporting templates and may omit details where disclosure would prejudice recoveries, negotiations, privilege, or legal processes.

***7. Information requests by the Attorney General***

7.1 Scope. The Attorney General may request access to documents, data and information reasonably required in relation to the Company or related persons or entities.

7.2 Process. Requests shall be made in writing, identifying the categories sought, the purpose, and any timing sensitivities. The Liquidators shall acknowledge within 3 business days and respond within a reasonable time, taking into account volume, complexity and competing duties.

7.3 Reasonableness and sequencing. The Liquidators may propose reasonable narrowing, staging or alternative formats, including summaries or redactions, to protect privilege, confidentiality, commercial sensitivity, or the integrity of civil recovery efforts.

7.4 Court supervision. If disagreement arises which cannot be resolved promptly, either party may seek directions from the Court on short notice.

***8. Authorised disclosures and gateways***

8.1 Court authorisation. Subject to sections 9–12, the Liquidators are authorised by the Court to disclose Confidential Information to the Attorney General for the limited purposes of regulatory or criminal investigation and prosecution, restraint, confiscation, forfeiture, mutual legal assistance, and related protective measures, and to receive Confidential Information from the Attorney General for liquidation purposes.

8.2 Statutory gateways. To the extent any statutory or regulatory gateway is required for disclosure or use of information, the parties shall cooperate to identify and use such gateways, including by seeking further directions or orders of the Court as needed.

8.3 No breach. Disclosures made in good faith under this Protocol shall not constitute a breach of duty, confidence, data protection laws, or contractual restrictions binding on the Company, and the Liquidators shall have the protection of the Court accordingly.

***9. Privilege and confidentiality***

9.1 Privilege preserved. The Liquidators shall not be required to disclose Privileged Material. Any inadvertent disclosure shall not constitute a waiver of privilege, and the Attorney General shall promptly return or delete such material and refrain from review or use upon notification.

9.2 Common interest. Where appropriate, and subject to legal advice, the parties may agree that certain exchanges are made on a common interest or joint interest basis to preserve privilege.

9.3 Use restrictions. The Attorney General shall maintain Confidential Information in confidence and use it solely for lawful law enforcement, regulatory and public interest purposes. Dissemination shall be limited to personnel with a need to know who are bound by equivalent confidentiality obligations.

9.4 Protective measures. Upon reasonable request, the Attorney General shall implement protective measures for sensitive materials, including secure handling protocols, restricted circulation, and, where appropriate, applications to seal or redact in criminal or regulatory proceedings to avoid prejudice to the estate.

***10. Data protection and personal data***

The parties shall process personal data lawfully, fairly and securely, with appropriate technical and organisational measures. Where cross-border transfers are contemplated, the parties shall cooperate to ensure a lawful transfer mechanism and, where necessary, seek the Court's directions.

***11. Preservation and holds***

The Liquidators shall implement and maintain appropriate document preservation measures in respect of the Company's records. The Attorney General shall notify the Liquidators of any preservation requirements arising from criminal investigations or proceedings, including anticipated requests or production deadlines, to allow timely compliance.

***12. Coordination to avoid prejudice and duplication***

The parties shall coordinate to minimise prejudice to the estate, civil recoveries and criminal processes, including by sequencing steps, agreeing standstills where appropriate, and consulting on timing of public filings or applications likely to have cross-impact. The Liquidators' primary duty to protect and realise assets shall be respected.

***13. Public statements and confidentiality vis-à-vis third parties***

Public statements about the Company, the liquidation or related investigations shall be coordinated to the extent practicable. The Liquidators may make statements required by law or the Court or necessary to protect assets or correct the market. The Attorney General may make statements required in the exercise of public functions, having regard to the Liquidators' requests to withhold sensitive details.

***14. Costs and resourcing***

The reasonable costs incurred by the Liquidators in complying with this Protocol, including costs of retrieval, review, redaction, secure transmission and liaison, are costs of the liquidation. Where requests impose material incremental burdens, the parties shall confer on pragmatic staging or cost-efficient approaches and, failing agreement, may seek the Court's directions.

***15. Non-fetter and independence***

Nothing in this Protocol fetters or derogates from the Liquidators' statutory powers and duties, or from the Attorney General's independent decision-making. The consultative role does not confer any power of direction over the Liquidators.

***16. Conflicts and recusals***

If a conflict of interest arises affecting any representative, that person shall recuse from relevant consultations. The parties shall notify each other of any material conflicts that could affect the integrity of cooperation, and may seek the Court's directions where necessary.

***17. International cooperation***

Where the Attorney General is engaged in mutual legal assistance, or cooperation with foreign authorities, the parties shall consult on scope and timing to ensure that disclosures and steps taken are consistent

with this Protocol and do not unduly prejudice the liquidation or foreign proceedings. The Attorney General shall take reasonable steps, where feasible, to secure protective handling by foreign authorities of any Confidential Information provided.

***18. Records and audit trail***

The Liquidators shall maintain a record of disclosures made to the Attorney General under this Protocol sufficient to evidence compliance, subject to privilege. The Attorney General shall, upon reasonable request, confirm receipt and any onward lawful use or disclosure to other agencies.

***19. Duration, variation and termination***

This Protocol takes effect upon the making of the Order and continues until the earlier of dissolution of the Company or further order of the Court. It may be varied by written agreement between the Liquidators and the Attorney General approved by the Court, or otherwise by order of the Court. The Court may suspend or terminate this Protocol upon application by either party.

***20. Notices***

Formal notices under this Protocol shall be in writing and sent to the designated contacts of each party as notified from time to time. Operational communications may be conducted by secure electronic means.

***21. Dispute resolution and directions***

Any dispute arising under or in connection with this Protocol shall, in the first instance, be addressed through consultation. Failing prompt resolution, either party may apply to the Court for directions on short notice.

***22. Safe harbour***

No act or omission of the Liquidators done in good faith and with reasonable care in reliance on this Protocol, or any directions of the Court, shall give rise to personal liability. The Liquidators shall be entitled to the usual indemnities out of the assets of the Company.

**Schedule 1 – Illustrative categories of information for disclosure**

A. Corporate records: constitutional documents, registers, organisational charts, officer and registered agent details.

B. Financial records: bank statements, ledgers, invoices, loan agreements, asset registers, related party transactions.

C. Communications: selected emails and messaging data from corporate systems relevant to suspected criminality.

D. Counterparty materials: KYC files, contracts, correspondence with intermediaries and fiduciaries.

E. Investigation work product: non-privileged factual memoranda, forensic accounting outputs, chain-of-custody logs.

F. Court materials: statements of affairs, affidavits, pleadings and orders (including sealed materials as authorised).

G. Asset tracing: non-privileged tracing schedules, dashboards, and summaries of restraints or recovery actions.

H. Preservation: litigation hold notices and repositories metadata (to the extent disclosure assists law enforcement).

Disclosure of any category remains subject to sections 9–12 of the Protocol.

**Schedule 2 – Template quarterly consultation report (confidential)**

1. Executive summary and key developments.
2. Asset position: discoveries, realisations, restraints and pending recovery actions.
3. Investigations: factual findings, cooperating witnesses, outstanding enquiries.
4. Legal proceedings: applications filed or contemplated; coordination with foreign courts.
5. Law enforcement interface: requests received/made; disclosures; pending deadlines.
6. Risks and mitigants: dissipation risks, data loss risks, reputational issues.
7. Next steps and proposed timetable; matters requiring Attorney General input.
8. Appendices: schedules of documents disclosed; privilege log (if applicable).

**IN THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**CLAIM NO BVIHC (COM) 2026/0019**

**BETWEEN:**

**IN THE MATTER OF PRINCE GLOBAL HOLDINGS LIMITED**

**AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS.**

**THE ATTORNEY GENERAL**

**Applicant**

-v-

**PRINCE GLOBAL HOLDINGS LIMITED**

**Respondent**

---

**ORDER ON APPLICATION FOR JOINT PROVISIONAL LIQUIDATORS**

---

O'Neal Webster
Legal Practitioners for the Applicant
2nd Floor Commerce House
181 Main Street
P.O. Box 961, Road Town, Tortola
British Virgin Islands VG 1110
Tel: (284) 393 5800 I Fax: (284) 393 5805
www.onealwebster.com

Andrew G. Dietderich
Sharon Cohen Levin
Christopher J. Dunne
Jacob M. Croke
Alexa J. Kranzley
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Authorized Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al.*,[1]<br><br>Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 26-(_____) (__)<br><br>(Joint Administration Requested) |

**DISCLOSURES REQUIRED BY SECTION 1515 OF THE BANKRUPTCY CODE AND RULE 1007 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Paul Pretlove, in his capacity as a duly authorized foreign representative (together with the other duly authorized foreign representatives, the "Authorized Foreign Representatives") of Prince Global Holdings Limited and its affiliated debtors (collectively, the "Debtors"), hereby submits this disclosure pursuant to section 1515 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code") and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and respectfully sets forth as follows:

[1] The Debtors in these Chapter 15 Cases are incorporated in the British Virgin Islands and maintain their registered address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110. A complete list of the Debtors and their company numbers is attached as Exhibit A.

**A. Names and Addresses of All Parties or Bodies that are Authorized to Administer the Debtors' Foreign Proceedings**

1. The Debtors are the subject of insolvency proceedings as part of a public interest liquidation (the "BVI Proceeding") currently pending in the Eastern Caribbean Supreme Court in the British Virgin Islands High Court of Justice (Commercial Division) (the "BVI Court"). On January 9, 2026, the BVI Court appointed Paul Pretlove, David Standish and James Drury as joint provisional liquidators of the Debtors pursuant to section 170 of the BVI Insolvency Act, 2003 of the laws of the British Virgin Islands (the "BVI"). The Authorized Foreign Representatives' mailing address is c/o Interpath (BVI) Limited, LM Business Centre, 4th Floor, Fish Lock Road, Road Town, Tortola, British Virgin Islands.

**B. All Entities Against Whom Provisional Relief is Sought Under Section 1519 of the Bankruptcy Code**

2. The Authorized Foreign Representatives are seeking provisional relief under section 1519 of the Bankruptcy Code against all creditors and all equityholders.

**C. All Parties to Litigation that Is Pending in the United States, in which the Debtors are a Party at the Time of the Filing of the Petition**

3. To the best of my knowledge, information and belief, there is no litigation pending in the United States to which the Debtors are a party as of the date hereof.

**D. Statement Under Section 1515(c) of the Bankruptcy Code**

4. To the best of my knowledge, the BVI Proceeding is the only foreign proceeding to which the Debtors are subject.

**E. 28 U.S.C. § 1746**

5. I declare, under penalty of perjury, that the information set forth above is based on my current knowledge, information and belief after reasonable inquiry and, in contemplation of and subject to supplementation, true and correct.

Dated: April 8, 2026
London, UK

Paul Pretlove
Joint Provisional Liquidator and Authorized Foreign Representative of the Debtors

# <u>**Exhibit A**</u>

## List of Debtors

| No. | Debtor Name | Company Number |
|---|---|---|
| 1. | Amber Hill Ventures Limited | 1965875 |
| 2. | Auspicious Tycoon Limited | 1984330 |
| 3. | Bright Team Global Limited | 1984336 |
| 4. | Delightful Thrive Limited | 1992053 |
| 5. | Even Sincerity Limited | 1970592 |
| 6. | Fulam Investment Limited | 1542112 |
| 7. | Giant Victory Holdings Limited | 1930566 |
| 8. | Golden Ascend International Limited | 1976645 |
| 9. | Harmonic State Limited | 2030628 |
| 10. | Jumbo High Limited | 1984889 |
| 11. | Lateral Bridge Global Limited | 2030656 |
| 12. | Luminous Glow Limited | 1992019 |
| 13. | Mighty Divine Limited | 1961510 |
| 14. | Noble Title Limited | 1925678 |
| 15. | Oriental Charm Holdings Investment Limited | 1977528 |
| 16. | Pacific Charm Holdings Investment Limited | 1977603 |
| 17. | Praise Marble Limited | 1903478 |
| 18. | Prince Global Group Limited | 1988522 |
| 19. | Prince Global Holdings Limited | 1988528 |
| 20. | Respectful Steed Limited | 1971898 |
| 21. | Retain Prosper Limited | 2022874 |
| 22. | Robust Harmony Limited | 1971181 |
| 23. | Simply Advanced Limited | 2035067 |
| 24. | Southern Heritage Limited | 2035209 |

| No. | Debtor Name | Company Number |
|---|---|---|
| 25. | Star Merit Global Limited | 1984550 |
| 26. | Starry Bloom Limited | 2035066 |
| 27. | Sure Tycoon Limited | 2030676 |
| 28. | Sword River Limited | 1971899 |
| 29. | Towards Sunshine Limited | 1970125 |
| 30. | United Riches Global Limited | 1984537 |

Andrew G. Dietderich
Sharon Cohen Levin
Christopher J. Dunne
Jacob M. Croke
Alexa J. Kranzley
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Authorized Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al.*,[1]<br><br>Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 26-(_____) (__)<br><br>(Joint Administration Requested) |

**CORPORATE OWNERSHIP STATEMENT PURSUANT TO BANKRUPTCY RULES 1007(a)(4)(A) AND 7007.1**

1. I, Mr. Paul Pretlove, in my capacity as a duly authorized joint provisional liquidator and foreign representative of Prince Global Holdings Limited and its affiliated debtors (collectively, the "Debtors"), hereby submit the corporate ownership information required by rules 1007(a)(4) and 7007.1 of the Federal Rules of Bankruptcy Procedure.

2. After conducting a good-faith inquiry based on the currently available books and records of the Debtors, I am aware of the following corporations, other than

[1] The Debtors in these Chapter 15 Cases are incorporated in the British Virgin Islands and maintain their registered address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110. A complete list of the Debtors and their company numbers is attached as Exhibit A.

governmental units, that directly or indirectly own ten percent (10%) or more of any class of the Debtors' equity interests and I have not received any notification otherwise that would lead me to believe that the same is not true as of the date hereof:

i. 100% of Debtor Even Sincerity Limited's equity interests are owned by non-Debtor Prince Group Holdings Limited. 100% of non-Debtor Prince Group Holdings Limited's equity interests are owned by Debtor Prince Global Group Limited.

ii. 100% of Debtor Respectful Steed Limited's equity interests are owned by non-Debtor Prince Group Holdings Limited. 100% of non-Debtor Prince Group Holdings Limited's equity interests are owned by Debtor Prince Global Group Limited.

iii. 100% of Debtor Sword River Limited's equity interests are owned by non-Debtor Prince Group Holdings Limited. 100% of non-Debtor Prince Group Holdings Limited's equity interests are owned by Debtor Prince Global Group Limited.

iv. 100% of Debtor Robust Harmony Limited's equity interests are owned by non-Debtor Prince Group Holdings Limited. 100% of non-Debtor Prince Group Holdings Limited's equity interests are owned by Debtor Prince Global Group Limited.

v. 100% of Towards Sunshine Limited's equity interests are owned by non-Debtor Prince Group Holdings Limited. 100% of non-Debtor Prince Group Holdings Limited's equity interests are owned by Debtor Prince Global Group Limited.

vi. 100% of Debtor Fulam Investment Limited's equity interests are owned by non-Debtor Ample Luck Investment Limited.

vii. 100% of Debtor Giant Victory Holdings Limited's equity interests are owned by non-Debtor Deluxe Heaven Limited.

viii. 30% of Debtor Jumbo High Limited's equity interests are owned by Debtor Delightful Thrive Limited.

ix. 100% of Debtor Noble Title Limited's equity interests are owned by Debtor Retain Prosper Limited.

x. 100% of Debtor Praise Marble Limited's equity interests are owned by non-Debtor Geotech Holdings Limited. 54.8% of non-Debtor Geotech

Holdings Limited's equity interests are owned by Debtor Star Merit Global Limited.

IN WITNESS WHEREOF, I have executed this corporate ownership statement under penalty of perjury this 8th day of April, 2026.

Dated: April 8, 2026
London, UK

Paul Pretlove
Joint Provisional Liquidator and Authorized
Foreign Representative of the Debtors

# Exhibit A

## List of Debtors

| No. | Debtor Name | Company Number |
|---|---|---|
| 1. | Amber Hill Ventures Limited | 1965875 |
| 2. | Auspicious Tycoon Limited | 1984330 |
| 3. | Bright Team Global Limited | 1984336 |
| 4. | Delightful Thrive Limited | 1992053 |
| 5. | Even Sincerity Limited | 1970592 |
| 6. | Fulam Investment Limited | 1542112 |
| 7. | Giant Victory Holdings Limited | 1930566 |
| 8. | Golden Ascend International Limited | 1976645 |
| 9. | Harmonic State Limited | 2030628 |
| 10. | Jumbo High Limited | 1984889 |
| 11. | Lateral Bridge Global Limited | 2030656 |
| 12. | Luminous Glow Limited | 1992019 |
| 13. | Mighty Divine Limited | 1961510 |
| 14. | Noble Title Limited | 1925678 |
| 15. | Oriental Charm Holdings Investment Limited | 1977528 |
| 16. | Pacific Charm Holdings Investment Limited | 1977603 |
| 17. | Praise Marble Limited | 1903478 |
| 18. | Prince Global Group Limited | 1988522 |
| 19. | Prince Global Holdings Limited | 1988528 |
| 20. | Respectful Steed Limited | 1971898 |
| 21. | Retain Prosper Limited | 2022874 |
| 22. | Robust Harmony Limited | 1971181 |
| 23. | Simply Advanced Limited | 2035067 |
| 24. | Southern Heritage Limited | 2035209 |

| No. | Debtor Name | Company Number |
|---|---|---|
| 25. | Star Merit Global Limited | 1984550 |
| 26. | Starry Bloom Limited | 2035066 |
| 27. | Sure Tycoon Limited | 2030676 |
| 28. | Sword River Limited | 1971899 |
| 29. | Towards Sunshine Limited | 1970125 |
| 30. | United Riches Global Limited | 1984537 |

Andrew G. Dietderich
Sharon Cohen Levin
Christopher J. Dunne
Jacob M. Croke
Alexa J. Kranzley
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Authorized Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al.*,[1]<br><br>Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 26-(_____) (__)<br><br>(Joint Administration Requested) |

**VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND RELATED RELIEF**

Paul Pretlove, David Standish and James Drury, in their capacities as the authorized foreign representatives (collectively, the "Authorized Foreign Representatives") for Prince Global Holdings Limited and its affiliated debtors (collectively, the "Debtors") regarding the Debtors' provisional liquidation proceedings (the "BVI Proceedings") in the Eastern Caribbean Supreme Court in the BVI High Court of Justice (Commercial Division) (the "BVI Court") pursuant to section 170 of the BVI Insolvency Act, 2003 ("BVI Insolvency Act"), hereby submit this verified petition (the "Verified Petition" and, together with the petitions, the "Petitions") for entry of an

[1] The Debtors in these Chapter 15 Cases are incorporated in the British Virgin Islands and maintain their registered address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110. A complete list of the Debtors and their company numbers is attached as Exhibit A.

order, substantially in the form attached hereto as Exhibit B (the "Order"), pursuant to sections 105(a), 362, 1504, 1507, 1509, 1515, 1517, 1519, 1520 and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). In support of the Petitions, the Authorized Foreign Representatives have filed contemporaneously herewith (a) the *Declaration of Paul Pretlove in Support of the (A) Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code and (B) the Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "Pretlove Declaration") and (b) the *Declaration of Andrew Barrington Chissick in Support of the (A) Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code and (B) the Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "Chissick Declaration"), each of which is incorporated herein by reference along with the exhibits thereto. In further support, the Authorized Foreign Representatives respectfully represent as follows:

## Background

1. The Debtors were controlled by Chen Zhi and are alleged to be associated with a transnational criminal organization referred to as the "Prince Group," a conglomerate alleged to have engaged in widespread patterns of criminal behavior such as cryptocurrency- and investment-related fraud. Pretlove Declaration ¶¶ 12–18.

2. Following years of reporting by various news outlets and human rights agencies on forced labor and scam compounds in Cambodia with alleged ties to the Prince Group, authorities in multiple jurisdictions launched formal criminal investigations into the Prince Group and its controlling stakeholder, Chen "Vincent" Zhi ("Mr. Chen"). These include an indictment from the U.S. Department of Justice ("DOJ"), a civil forfeiture action and sanctions in the United States, United Kingdom and other jurisdictions. *Id.* ¶¶ 19–31.

3. On October 14, 2025, the DOJ unsealed an indictment against Mr. Chen, charging him with wire fraud conspiracy and money laundering conspiracy for directing the Prince Group's operation of forced-labor scam compounds across Cambodia that stole billions of dollars from victims in the United States and around the world. The same day, the U.S. Attorney's Office for the Eastern District of New York and the DOJ's National Security Division filed a civil forfeiture complaint (the "Forfeiture Complaint") in the U.S. District Court for the Eastern District of New York against approximately 127,271 Bitcoin that are proceeds and instrumentalities of Mr. Chen's fraud and money laundering schemes. *Id.* ¶¶ 19–28.

4. The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and Financial Crimes Enforcement Network ("FinCEN"), alongside the United Kingdom's Foreign, Commonwealth and Development Office, immediately imposed sweeping sanctions on 146 targets within and connected to the Prince Group, including the Debtors, and designated the Prince Group as a "transnational criminal organization" responsible for crimes including online investment scams and the laundering of stolen funds. *Id.* ¶¶ 28–30.

5. OFAC alleges that the Debtors were part of the complex network of companies that were used by Mr. Chen and the Prince Group to conceal, hold, transfer and launder proceeds derived from their alleged criminal activities including forced labor, human trafficking, fraud and other serious criminal conduct. *See id.* ¶¶ 28, 30.

6. On January 5, 2026, in response to these actions and actions taken by other sovereigns, the Attorney General of the BVI applied, on public interest grounds, to liquidate the Debtors and appoint provisional liquidators while the application for liquidation remained pending. The Debtors include 28 of the Prince Group entities registered in the BVI that were included in

the OFAC sanctions, as well as two other companies identified in the Forfeiture Complaint. *Id.* ¶¶ 30, 40.

7. The appointment of the joint provisional liquidators was necessary to (i) divest Mr. Chen and his associates of control of the Debtors and prevent further use of the Debtors as vehicles for criminal activity, (ii) identify and preserve the Debtors' assets, (iii) conduct thorough investigations into past transactions, and (iv) review banking records, asset transfers, and corporate dealings to identify and locate the potential money laundering activities. *Id.* ¶ 43.

8. Between January 9 and January 14, 2026, the Honourable Justice Abbas Mithani of the BVI Court found that it was just, equitable and in the public interest that provisional liquidators be appointed for the Debtors and granted *ex parte* orders for the appointment of the Authorized Foreign Representatives from Interpath as joint provisional liquidators (the "BVI Orders").

9. The BVI Orders allow the Authorized Foreign Representatives, as court-appointed officers, to take control of the Debtors, carry out a full investigation of their affairs and use the tools available to them to trace, secure and preserve their assets. Further, the BVI Orders grant the Authorized Foreign Representatives the rights and powers of a liquidator, as described by the BVI Insolvency Act, "to the extent necessary to maintain the value of the assets owned by the [Debtors] and to carry out the functions for which they are appointed." BVI Orders ¶¶ 2–3.[2]

10. Additionally, the Authorized Foreign Representatives are entitled to take further steps in accordance with the BVI Orders. The BVI Orders provide the Authorized Foreign Representatives with the ability to conduct discovery, investigate and wrest control of assets from the prior stakeholders. BVI Orders ¶ 3(i). Pursuant to the BVI Orders, the Authorized Foreign Representatives have commenced an investigation of the Debtors' financial affairs. The Authorized Foreign

[2] The text of each of the 30 BVI orders is identical.

Representatives have also retained, among other advisors, Sullivan Cromwell LLP ("S C") to assist in the provisional liquidation.

11. The Authorized Foreign Representatives and S C have investigated the organizational structure of the Prince Group and its subsidiaries, directors and assets.

12. The purpose of chapter 15 of the Bankruptcy Code is to provide effective mechanisms for dealing with cases of cross-border insolvency, with the express objectives of: (i) cooperation between United States courts, trustees, examiners, debtors, debtors-in-possession and the courts and other competent authorities of foreign countries; (ii) greater legal certainty for trade and investment; (iii) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, shareholders and other interested entities, including the debtor; (iv) the protection and maximization of the debtor's assets; and (v) the facilitation of the rescue of financially troubled businesses. 11 U.S.C. §§ 1501(a)(1)–(5); *see In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 413 (Bankr. S.D.N.Y. 2014). To that end, the Authorized Foreign Representatives request recognition of the BVI Proceedings as foreign main proceedings to obtain this Court's assistance in facilitating the Authorized Foreign Representatives' efforts to identify, secure, protect and trace assets held by the Debtors or on their behalf and in investigating the Debtors' businesses, financial affairs and potential claims against third parties.

13. Recognition of the BVI Proceedings as foreign main proceedings would confer upon the Debtors the protections afforded by sections 362 and 1520 of the Bankruptcy Code, thereby preventing any bad actors from taking steps to abscond with property of the Debtors in the United States or otherwise interfering with the BVI Proceedings and implementation of the BVI Orders.

**Jurisdiction, Eligibility, and Venue**

14. The Court has jurisdiction to consider this Verified Petition pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* M-431 from the U.S. District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

15. These chapter 15 cases ("Chapter 15 Cases") have been properly commenced with respect to each of the Debtors in accordance with sections 1504, 1509(a) and 1515 of the Bankruptcy Code by the filing of the Petitions. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

16. Venue is proper in this District pursuant to 28 U.S.C. § 1410(1), as each of the Debtors has a ratable interest in an advance payment retainer of $25,000 held by S C in a client trust account in New York, New York.

17. The presence of property within the United States renders each of the Debtors eligible to file these Chapter 15 Cases pursuant to section 109(a) of the Bankruptcy Code. *See In re Barnet*, 737 F.3d 238, 247–51 (2d Cir. 2013) (applying the property requirement of section 109(a) to chapter 15 cases); *Suntech*, 520 B.R. at 411 (same); *In re Servi os de Petr leo Constellation S.A.*, 600 B.R. 237, 268–69 (Bankr. S.D.N.Y. 2019) (finding that a per-entity retainer in New York bank accounts satisfied section 109(a)); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–74 (Bankr. S.D.N.Y. 2014) (same).

**Relief Re uested**

18. The Authorized Foreign Representatives request that this Court enter the Order, pursuant to sections 105(a), 362, 1504, 1507, 1509, 1515, 1517, 1519, 1520 and 1521 of the Bankruptcy Code:

a. granting the Petitions in these Chapter 15 Cases and recognizing the BVI Proceedings as "foreign main proceedings" for each of the Debtors pursuant to

section 1517 of the Bankruptcy Code, and granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

b. finding that the Authorized Foreign Representatives are the duly appointed "foreign representatives" of each of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and are authorized to act on behalf of each Debtor in these Chapter 15 Cases;

c. providing that the BVI Orders are recognized, granted comity and entitled to full force and effect in accordance with their terms, and that such terms shall be binding and fully enforceable in the United States, and entrusting the Authorized Foreign Representatives with the administration or realization of all of the Debtors' assets within the territorial jurisdiction of the United States, including prosecution of any causes of action belonging to the Debtors;

d. waiving the 14-day stay of effectiveness of the Order; and

e. granting such other and further relief as the Court deems just and proper.

**Basis for Relief**

19. Under section 1517(a) of the Bankruptcy Code, subject to the public policy exception contained in section 1506, a court shall enter an order recognizing a foreign proceeding if each of the following three requirements are met: (i) such foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (ii) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515. 11 U.S.C. § 1517(a); *see In re Olinda Star Ltd.*, 614 B.R. 28, 45 (Bankr. S.D.N.Y. 2020); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 698–99 (Bankr. S.D.N.Y. 2017).

20. As set forth below, each of the requirements of section 1517(a) is satisfied for each of the Debtors, and the BVI Proceedings should be recognized as foreign main proceedings. The BVI Proceedings are provisional liquidation proceedings commenced in the public interest pursuant to section 170 of the BVI Insolvency Act under the supervision of the BVI Court. The Authorized Foreign Representatives are the duly appointed foreign representatives of each of the

Debtors. Recognition does not contravene U.S. public policy; rather, it advances U.S. policy interests by facilitating cooperation with U.S. regulatory and law enforcement authorities and by supporting the tracing, recovery and preservation of assets that may ultimately be available for the benefit of those harmed by the conduct attributed to the Prince Group.

**A. The BVI Proceedings Are Foreign Proceedings**

21. Section 101(23) requires that a "foreign proceeding" be (i) either judicial or administrative in character, (ii) collective in nature, (iii) pending in a foreign country and authorized or conducted under a law related to insolvency or the adjustment of debts, (iv) a proceeding in which the debtor's assets and affairs are subject to the control or supervision of a foreign court and (v) for the purpose of reorganizing the debtor or liquidating its assets. 11 U.S.C. § 101(23).

22. Each of the BVI Proceedings satisfies each of these elements. They are judicial proceedings pending in the BVI, commenced under the BVI Insolvency Act—a law relating to insolvency— in which the assets and affairs of the Debtors are subject to the control and supervision of the BVI Court through the appointment of the Authorized Foreign Representatives as joint provisional liquidators, pending the determination of the underlying applications for liquidation. The BVI Proceedings are also collective in nature. They were commenced in the public interest and are not directed toward the enforcement of the rights of any single creditor or stakeholder. Rather, they are intended to (i) centralize control of the Debtors' affairs under court supervision, (ii) preserve the Debtors' assets, (iii) facilitate investigation of the Debtors' activities and transactions and (iv) enable coordinated administration and recovery. *See* Chissick Declaration ¶¶ 56–58.

23. This Court has consistently recognized BVI and other similar offshore provisional liquidation proceedings as foreign proceedings under chapter 15 of the Bankruptcy Code. *See,*

*e.g.*, *Olinda Star*, 614 B.R. at 40–41 (recognizing BVI provisional liquidation as a foreign proceeding); *Ocean Rig*, 570 B.R. at 701–02 (recognizing Cayman Islands provisional liquidation as a foreign proceeding); *Suntech*, 520 B.R. at 416–20 (recognizing Cayman Islands provisional liquidation as a foreign proceeding); *In re Fleming Int'l Reinsurance Ltd.*, No. 25-12353 (JPM) [D.I. 39] (Bankr. S.D.N.Y. Nov. 20, 2025) (recognizing Bermuda provisional liquidation as a foreign proceeding); *In re Northeast Ins. Co. Ltd.*, No. 25-12275 (MEW) [D.I. 9] (Bankr. S.D.N.Y. Nov. 17, 2025) (recognizing Bermuda provisional liquidation as a foreign proceeding).

**B. The BVI Proceedings  ualify as  Foreign Main Proceedings**

24. The BVI Proceedings satisfy the definition of "foreign main proceeding" as set forth in section 1502(4) of the Bankruptcy Code. This section defines a "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).

25. While the Bankruptcy Code does not define "center of main interests" ("COMI"), section 1516(c) provides that, in the absence of evidence to the contrary, a non-individual debtor's registered office "is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012). *See also* H.R. Rep. No. 109-31, pt. 1, at 112–13 (2005) ("The presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy.").

26. The relevant time for determining a debtor's COMI is the date on which the chapter 15 petition is filed. *See In re Fairfield Sentry Ltd. (Fairfield II)*, 714 F.3d 127, 137 (2d Cir. 2013). To the extent that a debtor's COMI has shifted prior to filing, courts may conduct a more "holistic analysis" to ensure that a debtor did not manipulate its COMI in bad faith. *Ocean Rig*, 570 B.R.

at 704; *Fairfield II*, 714 F.3d at 137 (examining period between commencement of foreign proceeding and chapter 15 filing to ascertain whether COMI was improperly manipulated).

27. Each Debtor's registered office is located in the BVI and has been since each Debtor's incorporation. Moreover, the BVI Proceedings were not initiated by the Debtors or their former controllers, but by the BVI Attorney General acting in the public interest, negating any inference of COMI manipulation. Accordingly, each Debtor is entitled to the statutory presumption that its COMI is located in the BVI.

28. Even apart from the statutory presumption, the multi-factor analysis employed by courts in this District confirms that each Debtor's COMI is located in the BVI. Courts have identified several non-exclusive factors relevant to the COMI determination, including the location of those who actually manage the debtor and the jurisdiction whose law would apply to most disputes. *See In re SPhin , LTD.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *Fairfield II*, 714 F.3d at 130. These factors are not to be applied mechanically, and no single factor is dispositive. *Fairfield II*, 714 F.3d at 137. Where, as here, a debtor is an entity with no fixed operations in any single jurisdiction, courts generally look to the jurisdiction under whose court supervision the provisional liquidation, liquidation or winding up of the debtor's affairs is being administered. *See Olinda Star*, 614 B.R. at 42; *Suntech*, 520 B.R. at 417–18; *In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311 (GBD), 2011 WL 4357421 (S.D.N.Y. 2011), at 10–16; *In re Betcorp Ltd.,* 400 B.R. 266, 292 (Bankr. D. Nev. 2009). The Authorized Foreign Representatives were appointed by the BVI Court, derive their authority exclusively from the BVI Orders, are officers of the BVI Court and are required to report to and are supervised by the BVI Court. The BVI is the jurisdiction whose law governs the Debtors' corporate existence, the provisional liquidation and the

Authorized Foreign Representatives' powers and obligations. *See* Chissick Declaration ¶¶ 24, 49–52; BVI Orders ¶¶ 1–3, 14.

29. Furthermore, pursuant to section 245 of the BVI Business Companies Act, 2004, the situs of the ownership of shares of a BVI company is deemed to be in the BVI. *See* Chissick Declaration ¶ 60. As each Debtor was incorporated under the laws of the BVI as a company limited by shares, the BVI is the situs of the ownership of each Debtor's shares.

30. Courts also consider whether a debtor's COMI is ascertainable by third parties. *See* *Fairfield II*, 714 F.3d at 130. Here, third parties can ascertain that the BVI is the Debtors' COMI: the Debtors are incorporated in the BVI, the BVI Proceedings are pending and publicly noticed and the Authorized Foreign Representatives have been appointed by the BVI Court as officers of the BVI Court.

31. Accordingly, the COMI of each of the Debtors is in the BVI, and the BVI Proceedings should be recognized as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code.

**C. The Authori ed Foreign Representatives Are Foreign Representatives Under Section 101(24) of the Bankruptcy Code**

32. Section 101(24) of the Bankruptcy Code defines a "foreign representative" as a person or body authorized in a foreign proceeding to administer the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C. § 101(24). The Authorized Foreign Representatives—Paul Pretlove, David Standish and James Drury—are each individuals appointed by the BVI Court as joint provisional liquidators of the Debtors. BVI Orders ¶ 1. They are officers of the BVI Court, and their authority to act on behalf of the Debtors derives exclusively from the BVI Orders, which expressly authorize them to seek recognition of their

appointment in this Court and in other jurisdictions. BVI Orders ¶ 3(c); Chissick Declaration ¶¶ 49–51.

33. This Court and other courts have consistently recognized offshore provisional liquidators as "foreign representatives" within the meaning of section 101(24). *See, e.g.*, *Olinda Star*, 614 B.R. at 45 (finding a BVI joint provisional liquidator to be a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code); *Ocean Rig*, 570 B.R. at 701 (finding Cayman court-appointed JPLs to be foreign representatives); *Fleming*, No. 25-12353 (JPM) at 3 [D.I. 39] (finding Bermuda JPLs to be foreign representatives); *Northeast*, No. 25-12275 (MEW) [D.I. 9] (same).

**D. The Petitions Satisfy the Re uirements of Section 1515**

34. Section 1515 of the Bankruptcy Code requires that a petition for recognition be accompanied by evidence of the foreign proceeding and the appointment of the foreign representative, together with a statement identifying all known foreign proceedings with respect to the debtor. 11 U.S.C. § 1515(b), (c).

35. The Authorized Foreign Representatives have satisfied each of these requirements. Certified copies of the BVI Orders—the orders commencing the BVI Proceedings and appointing the Authorized Foreign Representatives as joint provisional liquidators of the Debtors—were filed with the Petitions, and a statement confirming that the BVI Proceedings are the only known pending foreign proceedings with respect to the Debtors was also submitted.

**E. Recognition Would Not Be Manifestly Contrary to U.S. Public Policy**

36. Section 1506 of the Bankruptcy Code provides that a court may decline to grant relief if the action would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This public policy exception is "narrowly construed." *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013). *See also In re Toft*, 453 B.R. 186, 195

(Bankr. S.D.N.Y. 2011) ("[T]hose courts that have considered the public policy exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly. . .").

37. Far from contravening U.S. public policy, recognition of the BVI Proceedings affirmatively advances U.S. policy interests. The BVI Proceedings were commenced in the public interest by the BVI Attorney General to divest a designated transnational criminal organization of control over the Debtors and to preserve assets for the benefit of those harmed by the conduct attributed to the Prince Group—objectives directly aligned with the enforcement actions of the DOJ, OFAC, and FinCEN.

38. The Authorized Foreign Representatives have actively engaged with U.S. law enforcement and regulatory authorities, and those engagements have been productive. *See* Pretlove Declaration ¶ 48. Recognition will facilitate continued coordination between the Authorized Foreign Representatives and U.S. authorities, support the objectives of the U.S. sanctions regime through court-supervised administration by independent, licensed insolvency practitioners and enable the tracing and preservation of the Debtors' assets, including assets within the United States.

**F. The Debtors are Entitled to Automatic Relief**

39. Recognition of a foreign main proceeding triggers the automatic protections set forth in section 1520(a) of the Bankruptcy Code—most critically, the application of the automatic stay under section 362(a) to the Debtors and their property within the territorial jurisdiction of the United States. 11 U.S.C. § 1520(a).

40. These protections are of particular importance here, where persons associated with Mr. Chen have already taken affirmative steps to interfere with the Authorized Foreign Representatives' powers and duties under the BVI Orders and have expressly threatened litigation in the United States. *See* Pretlove Declaration ¶¶ 54–59. Accordingly, the Authorized Foreign

Representatives request that the Court confirm the applicability of these protections upon entry of the Order.

**G. Additional Relief is Necessary and Appropriate**

41. Upon recognition of the BVI Proceedings, whether as foreign main or nonmain proceedings, this Court may grant "any appropriate relief" under section 1521(a) of the Bankruptcy Code where necessary to effectuate the purpose of chapter 15 and to protect the Debtors' assets or the interests of creditors. 11 U.S.C. § 1521(a). Such relief must ensure that the interests of creditors and other interested entities are sufficiently protected. 11 U.S.C. § 1522(a); *In re CGG S.A.*, 579 B.R. 716, 720 (Bankr. S.D.N.Y. 2017) (stating that relief under section 1521 of the Bankruptcy Code will only be granted if the "interests of the Foreign Debtor, its creditors and shareholders" are "sufficiently protected" under section 1522 of the Bankruptcy Code); *In re Rede Energia S.A.*, 515 B.R. 69, 94 (Bankr. S.D.N.Y. 2014) (same).

42. The additional relief requested here is necessary and appropriate. If the Court were to enter the Order without granting the BVI Orders comity, this would unduly restrict the reach of the BVI Orders at a time when persons associated with Mr. Chen are actively seeking to interfere with the Authorized Foreign Representatives' powers and duties under the BVI Orders. *See* Pretlove Declaration ¶¶ 54–60. Likewise, if the Court were to enter the Order without entrusting the Authorized Foreign Representatives with the administration and realization of the Debtors' property in the United States, the Authorized Foreign Representatives would be unable to adequately protect and maximize the value of such assets.

1. <u>The BVI Orders Should Be Granted Comity</u>

43. The Authorized Foreign Representatives request that this Court recognize and enforce the BVI Orders within the territorial jurisdiction of the United States.

44. In determining whether to extend comity to a foreign court order, courts consider whether the foreign forum provided a full and fair proceeding before a court of competent jurisdiction, under a system of jurisprudence likely to secure an impartial administration of justice. *See Hilton* v. *Guyot*, 159 U.S. 113, 202–03 (1895) ("The principle upon which I think our enforcement of foreign judgments must proceed is this: that in a court of competent jurisdiction, where according to its established procedure, the whole merits of the case were open, at all events, to the parties, however much they may have failed to take advantage of them") (quoting Lord Herschell in the House of Lords); *In re Atlas Shipping A S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy") (internal citations omitted); *P Morgan Chase Bank* v. *Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) ("Deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States.").

45. Principles of comity "strongly counsel approval of enforcement in the United States of [provisions in foreign court orders], even if those provisions could not be entered in a plenary chapter 11 case." *In re Metcalfe Mansfield Alt. Invs.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010). U.S. bankruptcy courts are "not required to make an independent determination about the propriety of individual acts of a foreign court"—rather, comity should be extended so long as the foreign proceeding "comports with our notions of procedural fairness." *Id.* at 697; *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 59 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 275 B.R. 699 (S.D.N.Y. 2002).

46. The BVI Orders satisfy this standard. The BVI is a British Overseas Territory with an English-style common law legal system based upon the doctrine of precedent. *See* Chissick Declaration ¶¶ 26–27. The BVI Proceedings were commenced on the application of the BVI Attorney General in the public interest, heard on an *ex parte* basis by the Honourable Justice Abbas Mithani, and resulted in the appointment of independent, licensed insolvency practitioners as officers of the BVI Court. The BVI Orders have since been continued on an *inter partes* basis, and any party with a legitimate interest may apply to the BVI Court to vary or discharge them. *See* Chissick Declaration ¶ 23; BVI Orders ¶¶ 15–16. The BVI Proceedings afford all interested parties access to a sophisticated insolvency regime administered by an impartial court in accordance with fundamental standards of due process. Granting comity to the BVI Orders will ensure that the Authorized Foreign Representatives' authority under those orders is recognized and enforceable within the United States. *See* Pretlove Declaration ¶¶ 62–66.

2. <u>Entrustment is Warranted</u>

47. The Authorized Foreign Representatives request that the Court entrust them with the administration and realization of all of the Debtors' assets within the territorial jurisdiction of the United States pursuant to section 1521(a)(5) of the Bankruptcy Code and to the extent authorized by the BVI Court.

48. Persons associated with Mr. Chen have purported to appoint competing directors of 25 of the Debtors, and counsel retained by those individuals has expressly threatened litigation in the United States to challenge the Authorized Foreign Representatives' authority and asset realization efforts. *See* Pretlove Declaration ¶¶ 55–58.

49. An order entrusting the Authorized Foreign Representatives with sole authority over the Debtors' U.S. assets will eliminate any ambiguity as to who is authorized to act on behalf

of the Debtors in the United States and foreclose the ability of adverse actors to interfere with the court-supervised administration of the Debtors' estates.

**H. Waiver of the 14 Day Stay of Effectiveness Should Be Granted**

50. The Authorized Foreign Representatives request that the Court cause the Order to become effective immediately upon entry, notwithstanding the 14-day stay of effectiveness imposed by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), including Bankruptcy Rules 1018, 7062 and 9014.

51. The facts and circumstances of these Chapter 15 Cases demand immediate relief. Persons associated with Mr. Chen have already taken affirmative steps to interfere with the Authorized Foreign Representatives' powers and duties under the BVI Orders, including by purporting to appoint competing directors and threatening to commence litigation in the United States. *See* Pretlove Declaration ¶¶ 55–58. A hearing on applications seeking to discharge the BVI Orders is scheduled for April 16 and 17, 2026 in the BVI. *See* Chissick Declaration ¶ 46. Any delay in the effectiveness of the Proposed Order may create a window during which adverse actors could take steps to dissipate or divert the Debtors' assets in the United States before the protections of recognition take effect.

52. This Court routinely grants waivers of the 14-day stay of effectiveness in chapter 15 cases. *See, e.g.*, *Fleming*, No. 25-12353 (JPM) [D.I. 39]; *Northeast*, No. 25-12275 (MEW) [D.I. 9]; *In re uzhou Grp. Holdings Co. Ltd.*, No. 24-11441 (LGB) [D.I. 26] (Bankr. S.D.N.Y. May 2, 2025); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [D.I. 14] (Bankr. S.D.N.Y. May 3, 2019); *In re Lehman Brothers Int'l (Europe) (in administration)*, No. 18-11470 (SCC) [D.I. 15] (Bankr. S.D.N.Y. June 19, 2018); *CGG S.A.*, No. 17-11636 (MG) [D.I. 25].

**Notice**

53. Notice of this Verified Petition will be provided to (a) the Debtors; (b) the United States Trustee for the Southern District of New York; (c) the United States Attorney for the Southern District of New York; (d) the United States Attorney for the Eastern District of New York; (e) the United States Department of the Treasury's Office of Foreign Assets Control; (f) the United States Department of Justice; (g) the United States Department of the Treasury's Financial Crimes Enforcement Network; (h) all parties that have filed a notice of appearance in these Chapter 15 Cases; and (i) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Authorized Foreign Representatives are aware. The Authorized Foreign Representatives submit that no other or further notice of this Verified Petition is necessary or required.

**No Prior Re uest**

54. No prior request for the relief sought in this Verified Petition has been made to this or any other court.

WHEREFORE, for the foregoing reasons, the Authorized Foreign Representatives respectfully request entry of the Order attached hereto as Exhibit B, (i) recognizing the BVI Proceedings as foreign main proceedings, (ii) recognizing the Authorized Foreign Representatives as the Debtors' foreign representatives, (iii) granting additional relief under section 1521, (iv) waiving the 14-day stay of effectiveness of the Order and (v) granting such other and further relief as the Court deems just and proper.

Dated: April 8, 2026
New York, New York

Respectfully submitted,

*s Andrew G. Dietderich*

Andrew G. Dietderich
Sharon Cohen Levin
Christopher J. Dunne
Jacob M. Croke
Alexa J. Kranzley
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: dietdericha sullcrom.com
levinsc sullcrom.com
dunnec sullcrom.com
crokej sullcrom.com
kranzleya sullcrom.com

*Counsel to the Authorized Foreign Representatives*

## VERIFICATION OF PETITION

Paul Pretlove, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

I am a managing director of Interpath Ltd and a duly appointed joint provisional liquidator of the Debtors. As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

Executed this 8th day of April, 2026 in London, UK.

Paul Pretlove
Joint Provisional Liquidator and Authorized
Foreign Representative of the Debtors

# EXHIBIT A

## List of Debtors

| No. | Debtor Name | Company Number |
|---|---|---|
| 1. | Amber Hill Ventures Limited | 1965875 |
| 2. | Auspicious Tycoon Limited | 1984330 |
| 3. | Bright Team Global Limited | 1984336 |
| 4. | Delightful Thrive Limited | 1992053 |
| 5. | Even Sincerity Limited | 1970592 |
| 6. | Fulam Investment Limited | 1542112 |
| 7. | Giant Victory Holdings Limited | 1930566 |
| 8. | Golden Ascend International Limited | 1976645 |
| 9. | Harmonic State Limited | 2030628 |
| 10. | Jumbo High Limited | 1984889 |
| 11. | Lateral Bridge Global Limited | 2030656 |
| 12. | Luminous Glow Limited | 1992019 |
| 13. | Mighty Divine Limited | 1961510 |
| 14. | Noble Title Limited | 1925678 |
| 15. | Oriental Charm Holdings Investment Limited | 1977528 |
| 16. | Pacific Charm Holdings Investment Limited | 1977603 |
| 17. | Praise Marble Limited | 1903478 |
| 18. | Prince Global Group Limited | 1988522 |
| 19. | Prince Global Holdings Limited | 1988528 |
| 20. | Respectful Steed Limited | 1971898 |
| 21. | Retain Prosper Limited | 2022874 |
| 22. | Robust Harmony Limited | 1971181 |
| 23. | Simply Advanced Limited | 2035067 |
| 24. | Southern Heritage Limited | 2035209 |

| No. | Debtor Name | Company Number |
|---|---|---|
| 25. | Star Merit Global Limited | 1984550 |
| 26. | Starry Bloom Limited | 2035066 |
| 27. | Sure Tycoon Limited | 2030676 |
| 28. | Sword River Limited | 1971899 |
| 29. | Towards Sunshine Limited | 1970125 |
| 30. | United Riches Global Limited | 1984537 |

# EXHIBIT B

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al.*,[1]<br><br>Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 26-(_____) (__)<br><br>(Joint Administration Requested) |

**ORDER GRANTING**
**RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND RELATED RELIEF**

Upon consideration of the Verified Petition[2] of the Authorized Foreign Representatives for the Debtors requesting entry of an order (this "Order") (i) recognizing the BVI Proceedings as "foreign main proceedings" under section 1517(b)(1) of the Bankruptcy Code; (ii) recognizing each of the Authorized Foreign Representatives as "foreign representatives," as such term is defined in section 101(24) of the Bankruptcy Code, in respect of the BVI Proceedings; and (iii) granting certain related relief; and this Court having found that it has jurisdiction to consider the Verified Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* M-431 of the U.S. District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.); and consideration of the Verified Petition and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and venue of this proceeding being proper before this Court pursuant to 28 U.S.C. § 1410(1); and this Court having found that proper and adequate notice of the Verified Petition

[1] The Debtors in these Chapter 15 Cases are incorporated in the British Virgin Islands and maintain their registered address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110. A complete list of the Debtors and their company numbers is attached as Exhibit A to the Verified Petition.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

and the relief requested therein has been provided in accordance with the Bankruptcy Rules and the Local Rules, and that no other or further notice is necessary; and this Court having determined that the relief requested in the Verified Petition is in the best interests of the Debtors; and no objections or other responses having been filed that have not been overruled, withdrawn or otherwise resolved; and after due deliberation and sufficient cause appearing therefor;

**THIS COURT HEREBY FINDS AND CONCLUDES THAT**:

1. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2. Each of the Debtors has property located in the United States, and, therefore, each of the Debtors is "eligible" to be a debtor in these Chapter 15 Cases pursuant to sections 109 and 1501 of the Bankruptcy Code.

3. These Chapter 15 Cases were properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code.

4. The Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

5. The official form petitions of each of the Debtors satisfy Bankruptcy Rules 1007(a)(4) and 2002.

6. The BVI Proceedings are "foreign proceedings" as such term is defined in section 101(23) of the Bankruptcy Code.

7. The BVI Proceedings are pending in the BVI, which is the jurisdiction in which each Debtor has its "center of main interests" within the meaning of such term in section

1517(b)(1) of the Bankruptcy Code. As such, the BVI Proceedings are "foreign main proceedings" pursuant to section 1502(4) of the Bankruptcy Code, which are thereby entitled to recognition as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code and to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code.

8. The Authorized Foreign Representatives are "persons" as such term is defined in section 101(41) of the Bankruptcy Code, and they are the duly appointed "foreign representatives" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code.

9. The relief granted in this Order is necessary and appropriate to protect the Debtors and the interests of their creditors and other parties-in-interest, consistent with the principles of comity, consistent with the purposes and objectives of chapter 15 of the Bankruptcy Code, not inconsistent with the public policy of the United States and warranted pursuant to sections 105(a), 362, 1504, 1507, 1509, 1515, 1517, 1519, 1520 and 1521 of the Bankruptcy Code. The relief granted in this Order will not cause any hardship or inconvenience to any party-in-interest that is not outweighed by the benefits of granting the requested relief to the Authorized Foreign Representatives, the Debtors, their creditors and other parties-in-interest.

10. The principles of comity support recognition of the BVI Orders appointing the Authorized Foreign Representatives as joint provisional liquidators pursuant to section 170 of the BVI Insolvency Act, as well as the enforcement by this Court of the BVI Orders within the territorial jurisdiction of the United States.

11. The Authorized Foreign Representatives have demonstrated that the relief requested with respect to entrustment of the Debtors' assets under section 1521(a)(5) of the Bankruptcy Code is necessary and appropriate, consistent with the principles of comity, consistent with the purposes and objectives of chapter 15 of the Bankruptcy Code, not inconsistent with the

public policy of the United States and warranted pursuant to section 1521(a)(5) of the Bankruptcy Code.

12. All creditors and other parties-in-interest, including the Debtors, are sufficiently protected in the relief granted in this Order as required under section 1522(a) of the Bankruptcy Code.

**IT IS HEREBY ORDERED THAT**:

13. The Verified Petition and the relief requested are GRANTED as set forth herein, and any objections or responses thereto that have not been withdrawn or resolved are overruled with prejudice.

14. The BVI Proceedings are granted recognition as "foreign proceedings" as such term is defined in section 101(23) of the Bankruptcy Code and pursuant to section 1517(a) of the Bankruptcy Code.

15. The BVI Proceedings are granted recognition as "foreign main proceedings" as such term is defined in section 1502(4) of the Bankruptcy Code and pursuant to section 1517(b)(1) of the Bankruptcy Code.

16. Throughout the duration of these Chapter 15 Cases or until otherwise ordered by this Court, all relief and protection afforded to a foreign main proceeding under section 1520 of the Bankruptcy Code is hereby granted to the BVI Proceedings, the Debtors, and the Debtors' property located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtors and their property located in the territorial jurisdiction of the United States.

17. The Authorized Foreign Representatives are recognized as "foreign representatives," as such term is defined in section 101(24) of the Bankruptcy Code, in respect of

the BVI Proceedings. The Authorized Foreign Representatives are authorized to act on behalf of the Debtors in these Chapter 15 Cases.

18. Each Foreign Representative is entrusted with the administration or realization of all of the Debtors' property within the territorial jurisdiction of the United States as set forth in section 1521(a)(5) of the Bankruptcy Code.

19. The BVI Proceedings, the BVI Orders and any other orders entered by the BVI Court in the BVI Proceedings as of the date of this Order shall be and hereby are granted comity and given full force and effect in the United States.

20. This Order is without prejudice to the Authorized Foreign Representatives requesting any additional relief in these Chapter 15 Cases, including seeking recognition and enforcement in the United States of any further orders issued by the BVI Court.

21. No action taken by the Authorized Foreign Representatives, the Debtors or their respective successors, agents, representatives, advisors or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the BVI Proceedings, the documents contemplated thereunder, this Order, these Chapter 15 Cases, any further order for additional relief in these Chapter 15 Cases or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

22. The Authorized Foreign Representatives, the Debtors and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules, the Local Rules or the orders of this Court.

23. The Authorized Foreign Representatives are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

24. No party shall incur any liability for following the terms of this Order, whether by acting or refraining from acting, except in the case of the party's own gross negligence or willful misconduct.

25. Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, without limitation, Bankruptcy Rules 1018, 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry, (b) the Authorized Foreign Representatives are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

26. This Court shall retain jurisdiction with respect to the implementation, enforcement, amendment and modification of this Order.

Dated: ____________________ ____________________________________

New York, New York

The Honorable ______________________
United States Bankruptcy Judge

Andrew G. Dietderich
Sharon Cohen Levin
Christopher J. Dunne
Jacob M. Croke
Alexa J. Kranzley
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Authorized Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al.*,[1]<br><br>Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 26-(_____) (__)<br><br>(Joint Administration Requested) |

**DECLARATION OF PAUL PRETLOVE IN SUPPORT OF (A) THE EMERGENCY MOTION FOR ENTRY OF ORDERS GRANTING (I) *EX PARTE* RELIEF AND (II) PROVISIONAL RELIEF, PURSUANT TO SECTION 1519 OF THE BANKRUPTCY CODE AND (B) THE VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND RELATED RELIEF**

I, Paul Pretlove, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am a Managing Director of Interpath Ltd in the United Kingdom. I, along with my colleagues David Standish, also of Interpath Ltd in the United Kingdom, and James Drury of Interpath (BVI) Limited (together with Interpath Ltd, "Interpath") in the British Virgin Islands

[1] Each of the Chapter 15 debtors is registered in the British Virgin Islands and maintains its registered address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110. A complete list of the Debtors and their company numbers is attached as Exhibit A.

(the "BVI") have been appointed as joint provisional liquidators (in such capacity, the "JPLs" or, individually, a "JPL") of 30 entities (collectively, the "Debtors") incorporated in the BVI associated with the group referred to as the "Prince Group."

2. I submit this declaration in support of (i) the *Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* in my capacity as JPL and, in such capacity, an officer of the Eastern Caribbean Supreme Court in the BVI High Court of Justice (Commercial Division) (the "BVI Court"), and (ii) the *Verified Petition under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "Verified Petition" and, together with the petitions, the "Petitions"), filed pursuant to chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code").

3. The facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, and information supplied to me by others in the course of my duties as a JPL. Where I refer to facts based on information provided by others, such information is true to the best of my knowledge and belief. I am duly authorized to submit this declaration on behalf of the Debtors, and if called upon to testify, I could and would testify competently to the facts set forth herein.

4. Section I of this declaration describes my professional background and experience. Section II describes the Debtors, specific information about the Debtors' businesses and background information on the Prince Group. Section III details the ongoing criminal investigations, sanctions and forfeiture proceedings with respect to the Debtors and the broader Prince Group. Section IV describes the legal proceedings currently pending in the BVI. Section V

describes certain pending actions by the JPLs in furtherance of their mandate. Section VI describes why Chapter 15 relief is necessary and should be granted.

## I. PROFESSIONAL BACKGROUND AND EXPERIENCE

5. I am a licensed insolvency practitioner with over 25 years of experience in restructuring and insolvency matters. I am a Fellow of the Association of Chartered Certified Accountants (FCCA), a Fellow of R3, the Association of Business Recovery Professionals (FABRP), and a Fellow of the Insolvency Practitioners Association (FIPA). I am currently based in London, having previously been based in the BVI for over 13 years.[2]

6. Interpath is an international advisory and restructuring firm with offices in, among other places, the United Kingdom, France, the BVI, Bermuda, Hong Kong and the Cayman Islands. As relevant in this matter, Interpath specializes in asset tracing, investigations, contentious insolvency matters, and cross-border restructuring engagements.

7. The other JPLs are also experienced licensed insolvency practitioners. David Standish is based in London with more than 30 years of experience. James Drury is based in the BVI with more than 15 years of experience.

8. In each of our professional capacities, the JPLs have acted in court-appointed roles in insolvency and restructuring proceedings, including in matters involving fraud and asset-tracing claims and freezing orders.

9. I am familiar with the UNCITRAL Model Law on Cross-Border Insolvency, which has been substantially adopted in the United States as Chapter 15 of the

---

[2] I joined Zolfo Cooper (BVI) Limited in the BVI in February 2012. This company and its BVI practice was subsequently rebranded as AlixPartners (BVI) Limited (December 2016), then became Kalo (BVI) Limited (May 2017) and, following a purchase and change of control, was rebranded as Interpath (BVI) Limited in July 2022. I relocated from the BVI to London in April 2025.

Bankruptcy Code. I currently serve as the liquidator and foreign representative in *In re Kingate Global Fund, Ltd*, *In re Kingate Euro Fund, Ltd* and *In re Three Arrows Fund Limited*, which have also been recognized as foreign main proceedings in the United States.[3]

10. Neither I nor the other JPLs had any relationship with the Debtors or the Prince Group prior to our appointment as JPLs.

## II. THE DEBTORS AND THE PRINCE GROUP

11. Each of the Debtors was incorporated under the laws of the BVI as a business company pursuant to the BVI Business Companies Act, 2004, a form of limited liability company that I understand to be broadly comparable to a corporation under United States law.

12. The U.S. Department of the Treasury has identified 28 of the Debtors as part of the so-called "Prince Group"—an alleged transnational criminal enterprise based in Southeast Asia that has been linked to large-scale online fraud, human trafficking, and money laundering operations targeting victims globally. The remaining two Debtors—Amber Hill Ventures Limited ("Amber Hill") and Lateral Bridge Global Limited ("Lateral Bridge")—are not the subject of sanctions designations but were identified in the civil forfeiture complaint further detailed in Section III below as entities used to launder the Prince Group's illicit proceeds.

13. Since approximately 2015, Chen Zhi served as Chairman of the Prince Group, which operated more than 100 business entities in over 30 countries. Chen Zhi was at various times a citizen of China, Cambodia, Vanuatu, St. Lucia, and Cyprus, and resided at various times in Cambodia, Singapore, Taiwan, and the United Kingdom. *See* Verified Compl. in Rem ¶¶

---

[3] *In re Kingate Global Fund, Ltd*, No. 19-12853 (Bankr. S.D.N.Y. Sept. 5, 2019); *In re Three Arrows Cap., Ltd.*, 649 B.R. 143 (Bankr. S.D.N.Y. 2023). Other cases in which I have served as foreign representative include *In re FCI Mkts*., No. 21-14743 (CL) (Bankr. S.D. Fla., May 14, 2021); *In re Hector Dao*, No. 24-16067 (MBK) (Bankr. D.N.J., June 17, 2021); *In re Limora Invs.*, No. 19-11678 (MG) (Bankr. S.D.N.Y., May 23, 2019); *In re Olinda Star Ltd.*, 614 B.R. 28 (Bankr. S.D.N.Y. Mar. 6, 2020); *In re World Fin. Grp.*, No. 17-22869 (AJC) (Bankr. S.D. Fla., Oct. 25, 2017); *In re Cinque Terre Fin.*, No. 16-11086 (JLG) (Bankr. S.D.N.Y., Apr. 27, 2016).

16(a), 16(o), *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025).

14. Ostensibly, the Prince Group was focused on real estate development, financial services, and consumer services. Its publicly disclosed business units in Cambodia included Prince Real Estate Group, Prince Huan Yu Real Estate Group, Prince Bank, and Awesome Global Investment Group, operating across sectors including banking, finance, tourism, logistics, technology, food and beverages, and lifestyle. *See* Verified Compl. in Rem ¶ 21, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025); Indictment ¶ 29, *United States* v. *Chen Zhi*, No. 1:25-cr-00312-RPK (E.D.N.Y. filed Oct. 8, 2025).

15. However, the criminal indictment of Chen Zhi and the civil forfeiture complaint further detailed in Section III alleges that, in secret, Chen Zhi and his top executives grew the Prince Group into one of the largest transnational criminal organizations in Asia. The indictment alleges that, under Chen Zhi's direction, the Prince Group generated enormous profits by operating forced-labor scam compounds across Cambodia that engaged in cryptocurrency investment fraud and other fraudulent schemes and used its network of ostensibly legitimate business enterprises to launder the proceeds of those criminal activities. The schemes are alleged to have resulted in billions of dollars in losses incurred by victims in the United States and around the world.

16. It also is alleged in the criminal indictment, the civil forfeiture complaint, and the sanctions designations further detailed in Section III, that the Debtors formed part of the Prince Group's complex multinational corporate structure. It is alleged that they were not independent operating businesses but served as components of a layered corporate architecture through which the Prince Group held real property, investment interests, financial accounts, and

other assets across multiple jurisdictions, including the United States, the United Kingdom, Hong Kong, Singapore, the Cayman Islands, Cambodia and Spain. The corporate structure is alleged to have been deliberately designed to obscure the ultimate beneficial ownership and control of assets and to facilitate the movement and laundering of proceeds derived from criminal activity. *See, e.g.,* Verified Compl. in Rem ¶¶ 40, 48, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025). Chen Zhi is directly recorded as the sole shareholder and director of several of the Debtors. Others are held through intermediate holding companies or registered in the names of individuals whom the Office of Foreign Assets Control ("OFAC") has identified as associates of Chen Zhi or the Prince Group. The JPLs' investigation into the full ownership chain and ultimate beneficial ownership of each Debtor is ongoing.

17. According to the civil forfeiture complaint further detailed in Section III below, one senior Prince Group executive boasted in 2022 that, by 2018, the enterprise was generating over $30 million per day from fraudulent pig-butchering schemes and related illicit activities—an amount that annualizes to approximately $11 billion. The civil forfeiture complaint refers to internal Prince Group financial documents maintained by Chen Zhi which indicate that, as of January 2024, total annual revenue from the organization's legitimate business operations, by contrast, likely did not exceed several hundred million dollars, and some key Prince Group entities maintained negative cash flows. *See* Verified Compl. in Rem ¶ 57, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025).

18. As described in greater detail in Section III below, the civil forfeiture complaint alleges that the proceeds of the Prince Group's criminal activities were laundered through a variety of complex methods, including through the Debtors and other BVI companies within the Prince Group's corporate structure. By around 2020, Chen Zhi is reported to have

amassed approximately 127,271 Bitcoin (worth over $8.7 billion as of the date of this Declaration) across unhosted cryptocurrency wallets he personally controlled—now the subject of a civil forfeiture action pending in the U.S. District Court for the Eastern District of New York.

## III. CRIMINAL INVESTIGATIONS AND SANCTIONS

### A. The DOJ Indictment and the Scam Compound Operations

19. Following years of reporting by news outlets, international organizations, and human rights agencies on forced labor and scam compounds in Cambodia with alleged ties to the Prince Group, governments spanning multiple jurisdictions launched formal criminal investigations into the Prince Group and Chen Zhi.

20. On October 14, 2025, the U.S. Department of Justice ("DOJ") unsealed an indictment (the "Indictment") against Chen Zhi in the U.S. District Court for the Eastern District of New York, charging him with wire fraud conspiracy and money laundering conspiracy for directing the Prince Group's operation of forced-labor scam compounds across Cambodia that stole billions of dollars from victims in the United States and around the world. *See* Indictment, *United States* v. *Chen Zhi*, No. 1:25-cr-00312-RPK (E.D.N.Y. filed Oct. 8, 2025).

21. The Indictment alleges that, at Chen Zhi's direction, the Prince Group built and operated at least 10 scam compounds throughout Cambodia in which thousands of migrant workers who had traveled to Cambodia seeking legitimate employment were instead trafficked and forced to execute cryptocurrency investment fraud and other fraudulent schemes, often under threat of violence. *Id.* ¶¶ 30-31. The compounds housed vast dormitories surrounded by high walls and barbed wire and functioned as forced labor camps. *Id.* Two facilities alone are reported to have been staffed with 1,250 mobile phones controlling 76,000 accounts on a popular social media platform. *Id.* ¶ 33. Chen Zhi is alleged to have personally maintained records tracking profits from the scams that explicitly referenced pig-butchering, and internal Prince Group

documents included detailed instructions on building rapport with victims and guidance on registering social media accounts in bulk. *Id.* ¶ 34.

22. The Indictment further alleges that the Prince Group's fraud schemes targeted victims around the world, including in the United States. *Id.* ¶ 41. The Indictment describes a Brooklyn-based money laundering network (the "Brooklyn Network") that facilitated an investment fraud scheme perpetrated by scammers at one of the Prince Group's compounds. *Id.* Between approximately May 2021 and August 2022, the Brooklyn Network allegedly facilitated the fraudulent transfer and laundering of more than $18 million on behalf of the Prince Group from over 250 victims in the Eastern District of New York and throughout the United States. *Id.* ¶ 44. Victim funds are stated to have been deposited into bank accounts in the names of Brooklyn- and Queens-based shell companies, then sent through a series of accounts back to Prince Group scammers, where they were further laundered before returning to the Prince Group and its top executives. *Id.* ¶¶ 42-44.

23. The Indictment further alleges that Chen Zhi and his co-conspirators used their political influence to protect the scam operations from law enforcement, including by bribing officials of the Chinese Ministry of Public Security and Ministry of State Security for advance information about law enforcement raids. *Id.* ¶ 36. Chen Zhi maintained ledgers tracking hundreds of millions of dollars in reimbursements to Prince Group associates for bribes and luxury purchases, and Prince Group associates used violence and coercion to maintain the enterprise's dominance and enforce discipline within the compounds. *Id.* ¶¶ 38-39. Prince Group associates are alleged to have used violence and coercion against individuals within the compounds, including beatings and threats of further violence. *Id.* ¶ 40. Reports from the United Nations and international human rights organizations have documented additional abuses within scam

compounds across the region, including beatings, electric shocks, prolonged confinement, sexual violence and other forms of torture used to compel participation in fraud operations.[4]

B. The Civil Forfeiture Action and the Laundering Pipeline

24. On October 14, 2025, the U.S. Attorney's Office for the Eastern District of New York and the DOJ's National Security Division filed a verified civil forfeiture complaint (the "Forfeiture Complaint") seeking forfeiture of approximately 127,271 bitcoin—at the time of seizure, the largest forfeiture action in U.S. history—as proceeds and instrumentalities of Chen Zhi's fraud and money laundering schemes (the "EDNY Forfeiture"). *See* Verified Compl. in Rem, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025).

25. The Forfeiture Complaint alleges that Chen Zhi and his co-conspirators laundered illicit profits through professional money laundering operations—referred to in internal Prince Group communications as "illegal money shops," "underground money houses," and "water houses"—which collected scam proceeds in the form of bitcoin or stablecoins, converted them to fiat currency, and then used the cash to purchase clean bitcoin or other cryptocurrencies. *Id.* ¶ 46.

26. The Forfeiture Complaint also describes that illicit proceeds were also laundered through BVI companies, including Amber Hill, Lateral Bridge, and potentially other entities among the Debtors or within the Prince Group's corporate structure. *Id.* ¶ 16. These entities maintained accounts at U.S. financial institutions that were opened with allegedly falsified

---

4 *See A Wicked Problem: Online Scam Operations and Trafficking into Forced Criminality in Southeast Asia,* UN Office of the High Commissioner for Human Rights (Feb. 20, 2026), https://www.ohchr.org/en/press-releases/2026/02/un-report-details-grave-abuses-against-those-trafficked-scam-centres; *"I Was Someone Else's Property": Forced Online Scam Labour in Cambodia,* Amnesty Int'l (June 2025), https://www.amnesty.org/en/wp-content/uploads/2025/06/ASA2394472025ENGLISH.pdf.

business descriptions and materially understated transaction volumes—in one instance, by more than 1,000%. *Id.* ¶ 47. The Forfeiture Complaint further alleges that Chen Zhi and his co-conspirators laundered proceeds through the Prince Group's own online gambling operations—which continued to operate in multiple countries even after Cambodia's ban on online gambling—and through large-scale cryptocurrency mining operations, including the China-based Lubian, which was for a time the sixth-largest bitcoin mining operation in the world. *Id.* ¶¶ 48–49. Chen Zhi is stated to have boasted to associates that the mining business's "profit is considerable because there is no cost"—the operating capital comprised funds stolen from victims. *Id.* ¶ 49.

27. Chen Zhi and his co-conspirators are also alleged to have employed sophisticated cryptocurrency laundering techniques to further obscure the origins of the illicit proceeds, including "spraying" and "funneling" techniques in which large volumes of cryptocurrency were repeatedly disaggregated across scores of wallets and then re-consolidated into fewer wallets, and the deliberate commingling of illicit funds with newly mined bitcoin to make laundered proceeds appear to originate from legitimate mining activity. *Id.* ¶¶ 50–52. Blockchain tracing by the U.S. Federal Bureau of Investigation ("FBI") is said to have determined that the 127,271 Bitcoin in wallets personally controlled by Chen Zhi were primarily funded by two categories of sources: cryptocurrency mining, including addresses associated with Prince Group mining operations; and indirect transfers from wallets at centralized cryptocurrency exchanges, including wallets controlled by BVI shell companies within the Prince Group's structure. *Id.* ¶ 45.

C. OFAC and OFSI Sanctions Designations

28. Also on October 14, 2025, OFAC and the Financial Crimes Enforcement Network ("FinCEN"), alongside the United Kingdom's Foreign, Commonwealth, and Development Office, imposed sanctions on the Prince Group and 146 individuals and entities

within and connected to it.[5] OFAC designated the Prince Group as a "Transnational Criminal Organization" and placed Prince Holding Group and many of its affiliates—including more than 100 corporate entities and more than a dozen officers and employees—on the Specially Designated Nationals and Blocked Persons List (the "SDN List"). As a result, all property of the SDN List designees subject to U.S. jurisdiction was blocked, and all U.S. persons were prohibited from transacting business with the designees without a license from OFAC.

29. The United Kingdom imposed corresponding sanctions targeting Chen Zhi and the Prince Group through HM Treasury's Office of Financial Sanctions Implementation ("OFSI") under the Global Human Rights Sanctions Regulations 2020.

30. Twenty-eight of the Debtors are among the 146 individuals and entities designated under the U.S. and/or U.K. sanctions regimes. The remaining two Debtors—Amber Hill and Lateral Bridge Global Limited—are not the subject of sanctions designations but were identified in the Forfeiture Complaint as entities used to launder the Prince Group's illicit proceeds.

31. By way of Overseas Territories Orders in Council, the U.K. sanctions automatically extend to and are adopted by the BVI and the Cayman Islands in their capacities as British Overseas Territories.

D. The Arrest and Extradition of Chen Zhi

32. On January 6, 2026, Chen Zhi was arrested in Cambodia and extradited to China. Cambodia's Interior Ministry confirmed the extradition and announced that Chen Zhi's Cambodian citizenship had been revoked by royal decree in December 2025. China's Ministry of Public Security stated that Chen Zhi and his "criminal gang" are suspected of crimes including

[5] Press Release, U.S. Dep't of the Treasury, *U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia* (Oct. 14, 2025), https://home.treasury.gov/news/press-releases/sb0278.

operating fraud operations and concealing their proceeds and announced that arrest warrants would be issued for additional key members of the criminal syndicate. I understand that Chen Zhi remains in custody in China as of the date of this Declaration.[6]

E. Alleged Financial Fraud

33. The Indictment and the Forfeiture Complaint allege that the Prince Group's operations generated harm on an extraordinary scale. The U.S. Department of the Treasury has described the Prince Group as a "dominant player in Cambodia's scam economy" that "has controlled illicit financial flows of billions of dollars."[7] TRM Labs, a leading blockchain analytics firm, described the Prince Group in its 2026 Crypto Crime Report, a copy of which is attached hereto as Exhibit B, as "one of the largest pig butchering scam operations ever uncovered." TRM's analysis found that HuiOne Pay—a Cambodian payments platform that was subsequently designated by FinCEN as a foreign financial institution of primary money laundering concern—served as a high-volume financial gateway for the Prince Group's laundering operations. HuiOne Pay received nearly 80% of funds from a Prince Group-linked escrow service, with monthly inflows peaking at approximately $4.7 billion in July 2025. TRM observed that HuiOne Pay suspended operations and halted withdrawals following an apparent bank run in December 2025, with incoming volume falling from multiple billions per month to approximately $100 million by December 2025.

34. Based on publicly available information, the number of potential fraud victims may be vast. The United States Institute of Peace has estimated that total annual revenue

---

6 *Cambodia Extradites Chair of Alleged 'Criminal' Conglomerate to China*, OCCRP (Jan. 7, 2026), https://www.occrp.org/en/news/chairman-of-alleged-criminal-conglomerate-arrested-in-cambodia-and-extradited-to-china.

7 *See U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia*, U.S. Dep't of the Treasury (Oct. 14, 2025), https://home.treasury.gov/news/press-releases/sb0278.

generated by cyber-enabled scam operations in Southeast Asia exceeded $63 billion in 2023.[8] The FBI's Internet Crime Complaint Center reported record total cybercrime losses of $16.6 billion in 2024, with cryptocurrency-related fraud alone accounting for $9.3 billion in losses—a 66% increase from 2023. Cryptocurrency investment fraud, the dominant subcategory, caused $5.8 billion in losses across more than 41,000 complaints.[9] The U.S. Department of the Treasury separately estimated in September 2025 that Americans had lost at least $10 billion to Southeast Asia-based scam operations in 2024.[10] These figures are widely understood to be substantially underreported, as the vast majority of victims never file complaints with law enforcement.

35. The TRM Labs 2026 Crypto Crime Report corroborates these estimates, reporting that actors sent approximately $35 billion in cryptocurrency to fraud schemes in 2025 alone, with investment-related schemes—including pig-butchering scams of the type allegedly operated by the Prince Group—accounting for 62% of observed fraud inflows. TRM further noted that fraud reporting is often delayed and that the vast majority of victims never report at all, meaning that observed totals almost always understate the true scale of activity.

F. Alleged Human Trafficking and Forced Labor Activities

36. The Indictment alleges that the Prince Group's operations also involved an enormous number of trafficking victims—thousands of individuals who were allegedly trafficked into the Prince Group's scam compounds and forced to execute fraud schemes under threat of violence.

---

[8] *See Transnational Crime in Southeast Asia: A Growing Threat to Global Peace and Security*, U.S. Inst. of Peace (May 2024), https://www.usip.org/sites/default/files/2024-05/ssg_transnational-crime-southeast-asia.pdf.

[9] *See Federal Bureau of Investigation Internet Crimes Report 2024*, FBI Internet Crime Complaint Ctr. (Apr. 23, 2025), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

[10] Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Southeast Asian Networks Targeting Americans with Cyber Scams* (Sept. 8, 2025), https://home.treasury.gov/news/press-releases/sb0237.

37. The United Nations reported in August 2023 that at least 100,000 people in Cambodia may be held in situations where they are forced to execute online scams.[11] More recent estimates place the number of scam compounds across Cambodia alone in the hundreds, with the cybercriminal labor force across Cambodia and other countries in the region estimated to exceed 350,000 people.[12] The Prince Group is alleged to have operated at least 10 such compounds and to have been among the largest operators in the region.

G. Independent Investigation by the JPLs

38. The JPLs have not completed an independent professional investigation of facts relevant to their mandate and have not yet formed any view as to the merits of the allegations included in the Indictment, the Forfeiture Complaint, the sanctions designations or the various other materials cited above.

## IV. THE BVI PROCEEDINGS AND THE APPOINTMENT OF THE JPLS

A. The BVI Insolvency Framework

39. Pursuant to section 162(1)(c) of the BVI Insolvency Act, 2003 (the "BVI Insolvency Act"), as described in greater detail in the Declaration of Andrew Chissick filed contemporaneously herewith (the "Chissick Declaration"), the Attorney General of the BVI may seek the appointment of a liquidator on public interest grounds. A BVI liquidation is a court-supervised collective process in which appointed liquidators and provisional liquidators serve as officers of the BVI Court. If a company is placed into liquidation, the liquidation process will

---

11 *Hundreds of Thousands Trafficked to Work as Online Scammers in SE Asia, Says UN Report,* UN Off. of the High Comm'r for Hum. Rts., (Aug. 29, 2023), https://www.ohchr.org/en/press-releases/2023/08/hundreds-thousands-trafficked-work-online-scammers-se-asia-says-un-report.

12 Jacob Sims, *Policies and Patterns State-Abetted Transnational Crime in Cambodia as a Global Security Threat*, Human. Rsch. Consultancy (May 2025), https://cdn.prod.website-files.com/662f5d242a3e7860ebcfde4f/68264cff356caba111f2db1e_Policies%20and%20Patterns_16052025.pdf.

involve the adjudication of creditor claims, realization of assets, and distribution of proceeds in accordance with statutory priority, at the conclusion of which the company is dissolved and ceases to exist. *See* Chissick ¶¶ 17, 32, 40.

B. The Liquidation Applications and the BVI Orders

40. On January 5, 2026, in response to the criminal investigations, sanctions designations, and enforcement actions described in Section III above, the Attorney General of the BVI, Dawn J. Smith (the "BVI Attorney General"), applied to the BVI Court for the appointment of the JPLs as liquidators pursuant to sections 162(1)(a) and (c) of the BVI Insolvency Act (the "Liquidation Applications"). In parallel, the BVI Attorney General sought the appointment of the JPLs as provisional liquidators of the Debtors pursuant to section 170 of the BVI Insolvency Act pending the determination of the Liquidation Applications, stating in the written submissions filed in support of the applications that these matters "require urgent investigation by independent professionals to determine the full extent of the fraudulent activities, identify, secure, protect and trace assets held by or on [the Debtors'] behalf; and identify potential claims against third parties." *See* Chissick Declaration Exhibit D ¶ 47.

41. Following an *ex parte* hearing on January 9, 2026, the Honorable Justice Abbas Mithani of the BVI Court granted orders (collectively, the "BVI Orders") appointing the JPLs as provisional liquidators of the Debtors. Copies of the BVI Orders are attached hereto as Exhibit C.

C. The JPLs' Powers and Authority

42. Pursuant to the BVI Orders, the JPLs have acquired formal legal control of the Debtors. The powers of the Debtors' prior directors and other officeholders with respect to the affairs and assets of the Debtors have, in material part, been displaced and now vest exclusively in

the JPLs. *See* Chissick Declaration ¶ 40. While legal ownership of the Debtors has not changed as a result of the JPLs' appointment, the registered directors of the Debtors—which at the relevant time included Chen Zhi in the case of entities where he served as director—have no power to act in that capacity during the pendency of the provisional liquidation.

43. The appointment of the JPLs was sought on the basis that it was necessary to, amongst other things (i) divest Chen Zhi and his associates of control of the Debtors and prevent them from continuing to use the Debtors to further the criminal enterprise thereby continuing to inflict public harm; (ii) identify and preserve the Debtors' assets (iii) conduct thorough investigations into past transactions, and (iv) review banking records, asset transfers, and corporate dealings to identify and locate the potential money laundering activities.

44. The BVI Orders confer broad powers on the JPLs as court-appointed officers. *See* Chissick Declaration ¶¶ 36–38. Pursuant to those orders, the JPLs are empowered to, among other things and without further sanction of the BVI Court:

i. take control of corporate governance and operations of the Debtors;

ii. act on behalf of the Debtors in legal proceedings in any jurisdiction;

iii. manage, operate, and control the Debtors' bank accounts;

iv. appoint agents and professional advisers;

v. gain entry to the Debtors' premises and take possession of and preserve the books and records of the Debtors, "to investigate the affairs of the [Debtors] so far as necessary to protect and, if necessary, retrieve the assets and records of the [Debtors]"; and

vi. take further steps, including initiating legal proceedings, conducting discovery, investigating past conduct, and taking control of assets previously managed by prior stakeholders.

45. The BVI Orders also expressly authorize the JPLs to "seek the recognition (or its equivalent) of the appointment of the Joint Provisional Liquidators in the United States, United Kingdom, Singapore, Hong Kong, Taiwan, Thailand and Cambodia or elsewhere for the purposes of securing, realising and remitting assets to the control of the JPLs and for the purpose of obtaining access to and control of the records of the Company." BVI Orders ¶ 3(c).

D. Continuation of the JPLs' Appointment

46. On January 29, 2026, the BVI Court continued the BVI Orders pending final determination of the Liquidation Applications currently scheduled for April 16–17, 2026. Copies of the continuation orders are attached as Exhibit D.

## V. PENDING ACTIVITIES OF THE JPLs

A. Investigatory Steps

47. Following their appointment, the JPLs commenced an investigation into the Debtors' financial affairs and assets pursuant to their powers under the BVI Orders to investigate the affairs of the Debtors so far as necessary to protect, and if necessary, retrieve the assets and records of the Debtors. At present, the JPLs have limited visibility into the full scope of assets held by the Debtors. The Prince Group is alleged in the Forfeiture Complaint to have deliberately obfuscated its corporate structure and books and records. The JPLs' present understanding of the Debtors' assets is based principally on publicly available information, U.K. and Hong Kong land registry documents, the Debtors' corporate registers, documents obtained from the Debtors' former registered agent, and the JPLs' further preliminary investigation. Additional assets, entities,

jurisdictions, and counterparties are expected to be identified as records are obtained and investigations progress.

48. To date, the JPLs and their counsel, in accordance with the BVI Court Orders (and the protocol therein), have actively engaged with the BVI Attorney General, the Debtors' former registered agent, and regulatory and law enforcement authorities across multiple jurisdictions, including the DOJ, the FBI, OFAC, the U.K. National Crime Agency, and OFSI, and numerous current and former counterparties to various of the Debtors and their affiliated entities. These engagements remain ongoing and have been productive.

B. <u>Sanctions Impact and Licensing Efforts</u>

49. The sanctions described above have had immediate and severe operational consequences for the Debtors. Financial institutions and service providers across multiple jurisdictions have ceased to engage with the Debtors, bank accounts have been frozen, and counterparties have declined to transact with or provide information to the JPLs absent appropriate regulatory licenses. The JPLs have been actively seeking licenses in relevant jurisdictions to provide clear regulatory confirmation that transactions undertaken pursuant to the JPLs' court-appointed mandate are authorized under applicable sanctions laws and regulations.

50. On February 20, 2026, the JPLs submitted a license application to OFAC requesting the issuance of a license on an expedited basis with respect to the Debtors. The JPLs remain in active contact with OFAC regarding this license application.

51. Meanwhile, in response to urgent developments at the Allied Cigar Group—a group of operating companies engaged in the global distribution of premium cigar products in which one of the Debtors holds a majority investment—OFAC issued at the JPLs

request a temporary license (License No. TCO-2026-1464321-2) on March 18, 2026, to facilitate financial transactions necessary to stabilize operations.

52. In the United Kingdom, the JPLs have been engaging with the Foreign, Commonwealth and Development Office and OFSI to explore the issuance of a license under the Global Human Rights Sanctions Regulations 2020. On March 13, 2026, OFSI confirmed that it had begun its assessment.

53. The JPLs have also engaged with relevant authorities in the BVI and the Cayman Islands to begin the parallel process of obtaining comparable licenses, and with the Cayman Islands Monetary Authority and the Cayman Financial Reporting Authority in connection with regulated subsidiaries of certain of the Debtors.

A. Interference by Chen Zhi and His Proxies

54. Since the entry of the BVI Orders, the JPLs have encountered active resistance from parties associated with Chen Zhi and the Prince Group who have taken steps to challenge the JPLs' authority and to interfere with the JPLs' efforts in multiple jurisdictions.

55. Campbells Legal (BVI) Limited ("Campbells"), a law firm purporting to represent 25 of the Debtors, has asserted that Cosimo Borrelli, a Hong Kong-based restructuring professional, purportedly has been appointed as director of 25 of the Debtors, and that this appointment was made by unspecified individuals acting pursuant to a purported power of attorney from Chen Zhi dated December 29, 2025—eight days before Chen Zhi's arrest. Despite repeated requests, Campbells has not produced the purported powers of attorney or identified the individuals purportedly authorized to act thereunder. Campbells has also declined to identify the person(s) or entities presently directing Campbells' actions, although Mr. Borrelli has stated in a sworn filing that he is receiving and relying on information from a U.S. law firm, Boies Schiller

Flexner LLP ("BSF"), and in correspondence with the Debtors' former registered agent predating the JPLs' appointment, Campbells similarly stated that it was acting pursuant to instructions from BSF.

56. In subsequent correspondence, Campbells has stated that the individuals acting under the purported powers of attorney "are not prepared to disclose their identities at this time," and that that position is reinforced by the fact that the JPLs have been "communicating with foreign governments in secret"—an apparent reference to the JPLs' express authorization under the BVI Orders to communicate and cooperate with law enforcement and regulatory authorities investigating Chen Zhi and his alleged co-conspirators. *See* BVI Orders ¶¶ 3(n)–(o).

57. The JPLs are not currently aware of the full scope of the activities of Campbells or Mr. Borrelli. But Campbells, Mr. Borrelli or persons acting in coordination with them have taken actions relating to the Debtors and their property that, including changing the registered offices of two Hong Kong Exchange listed companies in which the Debtors hold majority interests, and appointing a new director to one such company without the majority shareholder's consent. The JPLs have also been provided with unsigned statements of affairs for the Debtors which describe assets as "pledged for liabilities to shareholders."

58. In the BVI, Campbells has indicated that it intends to appear on behalf of the Debtors at a BVI Court hearing scheduled for April 16–17, 2026 seeking a dismissal of the BVI Attorney General's Liquidation Applications and the discharge of the JPLs' appointment. Separately, a law firm purporting to represent Amber Hill and Lateral Bridge has appeared in the BVI to seek to exclude those entities from the Attorney General's application, arguing that they have no connection to the Prince Group—an assertion contradicted by the allegations in the Forfeiture Complaint.

59. In the United States, BSF sent the JPLs a litigation hold notice on March 25, 2026. The letter, which copied Campbells, asserts Chen Zhi's ownership interest in the Debtors and expressly contemplates litigation against the JPLs in the event they pursue asset dispositions. A copy is attached as Exhibit E.

60. In the United Kingdom, the JPLs have encountered similar interference. Persons associated with Chen Zhi and the Prince Group—including a solicitor who has publicly declared that he acts for Chen Zhi—have contacted counterparties and service providers in relation to a valuable commercial property in the City of London held by one of the Debtors.

61. Recognition in the United States is therefore essential for the JPLs to fulfil the mandate for which they have been appointed by the BVI Court. In addition to recognition in the United States under Chapter 15, the JPLs intend to seek recognition of the BVI Proceedings in the United Kingdom, Hong Kong, Singapore and other jurisdictions as appropriate. I believe these Chapter 15 proceedings, the anticipated U.K. recognition proceedings, and the ongoing BVI Proceedings are complementary and mutually reinforcing. Any delay in recognition in the United States would impair the JPLs' ability to administer the Debtors' global estates in a coordinated and value-maximizing manner and would create opportunities for interested parties—including persons acting on Mr. Chen's behalf—to exploit gaps in cross-border protection.

## VI. CHAPTER 15 PROCEEDINGS AND RELIEF SOUGHT

### A. Why Chapter 15 Relief Is Necessary

62. I believe, for the reasons set forth in this declaration, that recognition of the BVI Proceedings under Chapter 15 of the Bankruptcy Code and granting the related relief are necessary to enable the JPLs to carry out their court-appointed mandate in the United States and preserve the Debtors' U.S. assets.

63. As described above, the Prince Group's enterprise has a direct and substantial nexus to the United States, including pending DOJ criminal and civil forfeiture proceedings, the apparent use of certain of the Debtors to launder illicit proceeds through U.S. financial institutions, and a money laundering network operating in New York that appears to have facilitated the fraudulent transfer of more than $18 million from over 250 U.S. victims. In my view, recognition is necessary to enable the JPLs to administer the Debtors' estates in a manner consistent with these ongoing U.S. enforcement actions, to coordinate with U.S. authorities, and to support the objectives of the U.S. sanctions regime through court-supervised administration under the direction of independent, licensed insolvency practitioners.

64. In addition to coordination efforts with the U.S. authorities and enforcement agencies, the JPLs' investigation requires engagement with, and coordination from, U.S.-based counterparties, including financial institutions that held accounts for entities within the Prince Group's corporate structure, as well as other persons and entities in the United States that may hold information, assets, or records relevant to the Debtors' affairs. Recognition will provide the JPLs with standing before U.S. courts and bind U.S. third parties to recognize the JPLs' authority.

65. I believe that recognition is consistent with the principles of comity and cross-border cooperation reflected in the UNCITRAL Model Law, which Chapter 15 implements, and advances the policy objectives of the Bankruptcy Code, including the promotion of cooperation between U.S. courts and foreign courts in cross-border insolvency cases. 11 U.S.C. § 1501(a).

66. I believe that the risks if recognition is not granted are immediate and material. As described above, the JPLs face active, multi-jurisdictional opposition from parties

seeking to obstruct the BVI Proceedings and challenge the JPLs' authority, and the Debtors' U.S. assets remain at risk of dissipation absent the protections of the automatic stay.

67. **Investigation risk**. If the JPLs cannot obtain records, communications, contracts, account information, and transactional documents located in the United States or held by U.S. counterparties, their ability to investigate the Debtors' affairs and the Prince Group's use of U.S. financial infrastructure will be seriously impeded. This risk is heightened by the fact that the JPLs have not yet identified the full scope of the Debtors' assets, and assets that remain unknown to the JPLs are particularly vulnerable to dissipation or diversion before the JPLs can take steps to preserve them.

68. **Sanctions Risk.** The sanctions relief obtained to date, including the OFAC license described above, is premised on the JPLs' status as court-appointed fiduciaries acting pursuant to a public-interest liquidation. Recognition of the BVI Proceedings will reinforce the framework on which that relief depends by confirming the JPLs' authority in the United States and providing assurance to OFAC, financial institutions, and other counterparties that the JPLs are the lawful administrators of the Debtors' estates. Absent recognition, the JPLs' standing in the United States remains uncertain, which risks undermining the cooperative relationship with U.S. enforcement authorities that has enabled the sanctions licensing process to date.

69. **Interference Risk**. As described in Section V above, proxies and persons associated with Chen Zhi have taken steps to interfere with the JPLs' authority across multiple jurisdictions, including through U.S. litigation threats, and engagement with counterparties without JPLs' authorization. Absent recognition, there is nothing to prevent these competing actors from commencing proceedings in U.S. courts, engaging with U.S. counterparties while disputing the JPLs' standing, or taking other actions inconsistent with the BVI Orders.

B. <u>The JPLs Are Foreign Representatives and the BVI Proceedings Qualify for Recognition as Foreign Main Proceedings</u>

70. As set forth above, the JPLs have been appointed by the BVI Court on a provisional basis to administer the Debtors' affairs and have been expressly authorized by the BVI Orders to seek recognition (or its equivalent) in jurisdictions including the U.S. As a result, the JPLs are authorized to seek recognition under Chapter 15. Based on consultation with U.S. counsel and as set forth in the Chissick Declaration, I believe that the BVI Proceedings satisfy the requirements for recognition under Chapter 15 of the Bankruptcy Code, that the JPLs are "foreign representatives" within the meaning of section 101(24), and that the BVI Proceedings qualify as "foreign main proceedings" within the meaning of section 1502(4). The Debtors were formed under the laws of the BVI, have continuously maintained their registered offices there, and the JPLs are administering the Debtors under BVI Court supervision.

71. The JPLs are not aware of any basis on which recognition could be refused under section 1506 of the Bankruptcy Code. To the contrary, the BVI Proceedings advance U.S. policy interests by facilitating coordination with U.S. law enforcement, preserving assets for the benefit of U.S. victims, and supporting the objectives of the U.S. sanctions regime.

C. <u>The Need for Emergency and Provisional Relief Pending Recognition</u>

72. I understand from the Debtors' U.S. counsel that recognition of the BVI Proceedings will require at least 21 days' notice of the recognition hearing and that, as a result, recognition cannot be granted for several weeks at the earliest. In the interim, the JPLs will have no standing or enforceable authority under U.S. law, and the Debtors' U.S. assets will be unprotected by any court order in this jurisdiction.

73. In my professional judgment, the Debtors' assets cannot safely remain unprotected during this period. As I have described in this declaration, the JPLs have limited

visibility into the full scope of the Debtors' assets, while persons acting at Chen Zhi's direction are likely to have detailed knowledge of the Debtors' asset holdings, corporate structures, bank accounts, and counterparty relationships. This information asymmetry creates a serious risk: those who wish to frustrate the JPLs' mandate are better positioned to act against the Debtors' U.S. assets than the JPLs are to protect them.

74. The pattern of interference described in Section V above confirms that this risk is not speculative. Campbells has not only refused to identify the individuals purporting to exercise corporate authority over the Debtors on behalf of Chen Zhi, but has referenced the JPLs' communication and cooperation with law enforcement and regulatory authorities as a reason for that refusal. In my experience, parties who have been willing to act to frustrate the JPLs' investigations will not hesitate to exploit the absence of any Court-mandated protections in the United States.

75. Without emergency and provisional relief from this Court, the JPLs cannot compel U.S. financial institutions and other counterparties to produce records needed to trace the Debtors' assets, cannot prevent the commencement of adverse proceedings in U.S. courts, and have no enforceable basis on which to require U.S. counterparties to engage with the JPLs rather than with persons purporting to act on behalf of the Debtors without authorization. For these reasons, I believe the emergency and provisional relief sought in the *Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* is necessary to enable the JPLs to protect the Debtors' assets during this critical stabilization period.

D. Waiver of the 14-Day Stay of Effectiveness

76. I understand from the Debtors' U.S. counsel that, upon recognition, section 1517(d) of the Bankruptcy Code ordinarily imposes a 14-day stay before the recognition order takes effect. This would create a second gap—after recognition is granted but before the automatic stay applies—during which the Debtors' U.S. assets would again be unprotected. For the same reasons set forth above, I do not believe the Debtors' assets can safely remain unprotected for any additional period. The circumstances described in this declaration make any delay in the effectiveness of recognition a material risk to the estates.

77. For these reasons, I respectfully submit that this Court waive the 14-day stay of effectiveness and grant immediate recognition of the BVI Proceedings as foreign main proceedings, together with all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code, including the imposition of the automatic stay within the United States.

Dated: April 8, 2026
London, UK

Paul Pretlove
Joint Provisional Liquidator and Authorized
Foreign Representative of the Debtors

# EXHIBIT A

## List of Debtors

| No. | Debtor Name | Company Number |
|---|---|---|
| 1. | Amber Hill Ventures Limited | 1965875 |
| 2. | Auspicious Tycoon Limited | 1984330 |
| 3. | Bright Team Global Limited | 1984336 |
| 4. | Delightful Thrive Limited | 1992053 |
| 5. | Even Sincerity Limited | 1970592 |
| 6. | Fulam Investment Limited | 1542112 |
| 7. | Giant Victory Holdings Limited | 1930566 |
| 8. | Golden Ascend International Limited | 1976645 |
| 9. | Harmonic State Limited | 2030628 |
| 10. | Jumbo High Limited | 1984889 |
| 11. | Lateral Bridge Global Limited | 2030656 |
| 12. | Luminous Glow Limited | 1992019 |
| 13. | Mighty Divine Limited | 1961510 |
| 14. | Noble Title Limited | 1925678 |
| 15. | Oriental Charm Holdings Investment Limited | 1977528 |
| 16. | Pacific Charm Holdings Investment Limited | 1977603 |
| 17. | Praise Marble Limited | 1903478 |
| 18. | Prince Global Group Limited | 1988522 |
| 19. | Prince Global Holdings Limited | 1988528 |
| 20. | Respectful Steed Limited | 1971898 |
| 21. | Retain Prosper Limited | 2022874 |
| 22. | Robust Harmony Limited | 1971181 |
| 23. | Simply Advanced Limited | 2035067 |
| 24. | Southern Heritage Limited | 2035209 |

| No. | Debtor Name | Company Number |
|---|---|---|
| 25. | Star Merit Global Limited | 1984550 |
| 26. | Starry Bloom Limited | 2035066 |
| 27. | Sure Tycoon Limited | 2030676 |
| 28. | Sword River Limited | 1971899 |
| 29. | Towards Sunshine Limited | 1970125 |
| 30. | United Riches Global Limited | 1984537 |

# EXHIBIT B

## TRM Labs 2026 Crypto Crime Report

TRM REPORT

# 2026 Crypto Crime Report

TRM identifies record USD 158 billion in illicit crypto flows in 2025, reversing a multi-year decline



TRMLABS.COM

# Key takeaways

- Illicit crypto volume reached an all-time high of **USD 158 billion** in 2025, up nearly 145% from 2024.

- Despite the increase in absolute illicit volume, **illicit volume as a proportion of overall crypto volume fell in 2025**, from 1.3% in 2024 to 1.2% in 2025.

- While illicit activity represented a small share of overall on-chain volume, **illicit entities captured 2.7% of available crypto liquidity in 2025**, according to a new metric released by TRM that frames risk relative to deployable capital rather than raw transaction volume.

- Sanctions-related activity in 2025 was overwhelmingly driven by Russia-linked flows, largely due to the rapid growth of the ruble-pegged stablecoin **A7A5**, which processed more than USD 72 billion in total volume.

- The wallet cluster associated with the Russian sanctions evasion network A7 is linked to **at least USD 39 billion** in 2025 – reflecting concentrated, coordinated activity closely associated with sanctions evasion and state-aligned financial infrastructure, rather than broad market usage.

- In 2025, **illicit actors stole USD 2.87 billion across nearly 150 hacks** – fewer incidents than last year – but the Bybit breach alone drove USD 1.46 billion (51%), accounting for much of the year-over-year increase in total losses.

- Major geopolitical players leaned further into cryptocurrency in 2025, using crypto rails as durable financial infrastructure. **Iran** and **Venezuela** relied on crypto for sanctions-constrained payments and financial services at scale. **Chinese language escrow and money laundering networks** processed over USD 100 billion, operating as critical infrastructure for global illicit markets, rather than as state-directed activity.

©TRM Labs 2026. All rights reserved. 

These takeaways reflect the current state of the cryptocurrency environment: no longer novel or peripheral, but broadly integrated and, in some cases, deeply embedded in traditional economic activity. Regulators, everyday users, governments, and criminal actors alike now encounter crypto as a routine part of financial life. Crypto tools are easier to use, increasingly seamless, and woven into both legitimate and illicit financial services, while many governments are incorporating digital assets into national economic strategies. The result is a growing baseline fluency with crypto that has, at the same time, improved the detection of illicit activity and enabled larger volumes of value to move through the broader illicit crypto ecosystem.

The percentage of illicit activity represents only a small fraction of overall activity, as has always been the case. However, TRM believes there are better ways to contextualize this figure and has adopted methodological changes to reflect this, detailed below.

## Revisiting our methodology: Considering illicit total volumes and illicit activity relative to incoming liquidity

**Illicit cryptocurrency wallets received an estimated USD 158 billion in incoming value in 2025**, a sharp increase from USD 64.5 billion in 2024 and the highest level observed over the past five years. Prior to this rebound, total incoming value to illicit entities had declined steadily from USD 85.9 billion in 2021 to USD 75.4 billion in 2022 and USD 73.3 billion in 2023, before reaching a low point in 2024.

The change in 2025 reflects a combination of intensified sanctions designations, increased use of crypto by nation-state actors, and technological advances by TRM that enable detection of previously unattributed illicit volume. The Beacon Network is one such example: a real-time intelligence-sharing system that allows law enforcement agents to flag addresses linked to financial crime, immediately alerting exchanges and triggering risk-based responses.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.




Despite the increase in absolute value in 2025, the percentage share of illicit activity continued to decline. Measured as a share of total attributed on-chain volume, **illicit activity fell slightly to 1.2% in 2025** from 1.3% in 2024[1], well below the 2023 high of 2.4%.

When we contextualize **illicit activity relative to incoming liquidity, a similar trend emerges: illicit entities received 2.7% of incoming VASP flows in 2025**, compared with 2.9% in 2024 and 6.0% in 2023. Together, these metrics indicate that while certain illicit categories expanded in absolute terms, illicit actors absorbed a smaller proportion of new capital entering the crypto ecosystem.




[1] **Methodology note:** TRM updated its approach to estimating illicit activity in this report. As a result, percentage figures may differ from those published previously and should not be interpreted as direct historical comparisons. See the Methodology section for additional detail.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

## Russia-linked sanctions designations and improved attribution drove the largest shift in illicit crypto activity

Volumes associated with sanctioned entities and jurisdictions rose sharply in 2025, led by **USD 72 billion received by the A7A5 token**, followed by an additional **USD 39 billion associated with the A7 wallet cluster.** This growth was highly concentrated: the vast majority of sanctions-linked volume was connected to Russia-linked entities, including Garantex, Grinex, and A7.

The increase is not linked to growth in sanctions evasion activity alone, but also to new designations of large entities in combination with improved attribution of cryptocurrency addresses to already-sanctioned actors.




> **Note:** A7A5 token refers to the blockchain-issued digital asset itself, while the "A7 wallet" refers to a specific wallet (or set of wallets) associated with A7-linked activity. Volumes attributed to the A7 wallet reflect transactions conducted by that wallet, whereas volumes attributed to the A7A5 token reflect aggregate on-chain activity involving the token across all holders. These figures measure different types of exposure and are not directly additive. There may be overlap in the above chart when the categories listed interact or have dual attribution.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

A7 stands out not only for its scale, but for its role as **centrally coordinated sanctions evasion architecture tied to Russian state interests.** On-chain activity indicates that A7 functions as a hub connecting Russia-linked actors with counterparties across China, Southeast Asia, and Iran-linked networks – reflecting a deliberate shift toward crypto-enabled, state-aligned financial infrastructure.

While the A7 wallet cluster is closely associated with sanctions evasion activity, **the A7A5 token reflects a broader strategy to reduce reliance on USD-backed rails by expanding use of a ruble-pegged stablecoin.** As a result, high volumes associated with A7A5 do not exclusively represent sanctions evasion, but rather sanctioned activity more broadly, including state-aligned economic flows. Together, these dynamics illustrate how Russia-linked actors are increasingly leveraging crypto – particularly stablecoins and higher-risk services – as part of a long-term, nationstate-backed strategy.

**Inflows to sanctioned entities predominantly used stablecoins.** This preference for stablecoins and move to high-risk services reflects the environment of more effective enforcement, expanded use of crypto identifiers in sanctions designations, and increased risk of detection or asset freezing. Together, these dynamics point to a sanctions environment in which authorities prioritize Russia-linked networks; enforcement tools are more crypto-native; and illicit actors adapt by moving to riskier, less regulated channels.

## Geopolitics moved on-chain

Geopolitical pressures reshaped illicit crypto activity in 2025, as **state and state-aligned actors moved to using cryptocurrency as core financial infrastructure rather than a tool of last resort.** While Russia-linked networks largely drove sanctions-related crypto volume, the more consequential shift was the institutionalization of crypto rails by other sanctioned actors.

In **Venezuela**, for example, crypto functioned as a pressure-release valve in a heavily sanctioned economy where traditional banking access is limited – supporting payments, remittances, and state-linked financial activity.

**China** occupies a distinct role in the illicit crypto landscape as a hub for illicit financial services infrastructure. TRM analysis shows that activity associated with Chinese-language escrow services and underground banking networks has grown sharply over time, with adjusted crypto volume rising from approximately USD 123 million in 2020 to **over USD 103 billion in 2025.**

This sustained growth reflects the increasing reliance of a wide range of illicit actors – including scam networks, cybercrime groups, and sanctions evasion intermediaries – on escrow-based crypto services for settlement and cash-out across the APAC region.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

©TRM Labs 2026. All rights reserved.




These services facilitate high-volume stablecoin transactions and bridge crypto assets into the formal financial system through OTC brokers, money mule networks, and APAC-based casinos.

This activity reiterates a clear theme for 2025: the **illicit crypto ecosystem is being shaped by its accessibility and integration into everyday financial activity.** Globally accessible service providers like these Chinese escrow services enable criminal demand at scale, with stablecoins serving as the primary connective layer between geopolitical actors, intermediaries, and illicit markets.

## Crypto crime numbers reached an all-time high

**Adjusted total incoming illicit cryptocurrency activity rose to approximately USD 158 billion in 2025**, the highest level observed in the past five years, and a sharp increase from USD 64 billion in 2024. This reversal followed three consecutive years of decline and reflects a renewed expansion of illicit activity across multiple categories, rather than growth driven by a single event type or market cycle.

| Crime type | YoY growth rates |
|---|---|
| **Sanctions** | >400% |
| **Blocklisted** | 32% |
| **Hacked or Stolen Funds** | 31% |
| **Darknet Markets** | 20% |
| **Illicit Goods and Services** | 12% |

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Key drivers of this increase include:

- **Expanded sanctions-related activity**, which grew over 400% year-over-year, alongside continued increases among **blocklisted entities** (32%) and **hacked or stolen funds** (31%) — reflecting both large-scale enforcement actions and improved attribution of activity linked to already-sanctioned actors.
- **More modest growth in market-driven illicit activity**, with **darknet markets** (20%) and **illicit goods and services** (12%) expanding at a slower pace.
- **Improved speed and coordination of attribution through TRM's Beacon Network**, which enables earlier identification of illicit activity by connecting law enforcement partners and private sector institutions across jurisdictions. Beacon has not expanded what TRM defines as "illicit activity," but has **accelerated how quickly high-confidence intelligence, incident data, and investigative insights are incorporated into our platform** — improving visibility into emerging threats and large-scale events as they unfold.
- **Growth in blocklisted activity across multiple crime types**, driven in part by expanded stablecoin issuer enforcement that targets wallets linked to sanctions evasion, terrorism financing, fraud, and hacking.

Taken together, these dynamics indicate that the 2025 increase in total incoming illicit crypto activity was driven less by broad-based expansion across all illicit activity types and more by **concentrated shocks, enforcement-linked developments, and faster, higher confidence attribution by TRM**, particularly around large-scale hacks and sanctions-related flows.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# TRM's methodology and approach

## Why we rethought how illicit crypto activity is contextualized

Illicit cryptocurrency activity has traditionally been expressed as a percentage of total blockchain transaction volume. While this framing offers a convenient high-level reference point, it has meaningful limitations that become more pronounced as crypto markets mature.

Total blockchain volume captures a wide range of activity that does not necessarily correspond to real economic transfers or changes in ownership. High-frequency trading, automated market making, arbitrage, internal exchange flows, and technical behaviors such as funds cycling repeatedly across addresses can materially inflate transaction volume without introducing new capital or increasing the amount of value effectively in circulation.

Although TRM applies techniques to estimate ownership changes and filter out certain internal or self-referential movements, these methods are inherently imperfect. In practice, distinguishing between genuine economic transfers and technical or intermediary-driven activity is increasingly difficult in markets defined by rapid trading, layered infrastructure, and repeated reuse of the same funds across multiple wallets. As a result, **total blockchain volume often functions as a noisy denominator — one that can mask the true economic scale and impact of illicit activity rather than illuminate it**.

For this reason, TRM has made two changes to this estimate this year:

1. Lower-bound estimate: Refining the denominator
2. Illicit activity as a share of VASP outflows

### 1. Lower-bound estimate: Refining the denominator

For the lower-bound estimate, **TRM now constrains the denominator to cryptocurrency activity involving known services, known wallets, and service-like clusters, along with a limited set of clusters that clearly behave like services but lack full attribution.** This adjustment is designed to more closely align the denominator with activity that reflects real economic use, rather than technical or self-referential movement.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

©TRM Labs 2026. All rights reserved.

The revised approach intentionally excludes large volumes of activity that inflate transaction counts without representing meaningful transfers of value. This includes wash trading, peel chains, internal exchange movements, and high-frequency arbitrage activity. Such behaviors can generate substantial on-chain volume while introducing little to no new capital and without increasing the amount of value available to users. Their prevalence has grown alongside newer blockchains and trading environments that enable highly automated strategies.

By narrowing the denominator to activity that can be confidently identified and economically contextualized, **this methodology produces a more conservative and analytically meaningful baseline for assessing illicit activity.** The principal tradeoff is the exclusion of some peer-to-peer and personal wallet activity that does not interact with identifiable services. TRM views this tradeoff as justified, as we prioritize precision and interpretability over completeness in environments where raw transaction volume can obscure – rather than clarify – economic reality.

## 2. Illicit activity as a share of VASP outflows

**TRM is introducing a new metric that frames illicit activity as a share of VASP outflows, rather than as a share of total on-chain transaction volume**. This approach reflects our view that illicit risk is better understood relative to available liquidity than to aggregate blockchain activity. In this report, we approximate available liquidity using the USD value of funds leaving virtual asset service providers (VASPs). VASP outflows represent the point at which value exits custodial environments and becomes freely deployable across the on-chain ecosystem, where it can be transferred, converted, and used for a wide range of purposes – including illicit activity.

A simplified example illustrates the distinction.

> Imagine USD 100 entering the on-chain ecosystem from exchanges over a given period. That same USD 100 may circulate extensively – moving through trading venues, wallets, bridges, and smart contracts – generating hundreds or thousands of dollars in transaction volume as it is reused. If USD 20 of that value ultimately flows to illicit wallets, measuring illicit activity as a share of total blockchain volume would yield a very small percentage, even though 20% of newly available capital was absorbed by illicit actors. Framing illicit activity as a share of the USD 100 in available liquidity, by contrast, more clearly reflects the economic significance of that absorption.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

©TRM Labs 2026. All rights reserved.

This liquidity-based framing better aligns with how illicit networks operate in practice. Illicit actors are constrained not by transaction counts, but by access to transferable value that can fund operations, payments, and downstream networks. **By anchoring the denominator to funds leaving VASPs, this metric focuses on the pool of capital that is realistically accessible for use, rather than on technical transaction activity driven by market structure, trading strategies, or internal system behavior.**

We do not suggest that VASP outflows capture all sources of liquidity, nor that every outflow represents newly introduced capital. However, as a consistent and observable baseline, **available liquidity provides a more stable and economically meaningful context for assessing illicit activity than total blockchain volume alone.** Used alongside traditional measures, this approach offers a clearer and more intuitive view of how illicit actors participate in — and draw value from — the crypto ecosystem.

## How we calculated total illicit volumes

TRM's estimate of total illicit cryptocurrency volume is based on the USD value of funds stolen through crypto-native hacks, combined with the USD value of transfers to blockchain addresses on Bitcoin, Ethereum, TRON, Binance Smart Chain, and Polygon that TRM has attributed to illicit entities. These entities include a broad range of threat categories, such as fraud schemes, sanctioned actors, terrorist organizations, and darknet marketplaces.

We treat this estimate as a conservative baseline — a minimum, or "floor," for illicit cryptocurrency activity. Illicit activity on blockchains is frequently identified with delay, as attribution improves over time through law enforcement actions, sanctions designations, judicial proceedings, and open-source reporting. As new intelligence emerges and additional wallets are linked to known illicit actors, historical estimates often increase, reinforcing the view that initial measurements understate the true scale of illicit activity at the time it occurred.

Several categories of activity are intentionally excluded from this estimate.

1. **First, we exclude proceeds from crimes that originate in fiat currency and are later converted into cryptocurrency.** These flows typically enter the crypto ecosystem through on-ramps and payment intermediaries and are difficult to identify using on-chain data alone. Accurately estimating this activity would require supplementary information from VASPs and national financial intelligence units that is not consistently available.
2. **Second, we exclude transfers to blockchain addresses that have not been attributed to illicit activity.** While unattributed addresses may include illicit actors, they also encompass a large volume of legitimate activity. Where relevant, we estimate an upper bound for such activity by examining

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

transactions involving unattributed addresses that do not appear to represent internal transfers within a single entity.

3. **Third, our estimate excludes the laundering of illicit crypto proceeds.** The illicit volume metric is intended to capture the revenue generated by illicit actors, not the subsequent movement of those funds through laundering chains. When calculating illicit crypto volume as a share of overall blockchain activity, we focus on incoming transaction volume to attributed illicit entities and exclude transfers that appear to be internal to a single entity, such as peeling chains or certain decentralized exchange swaps.

## Disclaimer: Overall illicit volume figures are likely to be revised upwards

These figures reflect TRM's current estimates of illicit cryptocurrency volume based on the best available intelligence at the time of publication. However, detecting and attributing illicit activity is inherently complex and often occurs with delay. As investigations progress, new sanctions are issued, cases are unsealed, and additional information becomes public, previously unknown wallets and transactions are frequently linked to illicit actors.

As a result, overall estimates of illicit volume tend to increase over time. **Readers should therefore view the figures in this report as a dynamic baseline rather than a fixed measurement.** This expectation of future upward revision applies both to our current methodology and to prior estimates, reflecting the evolving nature of attribution and the continual incorporation of new intelligence.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Sanctions

**Inflows to sanctioned entities increased; counter-Russia sanctions remained an international priority**

**Cryptocurrency associated with inflows to sanctioned entities and jurisdictions reached USD 93 billion in 2025, with USD 72 billion of that associated with volumes with the A7A5 token.** This increase, however, is largely due to new designations of large entities and to additional attribution of cryptocurrency addresses linked to already-designated entities.

While sanctions volume already accounts for the majority of illicit activity, this is compounded when considering entities under FinCEN special measures. 2025 saw the designation of **Huione Group** (a Cambodian conglomerate) as a foreign financial institution of primary money laundering concern under FinCEN, receiving over USD 39.6 billion in 2025 alone. New designations of major entities such as Russian cross-border payment platform **A7**, the **Grinex** rebrand of now-sanctioned Russian cryptocurrency exchange Garantex, and the network of Cambodia-based transnational criminal organization (TCO) **Prince Group**, drove a large share of volume to sanctioned entities and jurisdictions.

Authorities' increasing comfort in the crypto space has enabled the attribution of cryptocurrency addresses to already-designated entities – such as the Islamic Revolutionary Guard Corps (IRGC), Herzallah Exchange and General Trading Company (Hamas), Ansarallah (Houthis), and North Korea's Cheil Credit Bank – also contributed to this increase.

**Nearly 95% of inflows to sanctioned entities and jurisdictions in 2025 were through stablecoins.** Russia's A7A5 and Tether (USDT) made up the majority of these inflows.  Between 2024–2025, total flows to and from sanctioned entities and jurisdictions from centralized exchanges decreased by nearly 30%; however, flows to and from high-risk / no-KYC services and decentralized services increased by over 200%. This shift likely reflects multiple factors:

- Improved transaction monitoring and wallet screening by centralized exchanges
- Increasing use of obfuscation tactics by sanctioned actors, such as layering funds through intermediary wallets
- A broader move away from centralized platforms due to heightened risk of detection or asset freezing

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

## 2025 saw 21 total crypto-related sanctions designations (and one delisting) across the EU, UK, and US

**Sixteen of these designations included cryptocurrency addresses, one of which marked the first time the EU included actual addresses in a sanctions designation.** In its 19th sanctions package against Russia, the EU also adopted transaction bans against the payment processor, Payeer, as well as a first of its kind action that prohibited all transactions involving A7A5. Four designations were joint sanctions between the US and allies – most notably the United Kingdom and Australia – largely focused around cybercrime and tackling international scam compounds. 2025 also marked the first de-listing of a sanctioned crypto entity, with the March 2025 de-listing of Tornado.cash following the November 2024 US Fifth Circuit decision.

Across jurisdictions, authorities' growing comfort and investigative abilities with crypto have allowed them to include addresses as identifiers in sanctions designations – especially when addresses are directly tied to designated entities and where authorities have confidence in attribution. These recent designations suggest OFAC and other designating bodies will continue to append wallet addresses where feasible to enhance enforcement.

## US crypto-related sanctions priorities shifted between administrations

Sanctions designations in the cryptocurrency space reflected a clear shift in executive branch priorities. **Just over 50% of addresses designated in 2025 were associated with the illicit drug market, targeting businesses and individuals connected to fentanyl production and distribution.** This 2025 change – when taken with other US activity in the Western Hemisphere – suggests US sanctions policy is likely to remain focused on TCOs, illicit drugs and oil, and foreign cyber actors in 2026, with an emphasis on Iranian and Venezuelan entities.




QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Strategic global competitors

## Russia

### The A7 network anchored Russia's professionalized sanctions evasion effort with over USD 56 billion in volume




When Russia invaded Ukraine in 2022 – drawing strict international sanctions – cross-border crypto movement became a function for sanctions evasion. **By 2025, Russia's sanctions evasion activity has become institutionalized, consolidating around the A7 network.**

A7 is a Kremlin-backed cross-border sanctions evasion platform that has scaled functions previously carried out by smaller, fragmented networks. A leak of internal A7 communications enabled attribution of a large cluster of cryptocurrency addresses, revealing at least USD 56 billion in direct A7-related volume, with additional flows moving through intermediary wallets likely tied to A7 shell companies or foreign trade partners in places like China, Southeast Asia, and South Africa.

On-chain analysis shows over USD 2 billion in bidirectional exposure between A7, sanctioned Russian exchanges Garantex and Grinex, and multiple Kyrgyzstan-registered entities that are likely Garantex-affiliated. Several wallets display indicators consistent with shared infrastructure or overlapping control, suggesting common coordination for sanctions evasion. A7-associated addresses also show exposure to IRGC, Hamas, and sanctioned entities HuiOne and BYEX – highlighting overlap with other high-risk financial networks.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

## China-based intermediaries supported procurement and payment flows

A7-linked funds moved through intermediaries across multiple jurisdictions, with particularly strong exposure to China and Hong Kong-based entities. TRM Labs identified several Chinese counterparties receiving transaction volumes far exceeding what would be expected given their apparent business profiles, indicating the use of crypto intermediaries possibly based in Hong Kong to process payments on behalf of mainland firms, where cryptocurrency use is restricted.

These entities were frequent recipients of USDT on TRON from A7, A7-affiliated wallets, and entities likely using Garantex infrastructure. Chinese logistics and electronics firms featured prominently. One Chinese freight forwarder agreed to ship missile navigation components to Russia. They received USD 1.31 million from Garantex, with additional funds from a Kyrgyzstan-based Garantex-linked entity. Separately, A7-linked addresses show over USD 37 million in exposure to a Chinese electronics reseller, reinforcing the role of China-based intermediaries in supporting Russia's wartime supply chains.

## Stablecoins facilitated Russia's cross-border settlement; Russian stablecoin A7A5 value falsely inflated

Stablecoins were central to Russian sanctions evasion activity in 2025, as they were in other heavily restricted economies. **While A7A5 saw increased usage within the A7 and Garantex ecosystems, USDT was the dominant settlement asset for cross-border payments.**

Approximately 34% of A7A5's trading volume was likely artificially inflated through wash trading — including rapid, circular transfers consistent with automated behavior — according to TRM analysis. The scale and velocity of these patterns make explanations such as P2P trading or fiat on and off-ramps unlikely. Instead, the activity appears designed to inflate apparent liquidity and build confidence in a relatively novel stablecoin for international trade.

On-chain analysis indicates that A7A5 was used disproportionately in transactions between A7, Garantex, and Kyrgyzstan-based entities that are likely part of the same sanctions evasion network. A7A5 was primarily used to settle transactions between these foreign intermediaries, Russian entities, and trade partners involved in procurement — bolstering TRM's assessment that **A7A5 is meant as an internal settlement mechanism as part of a larger sanctions evasion network, not a globally competitive stablecoin.** The pairing of a domestically linked stablecoin with shared on-chain infrastructure underscores the need for innovation and coordination from sanctioning bodies as Russia adapts to sanction regimes.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

## 2025 was the year of the Russian rebrand

Russia-linked crypto services increasingly responded to sanctions and enforcement actions through rapid rebranding and reincorporation. Following the March 2025 international law enforcement operation against **Garantex**, Telegram channels associated with the platform quickly promoted a successor service, **Grinex**. On-chain analysis later confirmed continuity between the two, including asset migration facilitated through A7A5.

TRM also identified multiple additional Russia-linked platforms launched in Kyrgyzstan that shared almost identical user interfaces, backend infrastructure, and wallet heuristics with Garantex. **ABCeX** and its rebrand **AEXBit** showed similar patterns – such as co-spending into a shared hot wallet – indicating common control. In a similar effort, Russia-affiliated payment processor **Cryptomus** launched a parallel service, **Heleket**, which received its initial liquidity directly from Garantex. TRM identified shared characteristics – including coordinated launch timelines, minimal service or compliance changes, and overlapping on-chain infrastructure – confirming our assessment that these services were simply rebranded.

**These 2025 rebrands are likely part of a centrally coordinated effort to preserve Russia's access to international crypto liquidity while insulating core operators from sanctions and legal exposure.** Faster attribution, targeting shared infrastructure rather than specific brands, and greater comfort with crypto-specific sanctions may enable authorities to more effectively combat these networks in 2026.

# Venezuela

## Stablecoins, P2P activity were central to Venezuela's evolving crypto ecosystem

In 2025, Venezuela's cryptocurrency ecosystem was shaped by macroeconomic instability, sanctions pressure, and regulatory uncertainty – contributing to widespread reliance on stablecoins (particularly USDT) for everyday financial activity. Stablecoins are commonly used for retail payments, remittances, and informal financial transactions, reflecting the ongoing depreciation[2] of the bolívar and limited access to trusted banking infrastructure. Crypto use is growing fast in Venezuela, which ranked 11th of the top 20 countries by crypto adoption ranking in 2025, according to TRM's 2025 Crypto Adoption Report.

[2] The value of the bolívar depreciated significantly against the US dollar – increasing by approximately 750% on the informal market and around 480% based on official exchange rates reported by the Venezuelan government.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Following the 2023 restructuring of the National Superintendency of Cryptoassets and Related Activities (SUNACRIP), Venezuela's crypto regulatory environment remains fragmented and opaque. Gaps in formal oversight – alongside persistent peer-to-peer (P2P) usage and nested service models operating within global platforms – introduce structural risks, including for sanctions exposure.

Large international exchanges offering P2P functionality continue to play an outsized role, enabling users to convert between bolívares and stablecoins without interacting directly with traditional financial institutions. Alongside these major platforms, a range of informal providers operate via messaging apps and wallet-to-wallet transactions. While these channels may support financial inclusion, their informality reduces transparency into counterparties and transactional flows, increasing ecosystem-wide exposure to financial crime risk.

## Government-tolerated platforms coexist with informal rails

In parallel with informal activity, several domestic crypto-enabled payment platforms appear to operate with a degree of government tolerance – offering merchant payments, fiat off-ramps, and stablecoin-based services. Some of these entities likely operate under local authorization frameworks and are integrated into domestic payment systems, while others cross multiple jurisdictions – linking stablecoin accounts and regional payment rails, including local banks.

This dynamic reflects a hybrid financial environment shaped by economic necessity, regulatory ambiguity, and ongoing efforts to maintain access to dollar-linked value.

## High-risk financial infrastructure and stablecoins are likely used in oil settlements

Venezuela's digital asset activity, while often driven by macroeconomic necessity, also operates within an increasingly complex web of cross-border financial infrastructure. In 2025, stablecoins such as USDT remained central to domestic financial activity and informal FX settlement, but were also observed in transactions that mirror alternative settlement mechanisms used in heavily sanctioned jurisdictions.

Intermediaries operating in and around Venezuela have likely engaged in digital asset activity involving stablecoins, in contexts consistent with oil-linked trade flows. These patterns appear to reflect structural adaptations to limited access to traditional dollar channels and banking infrastructure. In some cases, this activity routes through regional high-risk exchanges or regional and international exchanges operating across multiple jurisdictions.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.




TRM has also identified exposure involving intermediaries historically linked to high-risk financial networks associated with Iran, Russia, and China. In some cases, these exposures occurred alongside the use of alternative digital assets that may limit traceability or enforcement visibility. **These observations highlight the systemic risks inherent in high-velocity stablecoin ecosystems, particularly those operating across fragmented or low-transparency regulatory environments.**




TRM graph depicting Venezuela's involvement in high-risk financial networks.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Iran

## Iran's crypto economy was resilient under sanctions and conflict

Iran's crypto economy largely sustained its engagement across 2024 and 2025, showing how deeply digital assets are now embedded in the country's financial system. Despite persistent sanctions pressure, heightened enforcement scrutiny, geopolitical disruption, and cyber activity targeting financial infrastructure, Iran's crypto flows adapted rather than collapsed.

**TRM observed approximately USD 11.4 billion in total crypto activity in Iran in 2024 and roughly USD 10 billion in 2025, including both inbound and outbound flows.** While activity declined modestly year over year, the scale and consistency of these volumes point to structural demand, not speculative participation. As attribution of offshore intermediaries and broker-mediated settlement continues to expand, observed totals for both years remain subject to upward revision.

### War showed consolidation, not collapse

The 12-day Iran-Israel conflict from June 13 to June 24, 2025 served as a stress test of Iran's crypto ecosystem, and highlighted its resilience under acute geopolitical pressure. During the conflict window, Iran's crypto volume increased by approximately 35%, while transaction counts declined by roughly 40%. At the same time, average transaction size rose by about 122% when compared to the same time period in 2024.

This divergence points not to reduced crypto usage, but to a consolidation of activity into fewer, larger transfers – a pattern consistent with crisis-driven behavior such as capital flight, balance consolidation, and risk mitigation rather than routine retail trading. Even with network disruptions, heightened sanctions pressure, and active conflict, Iran's crypto rails continued to function as a reliable channel for moving value when traditional financial pathways were most constrained.

### Nobitex adapted under pressure

This consolidation dynamic was visible at the exchange level. In the days preceding Israel's strikes on June 13, outflows from **Nobitex (Iran's largest cryptocurrency exchange)** surged by more than 150% week over week, indicating that users were proactively moving funds off domestic platforms in anticipation of escalation. Shortly after, the Israel-linked group Predatory Sparrow targeted Nobitex in a roughly USD 90 million hack, triggering widespread user distrust and temporary market dislocation. In the aftermath, incoming transaction volumes dropped by more than 70% year over year.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Iran's domestic crypto ecosystem continued to function despite these shocks. Nobitex resumed service in stages beginning in late June, aided in part by reserves held in bitcoin, including funds consolidated from previously dormant mining-linked wallets. More broadly, activity rerouted through intermediary wallets and offshore services rather than disappearing.

## Domestic protests prompted internet shutdown, suppressed participation

In late December 2025, the regime met widespread anti-government protests with aggressive state controls, including near-total internet shutdowns and restrictions on digital services aimed at suppressing mobilization and information flow. This produced a different outcome for the crypto ecosystem than the war earlier in the year.

Between December 28, 2025 and January 16, 2026, Iran's total crypto volume declined by roughly 60% year over year, while transaction counts fell by approximately 63% compared to the same period in 2024–2025. Though these dates are a defined window, protests and associated connectivity restrictions have continued beyond this period, suggesting that the observed suppression of activity reflects ongoing conditions – not a short-lived shock.

The data shows that retail and small-scale crypto participation was heavily constrained, likely due to internet outages, fear of surveillance, and restricted access to exchanges. While hundreds of millions of dollars still moved on-chain, activity narrowed to a smaller set of higher-capacity actors able to operate through disruptions. **In short, external conflict accelerated capital movement, while domestic unrest limited who could participate at all.**

## Share of total Iranian illicit activity flows remained stable

**In 2025, illicit Iranian crypto volume totaled just over USD 580 million, representing approximately 5.9% of observed activity.** In 2024, illicit activity accounted for roughly 5.1% of total observed volume, or approximately USD 600 million. While absolute illicit volume declined slightly in line with overall activity, its share of total flows remained stable – reinforcing the view that illicit and sanctions evasion usage is structurally embedded. As additional illicit activity is identified, these figures remain subject to upward revision.

Across both years, Iran's illicit activity was overwhelmingly concentrated in stablecoins, particularly USDT. This preference likely reflects USDT's liquidity, low transaction costs, and compatibility with broker-mediated settlement networks. At the margins, actors continued to layer transactions using alternative assets and routing techniques – but these methods complemented, rather than replaced, USDT as the core settlement asset.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

## Case study: Inside an IRGC-aligned crypto exchange network

TRM analysis identified two cryptocurrency exchanges incorporated in the UK that processed hundreds of millions of dollars in stablecoin transactions while functioning as offshore financial infrastructure linked to Iran's Islamic Revolutionary Guard Corps (IRGC). Although the entities – registered in the UK as Zedcex and Zedxion – publicly presented themselves as conventional crypto trading platforms, on-chain and corporate records indicate that they operated as a single exchange enterprise embedded within a broader sanctions evasion ecosystem.

Between 2023 and 2025, a substantial share of Zedcex's activity involved wallets linked to IRGC-controlled entities. In 2023, IRGC-linked flows accounted for roughly USD 24 million, representing approximately 60% of observed activity. That share rose sharply in 2024, when IRGC-linked volume increased to around USD 620 million (or nearly 90% of total flows) before declining to approximately USD 410 million in 2025 as non-IRGC-linked activity increased. Across this period, Zedcex processed close to USD 1 billion in IRGC-associated transactions, primarily in USDT on the TRON blockchain, a combination which offers low fees, deep liquidity, and broad broker acceptance.

Corporate records show that the two exchanges were incorporated in the UK using virtual office addresses, overlapping directors, and repeated dormant filings, despite the scale of activity observed on-chain. The sequencing of their incorporation and leadership changes suggests continuity rather than separation of operations. Earlier corporate control was linked to Babak Morteza Zanjani, a financier previously sanctioned by the US and EU for facilitating Iran-linked sanctions evasion. The Zedcex case reflects a broader pattern in which exchange-branded crypto infrastructure operates offshore while maintaining functional ties to sanctioned economies.

On-chain tracing connects Zedcex-attributed wallets directly to addresses designated by Israeli authorities as IRGC property and blocklisted by stablecoin issuers. Funds were routed between IRGC-controlled wallets, offshore intermediaries, and domestic Iranian exchanges – integrating sanctioned flows into Iran's broader crypto economy. In at least one instance, TRM observed direct transfers exceeding USD 10 million from Zedcex-linked infrastructure to a US-designated terrorist financier associated with the IRGC, without intermediary routing.

Taken together, these findings illustrate a shift in sanctions risk: **rather than episodic abuse of crypto rails, sanctioned actors are increasingly operating or embedding themselves within crypto financial infrastructure itself**, raising fundamental questions about platform control, beneficial ownership, and the limits of traditional compliance approaches.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Crypto hacks and exploits

## Operational compromise drove USD 2.9 billion in losses

In 2025, illicit actors stole USD 2.87 billion across nearly 150 distinct hacks and exploits.[3] While incident volume remained broadly consistent with recent years, the severity of losses increased sharply due to a structural shift in attack vectors: adversaries moved up the stack, targeting operational infrastructure – keys, wallets, and control planes – over smart contract code.

The landscape was defined by the massive Bybit breach in February, which accounted for USD 1.46 billion (51%) of all funds stolen in 2025. This concentration of loss, in which the top 10 incidents represented 81% of the annual total, signals a maturing threat environment. Sophisticated actors, particularly those linked to North Korea (DPRK), are no longer just exploiting code – they are compromising the operational foundations of crypto asset services and the ecosystems around them.

## Sophisticated actors drove a concentration risk




[3] TRM's "hacks and exploits" totals include attacks on crypto asset services (e.g. exchanges, custodians, bridges, protocols, and other service providers) and confirmed, large personal wallet attacks where reliable evidence supports theft and estimated loss amounts. The totals exclude smaller, unconfirmed personal wallet attacks and reports where incident details or loss estimates cannot be validated with sufficient confidence.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

The annual totals for hacks in 2025 were weighted heavily toward larger hacks – in some cases, catastrophic failures. **While the average incident size rose to USD 19.5 million, the median incident size fell to USD 1.3 million. In 2025, just five events accounted for 70% of all stolen crypto value.**

This widening gap illustrates a "long tail" risk environment: a handful of mega-heists drive global loss figures, while a high volume of smaller incidents continues to inflict persistent damage across the crypto ecosystem.

## Attack vectors pivoted to infrastructure

TRM's dataset classifies hacks and exploits into five top-level categories: **Infrastructure Attack**, **Code Exploit**, **Protocol Attack**, **Unknown**, and **Other**. In 2025, the disparity between operational compromise and on-chain exploitation was clear – infrastructure attacks drove the clear majority of losses.




While Code Exploits were the most frequent category (52 incidents), they accounted for a comparatively smaller share of total losses (USD 350 million, 12.1%) – about USD 6.7 million per incident on average. Protocol Attacks were less frequent (25 incidents) but more severe on average (USD 277 million, 9.6%) – roughly USD 11.1 million per incident.

By contrast, Infrastructure Attacks – which include compromises of private keys / seed phrases, wallet infrastructure, privileged access, and front-end surfaces – drove USD 2.2 billion in losses (76%) across 45 incidents, averaging approximately USD 48.5 million per incident. **The dominant 2025 pattern was therefore operational compromise, often enabled by social engineering, developer environment penetration, or weaknesses in access controls and withdrawal governance.**

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.




## The Bybit breach defined the trend

The February 2025 Bybit breach – which TRM assesses was carried out by North Korean operatives – was the defining event of the year. With USD 1.46 billion stolen in a single event, Bybit distorts annual totals. But it also clarifies the threat reality.

Even excluding Bybit, 2025 losses would have totaled USD 1.4 billion, underscoring a persistent baseline of criminal activity. More importantly, the breach validated a long-observed dynamic: **for top-tier adversaries, the highest ROI increasingly lies in compromising operational infrastructure (keys, signers, wallet orchestration) at centralized entities instead of discovering novel logic errors in smart contracts.**

## North Korea and the Chinese laundromat

TRM Labs attributes USD 1.92 billion to North Korea-linked actors (DPRK) in 2025. The 2025 data also reflects a continued evolution in how stolen assets are processed after theft. DPRK operators increasingly rely on "Chinese laundromat" networks – a term used by investigators to describe professionalized OTC brokers and underground intermediaries that facilitate off-ramping and settlement at scale.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Case 1:26-cv-05279-VEC Document 22-1 Filed 09/22/26 Page 119 of 153



These networks provide subcontracted laundering: high-volume OTC brokers absorb stolen assets and settle off-chain, distancing the theft operation from the cash-out point. They also facilitate chain hopping and fragmentation: rapid movement across chains and services to break traceability and route liquidity toward cashout channels. This professionalization complicates recovery, as the faster stolen assets can be routed through layered intermediaries, the narrower the window for interdiction.

For additional details, see North Korea and the Industrialization of Cryptocurrency Theft.

## The operational imperative for 2026

The data from 2025 shows that the primary risk surface is operational. Smart contract audits are necessary, but they are no longer sufficient.

The shift toward infrastructure compromise emphasizes the criticality of hardware-backed key custody and strict signer isolation, withdrawal governance (including velocity controls and tiered approvals to limit the blast radius of compromised access), and operational security hardening for developer environments and privileged systems. Additionally, typology-driven monitoring that goes beyond entity screening to detect complex cross-chain routing consistent with industrialized laundering would enable a more proactive response.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

©TRM Labs 2026. All rights reserved.

# Scams

## The fraud landscape evolved through converging typologies

Actors sent approximately USD 35 billion in cryptocurrency to fraud schemes in 2025 alone, on par with the value received last year at USD 38 billion. This figure reflects a combination of funds traced to confirmed fraud-linked wallets and additional victim-reported scam addresses submitted through public reporting and incident response channels.

While TRM's current dataset shows a decrease in fraud volumes, this should not be interpreted as a decline in real-world fraud activity. Fraud reporting is often delayed, with victim disclosures taking weeks or months to surface. Additionally, the vast majority of victims never report at all, due to factors such as embarrassment, fear of reputational harm, uncertainty about where to report, skepticism that funds can be recovered, or lack of awareness that a crime has occurred. **As a result, observed fraud totals almost always understate the true scale of activity, even as reported figures continue to rise over time.**




The above figures reflect verified fraud activity from TRM Labs and Beacon Network, as well as alleged fraud activity sourced from Chainabuse, a victim reporting platform operated by TRM.

**In 2025, TRM observed USD 23 billion in verified fraud and an additional USD 12 billion tied to community complaints.** As scammers become more sophisticated and adapt quickly, community complaints and shared reporting networks are increasingly critical for surfacing new scam wallets early, accelerating attribution, and disrupting fraud before losses scale further.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Crypto fraud is increasingly dominated by organized groups operating with business-like structure, specialization, and efficiency. Scam operators openly share tools and techniques, reuse proven playbooks, and run recruitment pipelines that resemble legitimate hiring processes.

In addition to financial theft, many large scam operations are connected to **scam compounds**, which can employ human trafficking, coercion, and violence – with some maintaining relationships with local power structures. Governments have started more direct enforcement, including through sanctions targeting entities and individuals linked to scam operations.

## Investment scams dominated, but tactics converged

As in previous years, **investment-related schemes accounted for the majority of observed victim losses, representing 62% of 2025 fraud inflows.** Within this category, TRM observed victim losses tied to **pig butchering scams and pyramid / Ponzi schemes**, which continued their streak among the most prominent subtypes.




**Task / work-from-home scams** have also emerged as a driver of victimization. These campaigns direct victims to fake platforms offering paid micro-tasks such as writing reviews, clicking advertisements, or "optimizing" content. Victims are shown fabricated account balances and earnings, then pressured to pay fees, deposits, or taxes to withdraw funds. While individual losses vary, job scams often scale through high-volume targeting, resulting in large aggregate harm even when per-victim losses are lower than in more elaborate long-con schemes.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

A defining trend in the current state of crypto fraud is the **convergence of distinct scam typologies.** Victim journeys increasingly span multiple phases of deception, combining elements of romance scams, investment fraud, and advance fee schemes. Pig butchering exemplifies this overlap: a scam might begin with a romantic connection, shift into a false investment opportunity, and end with the scammer demanding additional funds under the guise of taxes or administrative fees. Although social engineering remains a key component of fraud campaigns, it is now reinforced by technical and organizational innovations that make fraud more scalable and harder to detect.

This layered approach reflects fraud networks' broader shift toward more sophisticated campaigns. **Networks operate more like enterprises, deploying specialized teams and standard playbooks to target and exploit victims at scale.** Supporting this evolution is a growing ecosystem of illicit service providers. Some offer AI-as-a-service tools to automate outreach and engagement, while others sell phishing kits or provide access to breached data. These services lower the barrier to entry for fraud actors and enable them to replicate scams across geographies.

## Scam networks adapted to enforcement and improved laundering discipline

Scam operators have evolved their laundering tactics in response to enforcement pressure. In past years, large amounts of stablecoin funds often remained parked for extended periods, creating opportunities for freezing or investigative intervention. **Since 2024, however, many fraud-linked networks have reduced holding times, often moving funds onward within 48 hours.**




©TRM Labs 2026. All rights reserved.

Scammers have also increased the complexity of how they move and manage funds on-chain. To complicate freezing and tracing, they often convert proceeds into less freeze-prone assets such as ETH or DAI, then briefly shift into stablecoins like USDT or USDC closer to cash-out points. This shift is reflected in TRM's balance data: **across 2024 and 2025, the average value held in scam-linked wallets declined sharply, suggesting faster turnover and shorter holding periods.**




QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

## AI tools scaled fraud operations

**Fraud networks are increasingly leveraging generative AI to boost outreach, impersonation, and persuasion, with AI-enabled scam activity rising by roughly 500% over the past year.**

Large language models (LLMs) enable scams to cross language and cultural contexts with less friction, while AI-generated images, voice cloning, and deepfake videos reduce the cost of creating convincing personas. These capabilities are expanding impersonation-style scams across messaging platforms, recruitment campaigns, and investment fraud — and they increase the likelihood that victims can be deceived even when aware of scam warnings.

As outlined in TRM Labs' The Rise of AI-Enabled Crime Report and related publications, AI tactics such as voice cloning have powered impersonation scams across WhatsApp, fake job recruitment sites, and giveaway campaigns — many of which now use fabricated deepfake endorsements from celebrities like Elon Musk.

©TRM Labs 2026. All rights reserved.

As discussed in TRM's 2025 Crypto Crime Report, another common typology is non-investment related authorized push payment (APP) scams, where victims are manipulated into transferring funds to imposters posing as tax authorities, financial professionals, or lawyers.




Deepfake tool used in a scam center in Cambodia and Thailand (Source: UNODC)

AI-generated multimedia is increasingly used in investment fraud campaigns. Scam operators now routinely employ generative tools to create professional-looking branding assets for websites and social media, including logos, images, and in some cases videos featuring deepfake avatars. This reduces setup costs and makes it easier to rapidly rebrand, recycle infrastructure, and launch new scam iterations at scale.

## Stablecoins dominated verified fraud inflows, capturing 84% of fraud volumes

**On the inflow side, TRM's verified fraud dataset showed that stablecoins are the primary vehicle for deposits into fraud schemes, and their share grows meaningfully year over year.** In 2024, stablecoins represented ~70% of fraud inflows, rising to ~84% in 2025. This reflects fraud actors' continued preference for assets that offer high liquidity, broad exchange acceptance; easy denomination for victims; and frictionless movement across addresses and services.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.




QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

## Pyramid and Ponzi schemes remained a major driver of losses

**In 2025, pyramid and Ponzi schemes received approximately USD 6.1 billion in victim funds, marking a 49% increase compared with 2024 and broadly in line with levels observed in 2023.** This increase was driven in part by growth in the number of large schemes receiving over USD 100 million, which rose to 13 in 2025, compared with six in 2024 and 14 in 2023.

TRM Labs identified new iterations of previously observed decentralized investment fraud schemes that re-emerged in 2025, with operators collapsing and reconstituting them with largely identical infrastructure. These pyramid-like operations are structured around multiple smart contracts frequently promoted as transparent and supposedly unchangeable. In practice, however, most participants lack the technical capacity to independently assess the underlying code and verify its legitimacy.

While major pyramid and Ponzi schemes operate on a global scale and appear to spread opportunistically across jurisdictions, **TRM analysis indicates that several of the largest schemes in 2025 proliferated most strongly in developing markets and economically vulnerable communities.** For example, CBEX, which received approximately over USD 250 million in victim funds, gained significant traction in Nigeria; while Treasure NFT, which received approximately USD 800 million, spread extensively in India and Pakistan.

©TRM Labs 2026. All rights reserved.

## Case study: Prince Group's crypto laundering infrastructure and the role of HuiOne Pay

Prince Group is one of the largest pig butchering scam operations ever uncovered. In October 2025, the US and UK imposed sanctions on a number of individuals and entities related to what they called the Prince Group Transnational Criminal Organization. An indictment was filed simultaneously by the US Department of Justice (DOJ), charging the founder and chairman of Prince Group, Chen Zhi, with money laundering conspiracy for directing Prince Group's operation of forced labor scam compounds across Cambodia.

### How the laundering pipeline worked

According to the indictment, Chen and Prince Group allegedly laundered fraud-derived funds through a variety of methods — including the use of professional money laundering organizations and by routing money through Prince Group's legitimate business operations, including two mining companies: Warp Data and Lubian Mining. From there, funds seem to have been sometimes sent to Chen himself.

It is possible to trace a clear connection between bitcoin mining activity, Lubian Mining specifically, and a substantial portion of the 127,271 bitcoin seized by the US on the blockchain. Based on the allegations, victim funds were likely laundered and converted into fiat, then used to purchase mining equipment and support related operational expenses. Because much of this process occurs off-chain, it can be difficult to fully trace these connections using blockchain data alone.




TRM graph showing the flow of funds from scam victims to Lubian Mining and onward to Chen Zhi.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Financial connections may shift off-chain through operational expenses, infrastructure purchases, and energy costs — making the traceability picture more complex. This enables a layered laundering model where an organization can continuously recycle proceeds through hybrid on and off-chain steps, reducing exposure signals while preserving liquidity and control.

## HuiOne Pay as a high-volume financial gateway

Sanctioned Cambodian conglomerate HuiOne Group is a key financial enabler for Prince Group-linked illicit activity, including scam compounds operating in Southeast Asia. TRM identified a Prince Group-linked escrow service that sent almost 80% of its funds to HuiOne Pay-linked wallets, demonstrating direct fund flows from a Prince-associated node into HuiOne's payments infrastructure.

This level of dependency matters because facilitator nodes provide repeatable pathways, high-throughput routing, and access to services that make large flows operationally manageable. **When a scam enterprise relies on a single facilitator at this scale, that entity becomes a structural dependency that can accelerate fund movement, shrink the interdiction window, and expand downstream risk for institutions that may interact with connected activity.**

HuiOne Pay functions as a high-leverage facilitation layer that can move and concentrate funds at scale. That scale is visible in its activity over time: incoming volume grew from tens of millions per month in early periods (for example, roughly USD 44 million in December 2020) into sustained multi-billion-dollar monthly inflows by 2024 and 2025, peaking at approximately USD 4.7 billion in July 2025. That kind of consistent, high-volume throughput is what makes this kind of facilitator infrastructure so valuable.




QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

HuiOne Pay suspended operations and halted withdrawals following an apparent bank run as of December 2, 2025. Activity levels seem to reflect that disruption: after moving multiple billions per month throughout much of 2025, incoming volume fell sharply to around USD 803 million in November 2025, and approximately USD 100 million in December 2025. It is not immediately clear whether these liquidity issues and the subsequent run were a direct result of coordinated measures taken against HuiOne and Prince Group.

## Mapping networks and behaviors to strengthen enforcement

One of the key lessons of the Prince Group case is that major scam organizations often maintain operations under enforcement through adaptation – including wallet rotation, shifting intermediaries, restructuring routing paths, and distributing activity across new clusters. Known exposure then becomes outdated quickly, and reliance on static watchlists can create blind spots. However, the behaviors persist: how the system consolidates, how it stages liquidity, and what facilitators remain consistent over time.

**This adaptation is why mapping the entire system – and how it interacts – matters.** The most durable signals for disruption are often tied to infrastructure and operational chokepoints, not single identifiers. If the architecture remains intact, the organization can keep moving value, even when individual wallets or entities are removed from the ecosystem.

This case has several implications for compliance and investigative teams. Scam exposure is often not limited to direct victim-to-scam transactions, and it increasingly manifests through layered flows that touch intermediaries before reaching liquidity venues. Mining-linked activity can be used for value transformation rather than a pure profit-seeking operation, introducing traceability challenges. Facilitator nodes can create dependencies that function as both risk amplifiers and disruption opportunities, particularly when they act as repeatable routing channels.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Ransomware

**Ransomware activity remained elevated in 2025 as victim claims surged**

Ransomware remains one of the most persistent forms of cybercrime, with attackers encrypting systems or stealing data and demanding crypto payments to restore access or prevent public leaks.

In 2025, ransomware-linked crypto inflows remained high, though they did not reach recent peak levels. While reported payment volumes appeared steady, ransomware operations became more aggressive, with a sharp rise in victims posted to leak sites, signaling increased attack activity and extortion pressure. **The growing gap between rising victim claims and flatter payment totals suggests more targets are resisting demands or recovering without paying.**

## New ransomware groups flooded the ecosystem

Alongside rising victim claims, the ransomware ecosystem also saw an increase in the number of active and newly emerging variants. Internal intelligence cross-referenced with open-source reporting indicates that **93 new ransomware variants emerged in 2025, a 94% increase from 2024.** By year-end, the broader ecosystem had expanded to 161 active variants, including newly observed groups such as Beast, Business Data Leaks, Crypto24, Devman Group, Sinobi, and SafePay. This fragmentation trend has intensified since 2023; BlackFog's 2024 State of Ransomware Report identified 48 new ransomware variants in 2024, an estimated 65% increase from 2023. **In 2025, disruptions and ecosystem churn drove an unprecedented volume of new entrants.**

Several factors are likely driving this rapid growth. Major disruptions against high-profile groups such as LockBit, BlackBasta, BlackSuit, and ALPHV/BlackCat fractured established ecosystems and displaced affiliates, developers, and access brokers — many of whom regrouped and rebranded or launched independent operations. At the same time, the maturation of ransomware-as-a-service (RaaS) lowered barriers to entry, with leaked tooling, off-the-shelf playbooks, and increasing pressure on legacy brands making splintering and relaunching an attractive survival strategy. Collectively, these dynamics have amplified churn across the ransomware landscape, accelerating the formation of new groups at a pace not seen in prior years.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Among the ransomware groups that emerged in 2025, **SafePay** claimed the most victims, reaching 452 as of December 2025, according to Flashpoint data. SafePay is notable for rejecting the affiliate-based model common across much of the RaaS ecosystem – but its performance still reflects the broader pattern shaping 2025 ransomware outcomes: high victim volume does not necessarily translate into proportionate ransom revenue, reinforcing indications that a growing share of victims are choosing not to pay.

Ransomware activity is also becoming more distributed across strains by annual value received. When active strains are grouped by the total value they received over the year, the breakdown shows increases across the lower and mid tiers, alongside high-earning strains. This shift reinforces that **2025's proliferation is not only driven by a growing long tail of smaller operations, but also by newer strains reaching higher revenue levels as the ecosystem becomes more competitive.**

## On-chain laundering used bridges, mixers, and reversion patterns

Ransomware actors evolved their post-payment laundering behaviors in 2024 and 2025, likely in response to enforcement and heightened monitoring of high-risk services. TRM data indicates a clear shift in how threat actors move funds after receiving payments, with increasing preference for cross-chain mechanisms that offer flexibility in routing and access to new liquidity venues.




QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

**Over this period, bridge-related activity grew by 66%, while mixer-related activity declined by 37%.** This divergence suggests that many actors have deprioritized traditional privacy-enhancing services in favor of faster cross-chain movement — even though these flows can remain highly traceable when patterns repeat across incidents or affiliates.

## Major disruptions scattered but did not extinguish ransomware groups

2025 was a year of unprecedented disruption in the ransomware ecosystem. Disruptions of high-profile groups such as **LockBit**, combined with the ongoing efforts of [Operation Endgame](#) to defuse the major enablers of the ecosystem, fractured established networks and affiliates. However, the ransomware ecosystem has responded by reaching an all-time high for new variants in 2025: 93. These disruptions have influenced some established variants — like **Akira** — to become more sophisticated in their activities.

## Case study: Akira shows operational scale and laundering sophistication

Akira remained one of the most active ransomware groups in 2025, alternating with Agenda / Qilin as the most prolific by leak site victim volume. **Akira took in USD 150 million in 2025 alone — almost twice as much as the second most active strain, Agenda / Qilin.**




QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Active since 2023, Akira operates as a RaaS model and uses double extortion tactics, combining encryption with threats to publish stolen data. Its victim set spans multiple sectors and geographies, and public reporting has tied the group to several high-profile incidents affecting large institutions and service providers.

## Targeting and geography

Akira has impacted organizations worldwide, with victims concentrated in the United States, Canada, Brazil, Australia, and several European countries. Its targeting spans a wide range of sectors; public reporting has connected Akira to several high-profile incidents, including Stanford University, Nissan Australia, and the Finnish IT provider Tietoevry.

## Actor lineage and technical notes

Security researchers have noted code and operational similarities to the Conti ransomware ecosystem, suggesting possible overlaps in developer tooling or shared affiliates.

Overlaps include links to Russia, with evidence pointing to developers based in Russia or the broader post-Soviet region. Notably, unlike many ransomware groups operating out of Russian-speaking regions, Akira's malware does not include the typical safeguard that halts execution when a Russian keyboard layout is detected. Nevertheless, several indicators point to Russian origin, including observations of the group communicating in Russian on dark web cybercrime forums.

## Operational and on-chain evolutions

Throughout its activity, Akira has iterated on its data-theft mechanisms, negotiation style, and targeting patterns – indicating an adaptive RaaS model that continues to evolve despite increased scrutiny.

Akira ransomware has undergone at least four distinct evolutions in its post-payment laundering TTPs.

### Phase I (2023)

Early Akira payment flows can be grouped by likely "affiliate" based on consistent on-chain behaviors, including the reuse of intermediary addresses, wallet clusters receiving funds from multiple victim payments, shared cash-out points, and other observable transactional patterns.

### Phase II (early–mid 2024)

Akira shifted to a more standardized laundering process using WanChain – with most victim payments funneled through a single WanChain address before being cashed out across multiple global VASPs.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.




## Phase III (late 2024)

The group transitioned to routing all proceeds through the Defiway bridge. During this period, FOG ransomware employed the same laundering approach, reinforcing indications of overlap or cooperation between the two groups.

## Phase IV (August 2025–present)

Akira once again altered its laundering workflow. Each payment now passes through a unique intermediary address, followed by movement through two consolidation addresses, before ultimately being off-ramped at the same global VASP.

Despite operating as a RaaS, Akira's laundering patterns remain highly standardized. The admin–affiliate split remains opaque on-chain, as it likely takes place only after the funds are deposited into the same global VASP cash-out address.




QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

Recent activity suggests isolated deviations from Akira's current established laundering pattern, with victim funds first moved through cross-chain swaps before being deposited in full into Tornado Cash. This behavior may indicate either affiliate-level divergence from standardized laundering procedures or the early stages of the group's next evolution in laundering TTPs.




## Akira in 2026 and beyond

Akira's demonstrated willingness to evolve tooling, shift laundering infrastructure, and diversify its targeting suggests the group will continue refining tradecraft to preserve revenue streams and affiliate engagement. Defenders should expect increased speed in post-payment cash-out activity, more sophisticated attempts to fragment transaction flows, and continued expansion into sectors with lower security maturity but high operational impact.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Illicit drugs

Russian-language darknet markets, cartels, and Chinese money laundering networks reshaped online drug markets

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

## Darknet marketplaces – driven almost entirely by Russian language marketplaces – generated 20% more incoming volume in 2025

**The online illicit drugs trade generated over USD 3.4 billion in total incoming cryptocurrency volume in 2025.** Darknet marketplaces alone received USD 1.7 billion, marking a 20% increase from 2024. Consistent with previous years, **this activity is overwhelmingly driven by Russian-language darknet marketplaces**, which accounted for more than 90% of total darknet market (DNM)-related volume. In contrast, activity across Western darknet marketplaces that rely on cryptocurrencies with visible public ledgers remained effectively flat at approximately USD 60 million.

Meanwhile, **wallets associated with the sale of banned or controlled substances – which include independent illicit drug vendor shops – received USD 1.6 billion**, a nearly 45% drop from the previous year's USD 3 billion. Discounting the volume generated in privacy coins like Monero, this suggests relative stability in Western markets while underscoring that the Russian-language ecosystem continues to expand the scale of the global DNM landscape.




©TRM Labs 2026. All rights reserved.

## Russian-language DNMs dominated, and Monero use accelerated

The 2025 global breakdown of DNM activity shows an ecosystem dominated by Russian-language actors. This imbalance is due in part to market structure: **Russian-language DNMs operate in an environment with limited enforcement capacity and high corruption.** This creates conditions for sustained profitability for these actors and allows them to reinvest their profits in the same ecosystem, creating exponential growth. **Incoming volume to Russian-language DNMs grew by roughly 20 percent year over year, from USD 1.3 billion in 2024 to USD 1.6 billion in 2025**, enabling marketplace operators to continue investing in platform development and user acquisition.

In contrast to previous years, which showed falling numbers of new marketplaces, 2025 reversed this trend with 21 new markets.[4] The share of newly launched Monero (XMR)-only marketplaces also continued to rise, with nearly half of new DNMs supporting only XMR — a trend most pronounced in the Western ecosystem, where enforcement pressure is typically higher and demand for privacy coins is greater.




QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

[4] New marketplaces are defined as those that remained active for more than three months.

©TRM Labs 2026. All rights reserved.

## Individual vendor drug sales were down, but Chinese precursor manufacturers continued a sharp upward trend

While the value received by darknet marketplaces soared and new marketplaces emerged, **drug sales through individual vendor shops fell by more than 60% in 2025 to approximately USD 1 billion**, down from USD 2.75 billion in 2024. This decline could reflect a shift in vendor behavior toward the relative security and infrastructure offered by darknet marketplaces compared to individual vendor shops, as well as reduced visibility into independent vendors as they update financial infrastructure more frequently.

Chinese drug precursor manufacturers stood out as a rapidly growing component of the ecosystem. Incoming volume to individual vendors accelerated in 2023 to USD 30.9 million, with growth continuing through 2024 (USD 34.7 million) and 2025 (USD 39.1 million) – indicating a resilient market for precursor supply tied to synthetic drug production. Even amid sustained enforcement pressure, the continued expansion of these inflows suggests persistent demand and an established base of buyers that transact with precursor vendors at scale.




Overall, 2025 shows that online drug markets are not only growing, but also restructuring. Activity remains heavily concentrated in darknet marketplaces instead of individual vendors, even as new platforms continue to emerge and more adopt XMR-only payments in response to enforcement. At the same time, the continued rise in Chinese precursor shop inflows highlights the durability of the upstream supply chain that sustains fentanyl and other synthetic drug production.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

## Case study: Cartels, Chinese money laundering networks, and the adaptability of Chinese fentanyl precursor supply chains

Synthetic drug supply chains are supported by a complex ecosystem of specialized service providers. Mexico-based trafficking organizations generate substantial proceeds from the sale of fentanyl and other synthetic opioids, while upstream production of precursors and synthetic opioids such as nitazenes – which generally occurs in China – depends on reliable access to chemical pre-precursors, industry know-how, technology, and cross-border settlement mechanisms that can operate across jurisdictions, given the global reach of their operations.

Chinese drug precursor manufacturers are the dominant global supplier of chemicals used to make synthetic drugs. These suppliers have remained active even under enforcement pressure – reflecting both persistent demand, and the adaptability of upstream manufacturing and logistics networks. Cartels – which play various roles in the receipt, processing, and distribution of the synthetic drug precursors and finished synthetic drug products – rely on intermediary financial actors to facilitate payment and laundering. Chinese money laundering organizations (CMLOs) and cartel-associated money launderers (CAML) move and conceal drug-linked proceeds and support settlement with upstream suppliers.

**TRM estimates that the sums laundered by CAMLs reach into the billions of dollars, with all-time volumes reaching over USD 3 billion as of January 2026** – the bulk of which has been generated in the past two years as cryptocurrency has increasingly become part of the money laundering cycle due to its speed, ease of access, and security. The chart below illustrates this dynamic on-chain, showing funds flowing from cartel-linked wallets through laundering networks and onward to precursor vendors.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.




Funds transit a multi-step laundering chain through multiple pass-through wallets and laundering intermediaries, showing how cartel-associated money launderers funnel value onward to Chinese drug precursor manufacturers.

CMLOs play a critical role within the cartel laundering architecture, sitting between two major sources of liquidity: large pools of cash originating from China (often connected to wealthy Chinese individuals seeking to circumvent the country's capital controls) and large sums of drug-tainted cartel cash that needs to be laundered.

To move these funds, CMLOs take cartel-linked cash and place it with non-China-based intermediaries, businesses, and contacts associated with China-based clients. CMLOs then receive settlement payments from China-based counterparties and transfer value back to cartels through a range of channels, including trade-based money laundering (TBML). CMLOs typically charge cartels relatively low commissions, but can charge much higher fees to capital flight clients and capture the spread as profit.

By outsourcing laundering and settlement functions to professionalized networks, cartels can reduce friction in cross-border payments, accelerate turnover, and limit direct exposure. For law enforcement, financial intermediaries in these networks are key points of vulnerability, particularly where laundering entities also support other forms of illicit activity.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved. 

# Case study: Western darknet marketplaces adopt Russian-style "dead-drop" delivery, raising the risk of violence

In 2025, some Western darknet market platforms began experimenting with **dead-drop delivery**, a fulfillment model typically associated with Russian-language DNMs. A defining feature of the Russian-language ecosystem, dead-drops are a fundamentally different approach to distribution built around localized, offline delivery networks – not postal shipments typical to Western DNMs. **This model, which can be traced back to Cold War-era tradecraft, has shaped illicit drug markets in Russia and the former Soviet space by enabling regional operations and near-immediate fulfilment.**

The dead-drop model is a version of geo-caching, whereby vendors place illicit drugs in various public spaces and inform buyers of their locations instead of mailing illicit drug orders. One advantage is that this model greatly reduces the time between order and delivery and encourages hyper-local distribution networks, with vendors often serving only a small area. This aspect has contributed to the substantial profits generated by Russian-language darknet marketplaces – entities which in Russia and the post-Soviet space have overwhelmingly replaced on-street sales.[5]

TRM identified at least two Western DNMs where this delivery method is used alongside the typical postal delivery system. The first is Scandinavian marketplace MoominMarket, launched in the summer of 2025. **MoominMarket** hosts a variety of Swedish, Danish, and Finnish vendors who offer dead-drops across several large cities in the region.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

[5] https://globalinitiative.net/analysis/russia-drug-trade-organized-crime/

©TRM Labs 2026. All rights reserved.







QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

The second is hybrid Russian-Western DNM **Bazaar**, which emerged from a user forum called **BreakingBad**. Bazaar is aimed at a Western audience, but is likely administered by a Russian or Russia-based moderator. BreakingBad discusses dead-drops in an apparent effort to promote them across Western markets, which has carried over into Bazaar itself — which offers postal delivery and dead-drops. Bazaar has advertised on Russian-language channels as an alternative to established Russian DNMs in an unusual attempt to bridge Eastern and Western ecosystems.




Announcement by a British vendor on the forum "BreakingBad," who operates a dead-drop-style vendor shop, advertising services and locations where their services are offered.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

©TRM Labs 2026. All rights reserved.

A broader shift toward dead-drop delivery in Western DNMs would introduce several risks, including an increased likelihood of violence within the fulfillment layer of the illicit drug supply chain. Unlike postal delivery, which outsources delivery to legal postal networks, the dead-drop model depends on on-the-ground networks, including couriers and distributors ("kladmen") responsible for placing packages in public locations.

This structure increases exposure to loss and diversion, since stashes ("klads") can be stolen either by couriers themselves or by opportunistic third parties ("seagulls"). To mitigate these risks, some vendors employ dedicated enforcers ("athletes" or "sportsmen") to monitor drop areas, investigate theft, and use intimidation or violence against individuals believed to be interfering.

Local conditions in Russia, including law enforcement constraints, have historically made dead-drops easier to execute. If dead-drops were to be employed by Western drug markets, this could result in similar risks – such as drugs in public places or violence regularly used as an enforcement mechanism within drug vendor networks.

## Case study: Chimera Marketplace shows Russian-language DNM expansion beyond core markets

**Chimera Marketplace** emerged in August 2025, and initially seemed structurally consistent with Russian-language DNMs. But what makes Chimera different is that it serves jurisdictions outside of Russia and post-Soviet countries, notably Thailand (including Bangkok, Phuket, and Pattaya) and select locations in India.[6] Russian-language DNMs have historically operated only in Russia and post-Soviet states. TRM has observed Chimera employing offline marketing tactics in Goa, using QR-code stickers to advertise their services in public.

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

[6] India does not have a large Russian diaspora overall; however, Chimera's presence in Goa aligns with the more visible Russian-speaking community in North Goa.

©TRM Labs 2026. All rights reserved.




QR code advertisement for Chimera Marketplace in Goa, India

Neither Thailand nor India have established domestic DNMs. Although Chimera is likely primarily targeting Russian-speaking users, it employs a localized, city-based marketplace model focused on users and vendors in that area, as the platform's activity is oriented toward local fulfillment.

Chimera likely represents an expansion of the mature Russian-language DNM model into geographies where local demand exists but local marketplaces have not scaled. **If replicated elsewhere, this could influence how online drug distribution develops in new regions, including through increased adoption of Russian tactics such as dead-drops and associated operational risks.**

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Money laundering

## The maturing laundering economy executed settlement at scale

Money laundering enables illicit funds to be moved, layered, and reintegrated across jurisdictions back into the traditional financial system. When considering cryptocurrency, one method for estimating money laundering is to look at funds leaving illicit wallets and the services to which they flow. **In 2025, over USD 60 billion of value left illicit wallets and landed at different services.** Across recent years, the largest share of volume routes through VASPs and other service infrastructure, illustrating how illicit actors depend on intermediaries.

As illicit networks professionalize, more of the laundering lifecycle is visible after the initial crime. Activity increasingly stays on-chain through service providers, settlement layers, intermediary brokers, and repeat counterparties instead of ending at the first cash-out event. The result is that **the "post-illicit" stage is becoming a larger and more quantifiable component of the illicit finance picture.** Because of this, TRM is identifying more of the downstream facilitation layer on-chain, making it possible to map the infrastructure that supports laundering at scale.

## Escrow and guarantee marketplaces: The settlement backbone of cross-border laundering

Escrow services and Chinese-language "guarantee" marketplaces have become a central settlement layer in cross-border laundering, particularly among Chinese money laundering organizations operating across the Asia-Pacific (APAC) region. These ecosystems reduce counterparty risk by enforcing trust through escrow, reputation systems, and dispute resolution — enabling rapid stablecoin-based value transfer in corridors where speed and reliability often matter more than formal access to banking.

Over time, these services have evolved from niche facilitators into large-scale settlement infrastructure, supporting high-frequency exchange between stablecoins and fiat, even when cash collection and structuring occur primarily off-chain. **This shift is visible in the scale of flows routed into Chinese money laundering escrow services, with total inflows rising from a small baseline in 2020 to over USD 103 billion in 2025, expanding more than fourfold since 2022.**

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.




From 2024 to 2025, Chinese-language guarantee marketplaces on Telegram matured into one of the most important settlement layers in the APAC cybercrime economy. The market was highly concentrated across major hubs, led by **Huione Pay (~USD 73.0 billion)**, followed by **Haowang (~USD 7.3 billion)**, **Xinbi (~USD 5.9 billion)**, and **Tudou (~USD 3.0 billion)**. Rather than eliminating activity, enforcement actions and platform disruption largely reshaped where settlement occurred, reinforcing the resilience of the underlying escrow model.

Key developments in the market's evolution included:

- **May 2025:** FinCEN designated Huione Group a "foreign financial institution of primary money laundering concern" under Section 311
- **Shortly after:** Telegram removed channels associated with Haowang Guarantee and Xinbi, disrupting two major visible hubs
- **Re-routing followed:** Vendors and flows displaced toward Tudou, which benefited from Huione's earlier 30% stake acquisition, with inflows rising to ~USD 70 million per week (May–November 2025)
- **Late 2025:** After finalization of the Section 311 rule (effective November 17, 2025), Huione Pay inflows fell sharply to ~USD 100 million per month by December 2025, consistent with intensifying de-risking
- **Xinbi showed resilience:** After removal, it reportedly reappeared under the same Telegram ID and saw a ~90% increase in daily inflows, later promoting migration toward a mirrored escrow service on a proprietary chat platform

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

These ecosystems remain a key enforcement focus because they concentrate settlement at scale and create monitorable chokepoints. The most durable signals tend to be behavioral rather than brand-based, including broker hubs, repeated counterparty patterns, short holding periods, and consistent off-ramp dependencies.

## From “hub” to ecosystem

In 2024, guarantee marketplaces matured into standardized infrastructure, with escrow as the trust mechanism and USDT as the settlement layer. In 2025, enforcement and platform actions stress-tested that infrastructure and the market adapted through migration and rebranding. The result is an ecosystem with multiple viable settlement venues operating in parallel, including growing successor services capable of absorbing displaced activity.

The practical takeaway is that **enforcement changes the shape of the market.** It can degrade trust, increase transaction friction, reduce access to rails, and force fragmentation. But as long as demand persists, the escrow function will reappear – increasingly across multiple platforms by design, rather than by accident.

## Major crypto-enabled money laundering takedowns in 2025

In 2025, law enforcement agencies across the Americas and Europe demonstrated an improved ability to disrupt crypto-enabled money laundering infrastructure. Across 2025’s prominent cases in Brazil, Canada, Spain, Germany, the broader EU, and the US, a consistent pattern emerged: **Though criminal actors continue to rely on crypto, they frequently leave sufficient on-chain, operational, and custodial footprints to allow authorities to map networks, attribute infrastructure, and execute large-scale seizures when blockchain intelligence is combined with traditional investigative techniques.**

Several of the largest and most effective actions in 2025 targeted infrastructure, not individual transactions.

### Brazil: Dismantling industrial-scale laundering networks

**Operation Lusocoin**, led by the **Brazilian Federal Police**, targeted a laundering and foreign exchange evasion architecture of exceptional scale. Authorities estimate that the network moved tens of billions of Brazilian reais through a web of shell companies, OTC crypto brokers, and non-custodial wallets. Proceeds were linked to drug trafficking, smuggling, tax evasion, and other serious crimes – with leadership reportedly operating abroad, and operational nodes distributed across multiple Brazilian cities.

QUICK LINKS
Key takeaways
TRM’s methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

The enforcement action froze assets equivalent to hundreds of millions of US dollars, spanning crypto balances, bank accounts, vehicles, and real estate. Stablecoins, including several million USD worth of USDT across dozens of wallets, were a prominent working capital layer within the network. The case shows that large-scale laundromats diversify holdings across fiat, crypto, and real-world assets, and that disruption requires pursuing all of those asset classes in parallel.

Separately, **Operation Deep Hunt**, led by **Goiás State Civil Police**, illustrates how crypto has become embedded in what were once considered traditional cyber-fraud and carding schemes. Investigators documented roughly tens of millions of USD laundered through crypto rails following the theft of banking data, cloned cards, and forged identities. Authorities seized a substantial portion of the identified proceeds, again across both on-chain and off-chain assets.

Deep Hunt publicly highlighted cooperation with exchanges and the use of blockchain intelligence to reconstruct transaction graphs, identify key individuals, and bridge pseudonymous wallet activity with named suspects.

## Canada: Removing a high-risk offshore exchange

In Canada, the **Royal Canadian Mounted Police (RCMP)** dismantled **TradeOgre**, an offshore exchange that had operated for years without registration or meaningful compliance controls. On-chain analysis showed TradeOgre as a hub for funds linked to darknet markets, ransomware, scams, and other high-risk activity — effectively serving as an aggregation and off-ramping point within the illicit crypto ecosystem.

In September 2025, RCMP seized control of exchange-controlled wallets holding tens of millions of USD in digital assets, marking the largest crypto seizure in Canadian history. This deprived criminal users of a trusted venue, locked customer balances, and forced displacement into less familiar and potentially more observable channels.

One key to success was investigators' combination of wallet clustering and flow analysis with seed phrase reconstruction, allowing them to convert recovered physical evidence into complete historical wallet views. This approach illustrates how blockchain intelligence can turn partial artifacts into comprehensive financial records.

## Europe and the US: Targeting mixers, swaps, and cash-for-crypto services

### Spain and the EU: Cash-to-crypto networks under pressure

A coordinated Spanish and EU-wide operation targeted an underground cash-to-crypto network serving primarily Russian-speaking and Asian organized

QUICK LINKS
Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

crime clients. The service allowed customers to hand over large volumes of physical cash and receive stablecoins (often USDT) delivered to wallets or exchange accounts under various forms of obfuscation.

Enforcement actions led to dozens of arrests and the seizure of more than EUR 30 million in cash, crypto, and bank funds. Authorities froze tens of millions of USD in USDT, demonstrating the growing ability of authorities to act quickly against stablecoin balances.

While public disclosures focused on arrest figures and asset totals, the case aligns closely with broader European use of real-time monitoring and rapid-freeze workflows for TRON-based stablecoins, combined with conventional surveillance and cross-border cooperation.

### Germany and the EU: Dismantling mixers and swap services

The **Cryptomixer** takedown removed one of the longest-running bitcoin mixing services, which had processed billions of EUR in BTC since at least 2016. German and Swiss authorities seized backend servers and confiscated tens of millions of EUR in crypto. More importantly, they secured approximately 12 terabytes of internal data – including logs, wallet mappings, and transaction records – which is expected to support years of follow-on investigations.

Similarly, German authorities dismantled eXch.cx, an anonymous crypto-to-crypto swapping service advertised explicitly as having no KYC or AML controls. Over its lifetime, the service processed billions of USD in crypto, with exposure to darknet markets, payment card crime, major hacks, and child sexual abuse material-related payments. The seizure removed a high-throughput laundering node just as it attempted to shut down voluntarily.

### United States: Covert operations against cash-for-crypto services

In the US, the case against the dark-web cash-for-crypto service operated by **Anurag Pramod Murarka** illustrates a different enforcement approach. US authorities did not immediately shut down the network after the initial arrest, but instead covertly ran the service for an extended period of time. This allowed investigators to map customer networks across darknet markets, hacking communities, and other criminal ecosystems – collecting evidence under controlled conditions.

Blockchain analysis played a central role in demonstrating that the service pooled and mixed funds from multiple criminal sources, rather than merely facilitating one-off swaps. On-chain mapping was fused with communications data, travel records, and cloud forensics to link wallet clusters to real-world identities. The result was a lengthy prison sentence and the seizure of cash and digital evidence that will likely support additional investigations.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

# Terrorism

## ISIS crypto use mirrored broader upward adoption trend, led by Islamic State Khorasan Province (ISKP)

**ISKP remains the ISIS affiliate most synonymous with cryptocurrency use.** Over the last few years, TRM has identified dozens of addresses controlled by the group, totaling hundreds of thousands of dollars. These addresses – which were almost exclusively USDT on TRX – conducted hundreds of transactions ranging between USD 100 to USD 15,000. These transactions have moved through regulated exchanges, high-risk exchanges, and individual cryptocurrency traders – some of whom are witting to ISKP's activities. ISKP has used funds to solicit donations, move funds between affiliates, and fund attacks.

The spring joint Pakistani-Turkish arrest of **Ozgur Altun**, a key figure in the group's finance and media functions, was a notable disruption to ISKP's cryptocurrency use. Following his arrest, TRM data showed a decline in ISKP activity – although it has since rebounded, aided in part by the growing role of ISKP's regional affiliates. ISKP increased its use of swapping services, in a likely attempt to improve operational security to include cross-chain swap obfuscation and low-to-no KYC services.

In another sign of growth, TRM has identified several other ISKP-linked fundraising campaigns and media units in multiple countries over the last 12 months, all of which were connected on the blockchain.

## ISIS affiliates solicited crypto donations, primarily for displaced ISIS members and families in Syria

In Syria, the fundraising campaigns for ISIS members and families held in displacement camps remain a driver of cryptocurrency use by the group's supporters around the world. While the dozens of campaigns identified by TRM focus on the humanitarian aspect, ISIS as an organization benefits from these campaigns, with some linked to terror attacks. The majority of cryptocurrency terrorism convictions around the world in the last 12 months, including in the United States, were linked to these campaigns.

TRM has observed other Syria-based fundraising efforts, including one for ISIS fighters in Syria, although it also facilitates the transfer of funds to ISIS affiliates, including ISKP and ISWAP.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

©TRM Labs 2026. All rights reserved.

## African ISIS affiliates used crypto for fundraising, weapons purchases

In Africa, there is evidence of the growing role of cryptocurrency for ISIS affiliates, particularly in Nigeria and Somalia. In Nigeria, cryptocurrency was used in fundraising campaigns by ISIS-linked groups in Nigeria, including to purchase weapons and drones. More recently, a media unit linked to Islamic State West Africa Province (ISWAP) began publicly soliciting donations in bitcoin.

TRM data indicates that addresses linked to ISIS activity in Nigeria is primarily USDT on TRX, with hundreds of thousands of dollars of volume identified. ISIS's affiliate in Somalia, the key financial hub for ISIS in Africa, has repeatedly turned to cryptocurrency to move funds across borders and fund activities, with a recent TRM-supported conviction in Sweden, providing further evidence.

## Iranian proxies – Hamas, Hezbollah, and the Houthis – maintained access to cryptocurrency, despite increased targeted enforcement actions

### Hamas

US and Israeli authorities intensely pursued Hamas' use of cryptocurrency in 2025.

The US DOJ announced the seizure of approximately USD 200,000 in cryptocurrency tied to a Hamas financing scheme in March. The seized cryptocurrency was associated with a broader network of wallets that had facilitated more than USD 1.5 million in transactions in support of Hamas, according to US authorities.

In July, the DOJ unsealed a civil forfeiture action targeting roughly USD 2 million in cryptocurrency connected to **Buy Cash Money** and **Money Transfer Company (BuyCash)**, a Gaza-based financial facilitator previously sanctioned for providing material support to Hamas and other terrorist groups. The forfeiture seized digital assets held at major cryptocurrency platforms, and highlighted the US government's focus on intermediaries that enable terrorist financing, not just the end beneficiaries. US officials framed the case as part of a broader strategy to dismantle financial infrastructure supporting Hamas, including crypto-enabled money service businesses.

Israel's **National Bureau for Counter Terror Financing (NBCTF)** continued its own crypto-focused enforcement activity in 2025. The NBCTF issued multiple seizure orders targeting dozens of wallets assessed to be linked to Hamas, with a total volume of over USD 350 million.

QUICK LINKS

Key takeaways
TRM's methodology and approach
Sanctions
Strategic global competitors
Crypto hacks and exploits
Scams
Ransomware
Illicit drugs
Money laundering
Terrorism
Conclusion

©TRM Labs 2026. All rights reserved.

## Houthis and Hezbollah

The Houthis (aka Ansarullah) used cryptocurrency as part of broader sanctions evasion and financing efforts in 2025, despite their designation under US terrorism and sanctions programs. In 2025, OFAC sanctioned eight crypto wallet addresses linked to the Houthis. TRM Labs' analysis shows these wallets collectively facilitated over USD 1.8 billion in total volume, including transfers to high-risk and sanctioned counterparties.

Notably, some of these transactions linked to the Houthis were used to support procurement networks – including payments to intermediaries associated with the acquisition of UAVs, anti-UAV equipment, and other military-related goods. Some of these funds moved through brokers and facilitators connected to Russia, Iran, and Hezbollah-linked networks, highlighting crypto's role in cross-border payments outside the traditional financial system.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

©TRM Labs 2026. All rights reserved.

# Conclusion

Illicit crypto activity reached its highest recorded level in 2025, but the broader context tells a more nuanced story. **As adoption deepens, illicit activity now operates within a larger, more mature ecosystem.** Illicit actors absorbed a smaller share of capital entering the crypto economy than in previous years, showing a downward trend in relative risk.

This year was driven primarily by improved attribution and a concentration of large scale events, most notably the emergence of A7A5 and other Russia-linked entities as high volume, sanctions designated actors. These flows reflect more than just evasion; they point to the institutionalization of crypto rails by state-aligned actors seeking durable alternatives to traditional infrastructure – in effect, **using crypto as one tool in the toolkit to build a shadow economy operating in parallel to the legitimate economy.**

TRM's updated methodology, including its liquidity-based metric and lower bound denominator, captures this shift. It offers a realistic lens through which to consider how illicit actors interact with the crypto economy, and a clearer baseline for measuring economic impact. While detection has improved, the scale and ambition of the networks involved underscore the need for continued investment in cross-sector coordination, precision attribution, and crypto native enforcement tools.

Crypto is no longer novel – for threat actors or the institutions and individuals tasked with countering them.

QUICK LINKS

Key takeaways

TRM's methodology and approach

Sanctions

Strategic global competitors

Crypto hacks and exploits

Scams

Ransomware

Illicit drugs

Money laundering

Terrorism

Conclusion

## About TRM Labs

TRM Labs provides blockchain analytics solutions to help law enforcement and national security agencies, financial institutions, and cryptocurrency businesses detect, investigate, and disrupt crypto-related fraud and financial crime. TRM's blockchain intelligence platform includes solutions to trace the source and destination of funds, identify illicit activity, build cases, and construct an operating picture of threats. TRM is trusted by leading agencies and businesses worldwide who rely on TRM to enable a safer, more secure crypto ecosystem. TRM is based in San Francisco, CA, and is hiring across engineering, product, sales, and data science.

To learn more, visit www.trmlabs.com